**Exhibit 1**



# Land Use

Courthouse Annex • 2045 13th Street • Boulder, Colorado 80302 • Tel: 303.441.3930 • Fax: 303.441.4856
**Mailing Address:** P.O. Box 471 • Boulder, Colorado 80306 • **www.bouldercounty.org**

---

**BOULDER COUNTY
PLANNING COMMISSION – ITEM #4**

**May 16, 2012 – 1:30 P.M.
Hearing Room, Third Floor
Boulder County Courthouse**

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
3:55 pm, Mar 15, 2022
JEFFREY P. COLWELL, CLERK

**Staff: Abby Shannon, AICP**

**RE: <u>DC-11-0003: Land Use Code Text Amendments – Agricultural Uses</u>**
This docket will propose text amendments to the Boulder County Land Use Code Articles 4 and 18 related to principal and accessory agricultural uses including but not limited to definitions, allowed zone districts, use-specific criteria, and required land use processes. In addition, this docket may propose new use classifications or propose to modify or delete existing classifications. Other related issues will be addressed as identified through the public process.
*Study Session – No Action Requested*
*Public testimony will be taken – In order to be respectful of everyone's time, comments are limited to 3 minutes at the meeting. We welcome any additional written (mail or e-mail) comments for staff and Planning Commission to consider. They will be made available to the public to review as well.*

**Summary**
Agricultural preservation has long been a cornerstone goal in the Boulder County Comprehensive Plan. Preserving agriculture, providing buffers between the cities, maintaining scenic vistas, and protecting this sector of the local economy are all identified as goals in the Comprehensive Plan. The Board of County Commissioners has directed staff to examine our existing Land Use Code regulations that relate to agriculture to see if there are places we need to modernize, modify, and otherwise amend the Code.

**Discussion**
At the joint Planning Commission and Board of County Commissioners meeting on December 14, 2011, Land Use staff presented six project goals:

- Modernize and modify use classifications including adding or deleting use classifications where necessary.
- Consider agriculturally-based activities that supplement and support farming.
- Consider expanding options for local food production at a residential scale while maintaining neighborhood character.
- Consider local food production, sales, marketing, and production of value-added products while continuing to remain compatible with rural character.
- Encourage energy efficient and modern farming practices such as passive solar greenhouses while continuing to remain compatible with rural character.

---

**Cindy Domenico** *County Commissioner*          **Deb Gardner** *County Commissioner*          **Will Toor** *County Commissioner*

# Exhibit 1

- Consider the appropriate scale of rural and agricultural development including structure numbers and size.

At the direction of the Commissions at the December meeting, staff convened meetings with farmers to discuss specific topics.  The purpose of those meetings was to review the existing regulations and their purpose and to discuss how the regulations could be improved.  We hosted eight meetings with farmers and interested parties in January and February.  Approximately 15-30 people attended each meeting including staff from Land Use and other county departments.

1. Wineries – January 5, 2012
2. Farm Camps – January 17, 2012
3. Farm-to-Table Dinners/Special Events – January 20, 2012
4. Demonstration Farms/Classes – January 27, 2012
5. Farm Stands – January 30, 2012
6. Ag Worker Housing – February 2, 2012
7. Hoophouses and Greenhouses – February 7, 2012
8. Agriculture and Public Health – February 24, 2012

Using the meeting format as a template, we created an issue identification worksheet to begin to flesh out the concerns, possible strategies for improvement, and interrelatedness with other county departments.  The worksheets are included in their entirety in Exhibit A of this report, but here is a general assessment of each of the topic areas.

*Special Events*
The Land Use Code allows special events under the Reception Hall or Community Meeting Facility use classification through the Special Use review process.  In general, farmers have told us that these events should be allowed though a shorter review process because they help supplement the farmer's income and because there is demand from the public for weddings, farm-to-table dinners, fund-raisers, and other events that would occur outdoors during the summer months.  Potential strategies for this type of use is to scale the review process to the intensity of the use, require a tie for most events between the agricultural use of the land and the events.

*Farm Stands*
There are currently three uses defined in the Code that relate to farm stands.  There seems to be overlap (or underlap) in the definitions and confusion in their application.  One idea we have been discussing with the Building Division and the Parks and Open Space department is a standardized and "pre-approved" structure design that farmers could choose to use.  We also want to consider clarification of the definitions into a more workable form and allow these uses to occur in locations where negative impacts don't exist or can be easily mitigate and assure any necessary review process is appropriately scaled to the intensity and size of the use being proposed.

*Agricultural Structures*
Agricultural structures are used by farmers, ranchers, and in single family neighborhoods.   We see a variety of agricultural structures from chicken coops to indoor riding arenas and every size in between.  We have also seen an increased reliance on hoophouses or high tunnels as a way to extend the growing season for produce.  The Land Use Code could do a better job describing how these structures contribute to the character of a neighborhood and how they should (or shouldn't) be regulated.  Perhaps there could be amendments whereby smaller structures with little or no impact might not need a review process or would require a shorter review, and larger more impacting structures would only be allowed through a more rigorous review, only in certain zoning

## Exhibit 1

districts, have their size related to parcel size, and/or a combination of these strategies and other strategies identified in the process.

*Agricultural Worker Housing*
Agricultural worker housing is one of the three circumstances where accessory dwelling units are allowed in the unincorporated county.  There is some concern that the review process, qualification restrictions, and building code are preventing farmers from providing housing for employees.  Potential strategies include allowing some temporary form of housing which may help in some instances.  As we continue through the amendment process, we should review different housing types and appropriate level of requirements based on the use and occupancy.

*Wineries*
Wineries are considered a Light Industrial use and are allowed in the General Industrial, Light Industrial, Commercial, Business, and Transitional zone districts.  But some area wine (and mead and cider) producers want to operate in the Agricultural or Rural Residential (unsubdivided) zone districts.

*Agricultural Processing*
This use classification could be better described as "Agricultural Cleaning and Getting Ready for Market."  We've heard that some farmers want to be able to create value-added products (jellies, salsa, pickles) on the farm with the produce they grow.  This would be considered food processing and is not explicitly allowed on the farm.  There are Public Health requirements for on-farm processing as well, in particular, the need for certified kitchens and public water supplies.  Potential strategies may include allowing some agricultural processing of products grown on the farm.

*Demonstration Farm*
Farmers say there is a big demand from the public to learn the skills our mothers or grandmothers had but that we no longer remember.  This includes canning, saving seeds, and wool-spinning to name a few.   Hosting classes in small numbers once a day could meet the thresholds for Home Occupation… but classes held outside couldn't qualify.  There is also a concern that "farm" isn't defined well-enough to prevent demonstrations and classes from occurring in more residential neighborhoods.

*Farm Camps*
Summer camps are explicitly prohibited from Agricultural uses (by definition of Agriculture in Article 18) and Demonstration Farms, but the farmers say there is a demand for day camps, home school meet-ups, and other organized children's activities as a way for children to connect with the land, their food, and a rural lifestyle.

*Definitions Related to Agriculture*
This is the least fleshed-out of all the worksheets included in your packet and has largely been provided as a way to let you know how we currently define Agriculture, Agricultural Products, and Farm.  This worksheet includes examples of how Farm is defined by other organizations.

**Food and Agriculture Policy Council**
In addition to the outreach conducted by the Land Use Department, the Food and Agriculture Policy Council (FAPC) has been very interested in this project.  This advisory board was created by the Board of County Commissioners in 2009 with the mission, "to promote a locally-based food and agricultural system that advances Boulder County's economic, environmental and social well-being, through research, education, and public policy recommendations."   A subcommittee of FAPC

## Exhibit 1

created a survey and sent it electronically to farmers, ranchers, and owners of agricultural properties (about 400 email addresses in total). Forty-four responses were received by FAPC which, they say, represents about 6% of the total number of farms in Boulder County. Details of the survey including the questions and responses can be found in Exhibit B.

After reviewing and analyzing the survey results, FAPC came to the following conclusions:
- The Land Use Code should allow a wide range of agricultural uses by-right.
- Many respondents are interested in on-farm processing to create value-added products.
- Housing for agricultural workers is a concern for some farmers.
- Agricultural structures should be allowed so long as safety concerns are addressed.
- Working through the Land Use process can be challenging for farmers.

This last point has been discussed thoroughly during the stakeholder meetings and internally with county staff from the Land Use, Public Health, Transportation, and Parks and Open Space Departments. Staff will continue to work with the FAPC as this project continues.

**Boulder County Comprehensive Plan**
The Land Use Code implements the vision outlined in the Boulder County Comprehensive Plan. There are a number of references to agriculture in the Boulder County Comprehensive Plan. Indeed, there is an entire element dedicated to Agriculture. There are a number of goals and objectives that relate to agriculture, and this Land Use Code amendment project in particular, in addition to those found in the Agricultural element.

The following goals are found in the Goals section of the Comprehensive Plan under various headings. We should bear in mind each of these goals as we continue through the public process and consider amendments to the Land Use Code.

*A.1   Future urban development should be located within or adjacent to existing urban areas in order to eliminate sprawl and strip development, to assure the provision of adequate urban services, to preserve agriculture, forestry and open space land uses, and to maximize the utility of funds invested in public facilities and services.*

*A.3   Diverse, compatible, and functional land use patterns should be established and, when necessary, revised to prevent urban and rural decay.*

*B.7   Productive agricultural land is a limited resource of both environmental and economic value and should be conserved and preserved.*

*E.1   Preservation and utilization of water for agricultural purposes within the county shall be encouraged.*

*F.1   A balanced, diversified economy should be encouraged in order to maintain and enhance the quality of life of Boulder County citizens by assuring desirable local employment opportunities and strengthening and stabilizing the tax base.*

*H.1   The county shall encourage public participation in the making of decisions by public and quasi-public bodies which significantly affect citizens.*

## Exhibit 1

*I.1   The county should encourage and promote coordination and cooperation between Federal, State, and Local Government entities charged with making decisions which significantly affect land use in Boulder County.*

*M.1   Agricultural enterprises and activities are an important sector of the Boulder County economy and the county shall foster and promote a diverse and sustainable agricultural economy as an integral part of its activities to conserve and preserve agricultural lands in the county.*

The Plains Planning Area Element does not directly address agricultural lands but rather helps guide appropriate residential development in the plains.  This element does, however, contain a nice tidbit of wisdom in Objective #2.  It states that one of the purposes of the Plains Planning Area is, "To create land use regulations that provide for flexibility, predictability, promotion of environmentally sensitive land use patterns and insurance of the efficient provision of public services."

The Sustainability Element also includes a goal related to agricultural land:

*(6) The preservation and viability of the increasingly precious resources of open and rural lands, whether devoted to agriculture, forestry, open space, or plant and wildlife habitat, as well as the sustainability of uses that provide for the long-term preservation of such lands, should be fostered and promoted through innovative regulatory and acquisition programs, public-private partnerships, and public education, outreach and participation.*

The Agricultural Element has been attached in its entirety as Exhibit C for the benefit of Planning Commission and members of the public.  But there are two paragraphs in particular in the Objections of this element that are important enough to reiterate in the body of this report.  These words highlight the balance that must be struck between competing interests of economic viability, agricultural preservation, and the responsibilities to the residents and environment of Boulder County. (These can be found on pages AG-2 and AG-3.)

*The objective of the subsequent policies is the preservation of the agricultural lands in the county, and their related uses, by whatever means are available to the county and effective in achieving this end. The county recognizes that agricultural lands do not exist in a vacuum. Without the ability to conduct economically viable agricultural activities upon them, agricultural lands become merely vacant lands. The key to preserving agricultural lands in the county is maintaining a healthy agricultural economy in the county.  Therefore, a corollary objective of the subsequent policies is the encouragement, promotion, and fostering of agricultural enterprises and activities in the county.*

*It is important to note that, notwithstanding the county's continued backing of agricultural preservation and activity, there are intensities and kinds of agricultural uses that can have detrimental impacts on land, water and other components of the environment if not held accountable to some level of management and regulation.  A commercial feed lot, for example, is a far different form of legitimate agricultural enterprise than is an alfalfa field in terms of its potential impacts. The* Comprehensive Plan *recognizes these differences and the carefully exercised responsibility the county must assume in balancing an earnest support for agriculture with necessary degrees of regulation to protect the health, safety and welfare of residents and the environment of Boulder County.*

# Exhibit 1

**Referrals and Public Involvement**
Planning staff has worked very closely with our colleagues in the Building Division, Parks and Open Space Department, Public Health Department, and Transportation. They have participated in internal staff meetings as well as stakeholder outreach meetings. This has been a successful approach because it helps the public and county staff understand all the various regulations and triggers for regulations by other agencies. It has also helped staff identify ways we can perhaps streamline the review process or improve the way provide information to the public. The other departments contributed to the Issue Identification Worksheets (Exhibit A) and they will continue to be involved as we draft and implement revisions to the Land Use Code. It is possible that revisions to other regulatory documents such as the Building Code or the Multimodal Transportation Standards will be recommended as a result of this effort.

In addition to our website and articles that have been published in the Longmont Times-Call, we have primarily used three email lists for this project to reach out to members of the public. The first list we began compiling last fall. It includes property owners who have been through an agricultural planning review process recently, farmers, Community Supported Agriculture (CSA) providers in the county, and individuals who have contacted staff with an interest in this project. The second list includes email addresses from people who previously commented on dockets – site plan reviews and limited impact special reviews – proposing agricultural structures or uses. We included the email addresses of all comments (in support and in opposition). The third email distribution list is the Land Use Code listserv. This is just one of many listservs that Boulder County offers so that residents can keep abreast of issues and events in the county. It can be found at: http://www.bouldercounty.org/gov/media/pages/listserv.aspx. These three lists reach just over 900 email addresses.

On May 7, 2012, Land Use hosted a meeting to listen to the neighbors of farms properties in order to better understand the neighborhood impacts of agricultural operations. We invited people on all three of the email lists to attend. About 30 members of the public plus County staff participated in the meeting although only one person self-identified as only a neighbor. Other attendees self-identified as a farmer as well as a neighbor of agriculture. We discussed concerns related to the existing regulations, particularly the Public Health requirements and the recently approved Cottage Foods Act which was signed by Governor Hickenlooper in March 2012. Information regarding the Cottage Foods Act prepared by the Colorado Department of Public Health and Environment is attached as Exhibit D for your information.

Written public comments received since December 2011 is included in the back-up materials as Exhibit E and is presented in chronological order. Generally, the respondents express support for agricultural operations. There are some concerns raised, however, related to the inability to sell produce grown on the parcel in subdivisions zoned rural residential, the rigidity of the current regulations, a concern about indoor riding arenas being classified as agricultural uses rather than recreational uses, and a suggestion to tie the allowance for agricultural worker housing to generated sales above a certain threshold. Many of the respondents encourage flexibility and creativity with respect to agricultural uses as a way to support the economic realities of farming on land in an expensive real estate area. One letter-writer expresses concerns about agricultural structures being utilized for commercial or industrial purposes. She was also troubled by the number of bicycle events that occur on rural roads in the summer. Another letter-writer encourages us to allow beekeeping in residential neighborhoods where agriculture is not allowed.

Finally, there is one letter included in the packet that was actually a recent response to a site plan review docket. It is included because it is an example of the types of concerns voiced by neighbors

## Exhibit 1

of agricultural properties.  In this instance, the neighbor is concerned with the number of animals allowed in the Rural Residential zone – his neighbor's 1.12 acre parcel is allowed to have 112 chickens as a use-by-right.  (see email from Friday, May 4, 2012 at 12:24 pm)

**Conclusion**

This is a study session; staff is not requesting formal action on any of these proposals.  As you discuss the Issue Identification Worksheets in Exhibit A, please consider the following questions:

- Are there any issues staff has omitted that you think should be discussed?
- Are there project goals that should be added, revised, or removed?
- The attached worksheet identifies a number of potential strategies.  Are there other strategies or considerations that should be identified for discussion?  This may relate to why we should (or shouldn't) consider amendments to the Land Use Code or potential strategies for those revisions.
- What aspects of some of the strategies do you find appealing?  Not appealing? And what are some potential issues to be aware of as we further study these issues.
- Are there strategies, considerations, or topics that we should remove from discussion because they don't help reach the identified project goals?
- Should farm animals be allowed in zone districts where they aren't currently allowed (such as chickens/goats/bees in Suburban Residential, the commercial districts, Multifamily, and Manufactured Home Park)?
- Should there be structure limitations on agriculturally used lands in terms of square footage or numbers of structures?  Should these be related to parcel size?  Type of structure? Specific site by site analysis?
- Could a new agricultural zone district be created, in more open or agriculturally intensive areas, where agricultural uses would be favored, and not have to be judged so closely with respect to their impacts on other uses, environmental resources, or views?

Following this study session, staff will begin to draft options in regulatory language so that we can begin to focus on the salient issues in a format to which the public and decision makers can react and respond.

**Attachments**

| | |
|---|---|
| Exhibit A | Issue Identification Worksheets |
| Exhibit B | FAPC Survey Results |
| Exhibit C | BCCP – Agricultural Element |
| Exhibit D | Cottage Foods Act information sheets |
| Exhibit E | Public Comment Received |

# Exhibit 1

Exhibit A

**ISSUE IDENTIFICATION TEMPLATE**
*The worksheets included in Exhibit A will follow this general template.*

**Land Use Code – current regulations**
*The current regulations for this topic will be described here.  (There may not currently be regulations for the topic…) References to the Land Use Code are included throughout the worksheets.  The Code can be found online:* http://www.bouldercounty.org/property/build/pages/lucode.aspx *Most of the Code citations in this document can be found in Article 4, definitions can be found in Article 18.*

**Purpose of the current regulations**
*The Land Use Code regulations are a means to implement the Boulder County Comprehensive Plan (BCCP).  The Boulder Valley Comprehensive Plan (BVCP), Intergovernmental Agreements (IGAs), and perhaps the Building Code may also help explain or indicate the purpose of the regulations.*

**Why consider changes to the Code?**
*Ideas in this section come from county staff and discussions with the public.*
*These are the stated goals for the project:*
- *Modernize and modify use classifications including adding or deleting use classifications where necessary.*
- *Consider agriculturally-based activities that supplement and support farming.*
- *Consider expanding options for local food production at a residential scale while maintaining neighborhood character.*
- *Consider local food production, sales, marketing, and production of value-added products while continuing to remain compatible with rural character.*
- *Encourage energy efficient and modern farming practices such as passive solar greenhouses while continuing to remain compatible with rural character.*
- *Consider the appropriate scale of rural and agricultural development including structure numbers and size.*

**Land Use Code – potential strategies for revision**
*More strategies will undoubtedly come forward during the public process.  This is simply a starting point for discussion. Ideas in this section come from county staff as well as discussions with the public.  It should include strategies that consider cumulative impacts of different types of uses.*

**Transportation**
*Include current existing regulations and strategies that address the issue.  Highlight potential areas for improvement within this department's purview.*

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

## Exhibit 1

Exhibit A

**Building Code**
*Include current existing regulations and strategies that address the issue.  Highlight potential areas for improvement within this department's purview.*

**Public Health**
*Include current existing regulations and strategies that address the issue.  Highlight potential areas for improvement within this department's purview.*

**Parks and Open Space**
*Include current existing regulations and strategies that address the issue.  Highlight potential areas for improvement within this department's purview.*

**State**
*What existing regulations, gaps in the review process, etc., should we be thinking about or aware of as we consider changes to the Land Use Code?*

**Other Concerns within this Issue**
*Issues or ideas worth mentioning that don't seem to fit in other categories will be located in this section.*

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

**Special Events**

**Land Use Code – current regulations**
Weddings are allowed on Ag-zoned property as a Reception Hall or Community Meeting Facility (Article 4-504.G.) use through Special Use approval.  We do not have regulations to specifically address "farm-to-table" dinners.

**Purpose of the current regulations**
The Land Use Department has historically viewed places where people gather as an urban-type use.  The purpose of the current regulations is to maintain the rural character by directing urban uses to urban areas.  We require a high level of review in the unincorporated areas for these uses because the unincorporated areas (generally speaking) do not have the infrastructure necessary to serve large gatherings.  Roads are narrow and perhaps unpaved, water is provided through domestic wells, sanitation is provided by onsite wastewater (septic) systems, and many emergency services are provided by volunteer fire departments.  In addition, the County has agreed, through our Intergovernmental Agreements, it will not compete with neighboring municipalities for commercial businesses or additional households.

There are some uses, however, that can only occur in a rural setting.  There should be a way to allow these types of uses on a limited basis or through careful consideration to ensure the other goals of the Plan are not compromised.

**Why consider changes to the Code?**
Through the outreach meetings and in talking with individuals, a few reasons have been given for amending the Code to allow special events:
- These events supplement and help diversify the farmer's income
- There is tremendous demand for these types of events from the public
- There is not use classification for farm-to-table dinners (although they have been occurring with no zoning complaints)
- These types of events can be an introduction to the local food network and helps to support it
- Bed and Breakfasts (B&B's) are allowed in the Ag zone but farm-to-table dinners, special events (weddings), and other types of events that are sometimes associated with B&Bs are not explicitly permitted
- The Home Events use (4-516.K.) allows group gatherings for commercial purposes with specific limitations. A farm-to-table dinner could also be considered another type of "commercial entertainment… where a fee or financial donation is requested from attendees to pay for the event."
- Based on what we've seen so far, these events are fairly low-impact from an infrastructure perspective.  Most events take place in tents or in open fields as opposed to permanent structures.  Or, if they do take place in structures it is within existing structures.  Farmers have a particular interest in protecting their most valuable asset (the land), and are judicious in where they allow events, parked cars, port-a-potties, etc.
- Requiring a Special Use review process causes a greater investment on the part of the applicant (studies, engineering, site improvements, etc.) which then leads to requests for increased usage in order to recoup those costs.  Allowing a certain number of events to occur in temporary, existing, or without structures would (perhaps) support County goals of minimizing impacts in the rural areas.

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

- Are Community Supported Agriculture (CSA)-member events considered Special Events or are they large private parties?

**Land Use Code – potential strategies for revision**
- Amend Home Events to explicitly include this use?
- Create a Farm Events use similar to Home Events?
    - Intent would be to support the farm and allow the farm to diversify while not become an event venue
        - Require demonstration of the farm use?
    - Majority of food served must come from that farm (75%? 90%?)?
        - Is this measured by cost, volume, or menu (soup, salad, main dish made with ingredients from the farm, dessert is not)?   OR we could require the majority of the food to come from Boulder County sources?
    - Based on the outreach meetings with stakeholders, those participants seemed to support 5-10 smaller events per year (25-75 people), 2-3 large events per year (250 people max).  Supported a Temporary Use permit for large events.  Note: The definition of Group Gathering (4-517.C.) does not meet the characteristics of the large events described by the stakeholders.
        - Consider the events on a per farm basis (Farm needs to be defined) so that multiple parcels or ownerships do not hosts events per parcel
        - Amend Group Gathering to include events that happen for shorter durations; develop submittal requirements and review standards
    - Establish a minimum parcel size to minimize impacts on neighbors?  Establish a minimum setback from private property lines to minimize impacts on neighbors?

**Transportation**
The following existing tools may be helpful in reviewing special event uses:
- TSIA guidelines (Article 4 of the Transportation Standards) evaluate traffic impacts and provides ideas for mitigating any adverse impacts;
- Parcel access design standards (Section 5.5 of the Transportation Standards) and Access permit and Access permit standards ensure appropriate and safe access;
- Parking requirements (Article 4 of the Land Use Code) and Parking lot design standards ( Section 5.6 of the Transportation Standards) ensure appropriate parking is provided for the use;
- Sign Code ( Article 13 of the Land Use Code)provides guidance for signing in and outside of the right-of-way; and
- Special event regulations have been used in the past to mitigate and manage unique events that have short-term (usually a duration of one day or less) but high impact to the right-of-way, regardless of whether the event actually occurs on the right-of-way or not.

There are some limits as to how helpful the tools listed above may be due primarily to the seasonal and off-peak nature of special events.  At this time, the available tools do not reflect a strong methodology for reviewing seasonal, off-peak, weekend traffic volume or seasonal and/or infrequent parking needs.  Consequently, the transportation issues identified for special events include those concerns as well as ensuring appropriate access to sites and placement of signs in the ROW.

**Building Code**

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

- It is most likely that events will be held outside.  If the event moves inside in inclement weather, will the existing building need to be retrofitted?  Or should we state the events cannot take place inside a structure unless that structure meets the occupancy requirements?
    - Trigger for that change in occupancy/non-residential occupancy is 50 people
- The building code does not regulate large tents – this is done by the local fire districts through the fire code.
    - Perhaps we would want to add a tent provision to the Building Code in order to standardize the requirement and remove the regulatory burden from the (largely) volunteer fire departments?

**Public Health**
- Food providers must be licensed caterers.  Food must be prepared in a certified (commercial) kitchen either off site, onsite, or with a certified mobile catering unit.
- Potable water and chemical toilets would be brought in for special events – is this OK?  Does it matter if the events are in existing structures or in tents or in open air?

**Parks and Open Space**
- On Conservation Easements (CE), the CE language is unique to each of the county's nearly 800 CEs.  Generally, special events that follow Land Use regulations for private properties are permissible but may be further limited by the specific CE language, e.g., if the language limits the property's use to Agricultural uses only.
- On county-owned property that is leased for farming, any events would need specific county approval and would need to meet the guidelines for county-owned properties related to alcohol (3.2% or less…)

**State**


**Other Concerns within this Issue**
- Scale? Could these events proliferate? Want to ensure that it is an accessory use of the farm and not a Reception Hall/Community Meeting Facility with a garden
- Will there be an increase structure number and size to store chairs/tables/etc or to serve as a shelter from inclement weather.  If so, would we consider these residential or non-residential floor area?

*Ex) from to regulate agritourism in Mariposa County, California:*
*http://ca-mariposacounty.civicplus.com/DocumentView.aspx?DID=3930*
- *They limit area used for special events/agritourism (infrastructure) to 10% of total acreage, w/ a 5 acre maximum*
- *Limit full time employees to 1 per acre of development potential for agritourism (above)*
- *Daily use or activity limited to no more than an average of 10 persons per day w/ a max of 75 in any given week (excludes employees)*
- *No more than 12 days of organized "special events" per calendar year, no event shall exceed 3 days in length*
- *The above uses are permitted by right in the agriculture exclusive zone, are other uses at a larger scale that require an "administrative use permit", see above link for details*
- *Owner or designated family member must be present during special event*

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

## Farm Stands

### Land Use Code – current regulations
The farm stand use can be found under three different use classifications:
- <u>Farm Stand</u> (4-502.C.) – allows sales for more than 42 days/year; products do not need to be grown onsite; No more than 10% of sales can be nonagricultural or nonhorticultural
- <u>Accessory Agricultural Sales</u> (4-516.A.) – allows retail and wholesale sales of products grown onsite; No more than 10% of sales can be nonagricultural, nonhorticultural, AND not grown onsite.  For purposes of this use, grown "onsite" means grown on parcels under the same ownership, control, or lease as the sales location. (CSAs are considered Accessory Agricultural Sales)
- <u>Temporary Farm Stand</u> (4-517.G.) – allows sales for 42 days OR LESS; No more than 10% of sales can be nonagricultural, nonhorticultural, AND not grown onsite.  Allows "agriculturally based recreation activities."

### Purpose of the current regulations
The purpose of these regulations is to support the agricultural economy by providing markets for the farms' products while, at the same time, protecting the rural character of the unincorporated county.

### Why consider changes to the Code?
These three uses consistently cause confusion to the public.  In addition, the regulations encourage every farm to have their own farm stand when, perhaps, it would be better to allow neighboring farmers to share in the responsibilities of a farm stand.

### Land Use Code – potential strategies for revision
- Allow farmers to join forces in establishing and manning their farm stands, if they desire to do so through a smaller/shorter process than Limited Impact Special Review
  - Some farmers do not have convenient locations to capture passersby
  - Some farms may not have the desire to man a farm stand either due to limited products, limited time, or other limitations
- We could require 90% of the products to come from a specific limited geography (Within 5 miles? Boulder County?  State of Colorado?)
  - This would still support Boulder County farmers while limiting outside sources so as to support the local ag economy
- Boulder County could establish one or more pre-approved structures that could be allowed on private or public land.  It would minimize processing time, standardize a "look" for Boulder County farm stands, and create an easy path for farmers who don't have the time or energy to work with a builder to design a farm stand from scratch.  Needs to have options for electricity and refrigeration for produce.
- We could group Christmas tree sales and pumpkin sales with fireworks sales as part of a temporary seasonal sales use classification since they have similar characteristics (assuming the pumpkins and Christmas trees are not grown on site).

### Transportation
- There are some limits as to how helpful the existing tools may be due primarily to the seasonal and off-peak nature of farm stands.  At this time, our tools do not reflect a strong methodology for reviewing seasonal, off-peak, weekend traffic volume or seasonal and/or infrequent parking

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

## Exhibit 1

Exhibit A

needs.  Consequently, the transportation issues identified for farm stands include those concerns as well as ensuring appropriate access to sites and placement of signs in the ROW.
- Farm stands cannot be within the right-of-way – they need to meet setbacks.

**Building Code**
- The Building Code views an enclosed structure where shoppers are inside as a commercial building.  The building would need to be constructed to all commercial standards.  A walk-up farm stand where customers approach the structure would not need to meet commercial occupancy standards but the structure would still need to meet wind and snow loads and would require a building permit.
- Perhaps we should distinguish the structures as either a Farm Store or a Field Stand?

**Public Health**
- Farm stands do not require restrooms provided they only sell fresh produce (no prepared foods) and do not provide a seating area.  However, if a restroom is provided for the public, the water flowing from the tap must be from a public water supply because there is a chance that someone could assume the water from the tap is potable and to the same standards of any other retail facility.  Or, a toilet without a sink could be offered for public use with hand sanitizer provided.
- Value-added food products, even those products sourced entirely from the subject property must be prepared in a certified commercial kitchen.   A retail food license is required to sell anything other than whole (uncut, unprocessed) agricultural products.

**Parks and Open Space**
- Parks and Open Space may be interested in standardizing a simple farm stand design which could be easily approved for building on CE or fee-owned land that is leased for farming.

**State**
- Monitor HB-12-1027 – to allow "non-potentially hazardous foods" to be produced at a "home kitchen", (excludes canned food).
  - As of 5/1/12 passed the House and assigned to committee in Senate; postponed indefinitely
- SB-12-048 "Colorado Cottage Foods Act" (would allow "nonpotentially hazardous" foods such as jams/jellies, baked goods, etc.) signed by the Governor on 3/15/12
  - Exempts small producers from requirements placed on retail food establishments
  - Sales limited to (net) $5,000/year
  - Exempts sellers of 250 dozen eggs/mo. or less from licensing requirements
  - Requires labeling
  - For more information: http://www.cdphe.state.co.us/cp/index.html

**Other Concerns within this Issue**
- Does the 90%/10% split make sense?  The feedback staff heard at the stakeholder meetings was "no" – farmers who participated in the stakeholder meeting thought the range should be 60-90% instead so they could sell other farmers' eggs or produce, West Slope fruits, etc.

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

**Agricultural Structures**

**Land Use Code – current regulations**

We see a variety of agricultural structures used for a variety of purposes including but not limited to: hoophouses, greenhouses, barns for animals, barns for hay storage, barns for equipment storage and/or workshop space, chicken coops, indoor riding arenas, farm stands, loafing sheds, and more.  Some of these structures require building permits and some do not.  Site Plan Review may be triggered in certain circumstances even though a building permit is not required (see Art. 4-802 for a complete list).  All utilities (or *service systems*) require building permits including heating, fans, lighting, or plumbing regardless of whether the structure requires a building permit.  If structures requiring building permits are proposed for vacant property, site plan review will be required.  And all structures, regardless of whether a building permit is required, must meet setbacks for their zone district.

| | Building Permit? | Planning Review? |
|---|---|---|
| Hoophouse | No unless there are service systems | Depends on location[1] |
| Greenhouse | Yes | Depends on size[2] |
| Barn | Yes | Depends on size[2] |
| Chicken coop | No if less than 120 sq ft | Depends on location[1] |
| Indoor Riding Arena | Yes | Depends on size[2] |
| Farm Stand | Yes | Depends on size[2], Depends on sales[3] |
| Loafing Shed | No if less than 200 sq ft | Depends on location[1] |
| Shed | No[4] if less than 120 sq ft | Depends on location[1] |

[1] Structures proposed to be built in the floodplain or on conservation easements trigger SPR.

[2] Accessory structures less than 1,000 sq ft do not require SPR provided not more than 1,000 sq ft of structure has been added to the parcel since 9/8/98. Some structures may qualify for the expedited SPR process (SPRW).

[3] Farm stands located on the same site where at least 90% of the products are grown does not require a planning review for the use (although it might require review for the structure).  If less than 90% of the sales are from products grown onsite, Limited Impact Special Review is required.

[4] Depending on the number of sheds and the size of a parcel, a building permit may be required. See 17-300.A.

Hoophouses in particular are not specifically mentioned in the Land Use Code or Building Code.  The Building Code, however, specifically exempts, "Shade cloth structure constructed for nursery or agricultural purposes, and not including service systems" from requiring building permit and staff has interpreted this to include hoophouses.

**Purpose of the current regulations**

The Boulder County Comprehensive Plan supports agriculture and protecting agricultural land.  In addition, Section 9 of the Boulder Valley Comprehensive Plan encourages and supports local food production in the City of Boulder and the unincorporated Boulder Valley.  In the Boulder County Land Use Code, there are, generally, fewer specific limitations for agricultural structures as compared to residential structures.  Agricultural structures are not subject to the site plan review neighborhood size compatibility standard although neighborhood character and siting are reviewed and considered as part of the review process. Transferrable Development Credits (TDCs) are not required for agricultural square footage like they are for residential square footage.

**Exhibit 1**

Exhibit A

**Why consider changes to the Code?**

_Hoophouses_.  Hoophouses are an inexpensive way to extend the growing season in a cold climate.  Being clearer on the review process and the building code requirements will help the public and reduce confusion at the staff level.  Creating a definition and regulations for hoophouses (and perhaps all agricultural structures) will create a better understanding of what these structures are and what they are not, will safeguard against the potential for them to proliferate to unacceptable levels, and will increase predictability for landowners.  We also should clarify whether hoophouses and/or greenhouses are Residential Floor Area if they are accessory to a residence (where the principal use of the property is not a farm).  There may be concerns from decision-makers, staff, or members of the public regarding increased coverage of agricultural lands with either temporary or permanent structures.

_Other Agricultural Structures_.  Currently, there are challenges with reviewing agricultural structures for compatibility with neighborhood character.  In addition, Land Use staff (and the Board of County Commissioners on appeal) has approved a few controversial agricultural structures in the last few years which left some neighbors dissatisfied with the review criteria.  The SPR regulations are very clear in defining what is considered residential floor area and how it should be compared with the rest of the neighborhood for compatibility, but agricultural structures are not defined and do not have their own considerations.  In addition, since defining residential floor area and adding the compatibility standards in 2008, staff is seeing applications for barns and agricultural structures that don't seem to be associated with an agricultural use or the scale of the proposed structures does not seem to fit the associated use. We do not have means to evaluate the agricultural use or to relate the scale of the proposed structure to the scale of the agricultural operation in the Land Use Code.

**Land Use Code – potential strategies for revision**

- Develop pre-approved model and/or size of hoophouse that could be incorporated into a handout?  Property owners would then build to specifications that the Building Division has determined will be safe considering the use of the structure
- Relate the size of ag structures to the scale of the ag use?  Take "usable agricultural area" into consideration in order to determine the appropriate or compatible size?
  - How do applicants demonstrate the agricultural use?  What if they are in the process of establishing the agricultural use?
- Relate size/quantity/lot coverage of agricultural structures to parcel size (usable agricultural area?) such as the regulations for Community and Lodging Uses (see 4-602.C.)?
- Should we consider commercial applications of hoophouses and greenhouses differently than residential applications?
  - If either type of structure is used for non-commercial purposes, does it count as residential floor area?  Should we exempt a certain square footage of either type of structure from RFA?  Should there be a demonstrated agricultural use to be exempt from RFA?  How would that be demonstrated?
- Consider additional definitions or clarification to existing definitions of agricultural structures?
  - Include provisions for residential and non-residential applications?
  - Limitation to the % of the parcel under coverage?
  - Add definition of barn?  What makes a barn ag?  What differentiates it from a garage?
- Consider how any changes would relate to the 25,000 sq ft of agricultural structure trigger (triggers Limited Impact Special Review)

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

## Exhibit 1

Exhibit A

**Transportation**

Site Plan Review is triggered if a structure is proposed to be built in a floodplain, even if the structure does not require a building permit.  Agricultural structures can meet the standards for a floodplain development permit.  Property owners need to work with the Floodplain Manager in the Transportation Department.

**Building Code**
- Establish a clear distinction between hoophouses, shade structures, and greenhouses?
- There isn't an agricultural occupancy type.  Should we do a better job educating property owners about the triggers for commercial occupancy vs. residential occupancy?
- Should we exempt a certain square footage of hoophouse from BP requirements but require BPs once a certain threshold is met?
    - Building Division concerned that more hoophouses would lead to more employees inside those structures and they could become more commercial in nature.
- Is it possible (or reasonable?) to establish alternative specifications for hoophouses?  This may include wind/snow load, foundation requirements, etc.

**Public Health**

All standard Public Health requirements apply if water and/or sanitation are proposed for the agricultural structure.

**Parks and Open Space**

The Parks and Open Space Department generally depends on Land Use to determine whether a human-made edifice is a "structure" and whether it requires a building permit or a planning process for County-owned fee open space properties.  For County-held CE properties, the CE language may define what is a "structure", but where is doesn't, the Land Use definition is applied.

**State**


**Other Concerns within this Issue**


Definitions provided by a farmer during the Greenhouse/Hoophouse meeting (2/7/12)

Greenhouse – a permanent structure with installed heating, ventilation, and possibly cooling systems.  It may have a permanent foundation and rigid covering, or it may consist of steel hoops covered with an inflated double layer of poly film.  Plants may be grown in ground beds or in containers on a concrete, gravel, or landscape-cloth floor or on tables.

Hoophouse – also known as a high tunnel, is a less permanent structure erected in the field to protect crops and extend the growing season.  In general, hoophouses rely on doors, vents, and roll-up sidewalls for ventilation.  Heating systems may be used to keep the temperature inside the enclosure above freezing but not to warm the building to the same degree as a greenhouse. Hoophouses could be covered by a single or two-ply layer of clear/translucent plastic sheeting. If two-ply, small fans will likely be used to inflate a pocket of air between the layers which will act as an insulator.

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

**Agricultural Worker Housing**

**Land Use Code – current regulations**

The ag accessory dwelling unit (ADU) must be occupied by an agricultural worker or family whose help is required to support or conduct an agricultural principal use on the subject property.  It is only allowed on A or RR unsubdivided properties and on legal building lots.  Limited Impact Special Review (LISR) is required.

Additional Provisions for agricultural accessory dwelling units (see 4-516.D.6.)

a. The applicant shall adequately demonstrate that the property size and nature of the agricultural work on the property requires a second household for labor on site.

b. The applicant shall adequately demonstrate that the worker is substantially employed in farming the property.

c. The applicant shall adequately demonstrate that the unit is necessary for operating the farm.

d. The accessory dwelling may be detached from the principal dwelling, provided it is either closely clustered with the principal structure or located where appropriate for the agricultural operation with which it is associated.

e. The accessory dwelling is limited to 1,800 square feet. The Board may approve covered porches to proposed accessory dwellings which exceed these specified square footage limitations, provided that no other portion of the floor area of the proposed dwelling exceeds the specified limitation, and provided that the Board approves the additional covered porch area in accordance with the special use criteria. In no event shall any such approved covered porch area ever be enclosed.

f. The property owner or a member of the owner's immediate family must work and live on the property.

g. The owner must submit an annual report to the Land Use Department indicating that the purpose for which the accessory unit was approved has not changed, and that the unit continues to be occupied in accordance with the approval. Any impermissible change in use of the unit can result in termination of the right to occupy or use the unit.

h. A notice of these provisions will be recorded in the real property records of the Clerk and Recorder's Office.

i. Agricultural accessory dwellings approved by Boulder County or legally nonconforming prior to October 19, 1994 shall be permitted to be repaired, remodeled or replaced, provided the new structure is in the same general location and does not exceed 1,800 square feet.

4-507-B-1c. Lodging Uses - Overnight camping limited to 14 days

Definition of Dwelling (18-137)

A. A building or portion thereof used exclusively for residential occupancy, including one-family dwellings and multiple-family dwellings, but not including hotels, motels, tents, seasonal vacation cabins, camper trailers, or other structures designed or used primarily for temporary occupancy.

B. A dwelling shall also include the following types of residential buildings which are factory made and not constructed on site:

1. Manufactured homes which are not less than 24 feet in width and 35 feet in length, which are installed on an engineered permanent foundation in accordance with all applicable County requirements, and which have a brick, wood, or cosmetically equivalent exterior siding and a pitched roof, pursuant to C.R.S. 30-28-115(3)(a), as amended; and

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

2. Factory built modular housing which is certified by the State of Colorado to meet Uniform Building Code requirements pursuant to the Colorado Housing Act of 1970, C.R.S. 24-32-701, et seq., as amended.

**Purpose of the current regulations**

All accessory dwelling units require greater scrutiny than the principal dwelling. The number of dwelling units is limited due to our commitment to direct growth to the municipalities (where urban services exist) and to limit growth in the unincorporated county as described in our intergovernmental agreements with the municipalities. The additional provisions for Ag Worker Units are in place so that farm owners know which when an additional dwelling unit is permissible. Some of the provisions are also in place to safeguard against potential misuse.

**Why consider changes to the Code?**

- Growing fruits and vegetables is more labor intensive than the traditional crops we've seen in Boulder County such as wheat, sugar beets, and hay. This shift has increased the demand for ag worker housing.
- There is interest in learning how to establish and work a market farm and there is interest from current farmers to allow interns to work and live on the farm. Farmers say this provides the worker with a richer experience while providing an amenity in addition to the wages provided.
- The Land Use Code requires ag worker housing to meet the definition of "dwelling." In addition, the inhabitants would need to meet the definition of "family." Permanent, expensive new dwellings would increase the likelihood that the additional unit of density would continue to be utilized whether or not the agricultural use still exists. It would also be difficult and resource consumptive to remove. It might be preferably to allow simpler, less permanent structures such as mobile homes (allowed if it meets the definition of dwelling), bunkhouses, or yurts which are less expensive and less permanent.
- The annual reporting requirement is problematic – property owners who have received approval for accessory dwellings rarely submit these reports and Land Use rarely requests them. Also, it is not clear how the property owner is expected to demonstrate the continued need for the accessory dwelling.
- Additional provision "c" (The applicant shall adequately demonstrate that the unit is necessary for operating the farm) and "f" (The property owner or a member of the owner's immediate family must *work and live* on the property) are somewhat problematic. Some property owners may work in a traditional job in a city but they want their land to be farmed. In this instance, would the accessory ag dwelling for the farm manager not be allowed because the owner of the land doesn't work on the property? What if the owner worked on the property but that work was a non-farming home occupation? What if the owner lives on the property but is no longer willing or able to work on the farm but wants the farming to continue? It is not clear whether the regulations would allow or oppose an accessory ag dwelling in these situations.

**Land Use Code – potential strategies for revision**

- Could Accessory Ag Dwellings retain the additional provisions but go through a Site Plan Review process instead of Limited Impact? The SPR regulations are more appropriate for the siting of a new dwelling or accessory structure than the special use criteria.
- Is there any way to allow yurts or other semi-temporary structures through the Building Code?
- Would it be possible to develop a pre-approved design for Ag ADUs?
- Perhaps we should require zoning affidavits for ag ADUs instead of annual reports?

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

**Exhibit 1**

Exhibit A

**Transportation**

Transportation and engineering issues for worker housing would be reviewed using the same tools and review criteria as other residential structures.

**Building Code**

- I haven't found a local government yet that allows yurts, tipis, or camping as an acceptable dwelling for more than 2 weeks to 6 months, depending on the local government.  Farmers seeking to utilize these types of structures are looking at using them for 8-9 months of the year (March-Oct/Nov).
- The Building Code exempts federally- and state-certified manufactured homes from meeting BuildSmart.
- Factory-built modular homes can be built to meet Boulder County's snow and wind load requirements; federally-approved (aka HUD-standard) mobile homes cannot meet our wind and snow loads.

**Public Health**

- Water and sanitation must be approved and sized for the number of dwellings and bedrooms on the parcel.  Composting toilets are ok but need to be approved by Public Health.  Graywater must be disposed of in an OWS – cannot be used to water plants.

**Parks and Open Space**

- Parks and Open Space does not allow tenant farmers or their employees to live on County-owned land with the exception of existing housing which is occasionally leased with the land.
- For CE properties, CE language limits the number of residences on the property, typically to one single-family residence, so tenant housing is not allowed.

**State**

The Wage and Hour Division of the US Department of Labor regulates farm worker housing – if the farmer provides housing, it needs to meet standards provided for in the Migrant and Seasonal Agricultural Protection Act

**Other Concerns within this Issue**

Resources regarding yurts and building codes:
http://www.yurtinfo.org/buildingcodes.php
http://www.networkearth.org/naturalbuilding/codes.html
http://www.postindependent.com/article/20070801/VALLEYNEWS/108010035
http://www.denverpost.com/ci_6683497
http://www.coloradoyurt.com/big-bad-wolf-proof/

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

## Wineries

**Land Use Code – current regulations**
- Wineries are considered Light Industrial (4-506.C.) which includes the use "food or beverage processing"
- Wine, mead, or cider are not considered Agricultural Products because they are processed; the definition of Agricultural Products states "products intended for direct human or animal consumption" (18-105)

**Purpose of the current regulations**
The regulations included in the Land Use Code implement the Boulder County Comprehensive Plan (BCCP). The BCCP calls for keeping rural areas rural, directing urban uses to urban areas, maintaining a visual separation between the municipalities, and supporting the municipalities' economic development programs through the support of existing and new industries. The Land use Code and the BCCP do not distinguish in scale of production facilities – they assume industries/businesses belong in either the municipalities or in the more-intense zone districts (GI, LI, C, B, T).

**Why consider changes to the Code?**
Wineries and meaderies are part of the changing face of agriculture. Allowing the value added product of honey (mead) will support bee keeping as well as other agricultural crops that depend on bees for pollination. In Colorado, there are a few regions where wine varietal grapes grow but they tend to be far away from the population centers although local growers are experimenting with local grapes. Wine production is limited to the fall when grapes are ripe. Production of both types of products would provide another revenue option for diversified farms, would help prevent rural decay, would support local agritourism in the unincorporated county as well as the cities, and would create another option for an agricultural activity as opposed to the conversion of Ag zoned property to large lot residential development. If we consider the scale of these types of facilities, we can honor the intent of the existing regulations while providing for more options for agricultural land in the unincorporated areas.

In addition, we have a provision that states, "On-site means agricultural and horticultural products that are grown on parcels under the same ownership, lease or contract as the parcel on which the Accessory Agricultural Sale use is located" (4-516.A.5.a). The intent of this provision is to allow someone who leases POS land to sell ag products on private land they also own. It is good because it allows us to consider the total farm as one unit regardless of ownership or parcel patterns. It is not good because it doesn't say the "other lands" need to be in Boulder County. It might be vegetables in Brighton or a vineyard in Mesa County, CO, or ag products from out of state (this is a correction we should make).

**Land Use Code – potential strategies for revision based on stakeholder meeting**
- Propose allowing wineries on a small scale in A (perhaps unsubdivided RR) through SU as an Agri-Business use
- Require that grapes must be from Colorado
- Require that some grapes/fruit/bees come from the parcel where the production is occurring? (This would serve as a demonstration of the growing and perhaps development of locally-grown inputs)
- Establish a maximum floor area for storage, tasting room, wine production (2,000 sq ft?); establish minimum parcel size (10 acres?)

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

- Encourage retrofit of existing agricultural structures (perhaps allow through LISR if no new structures are proposed – only interior retrofit)
- Allow Special Events at the same level farms are allowed to host large special events (assuming we decide to allow this), more events or larger numbers could be allowed through the review process
- Allow as a home occupation provided:
  - o Tasting rooms prohibited; OR tasting rooms allowed if it would generate fewer than 16 Average Daily Trips (ADT), AND
  - o No retail sales from the property unless it is in conjunction with a Farm (new use classification TBD) and accessory agricultural sales
- What about growing potatoes and setting up a vodka distillery?
- What about growing agave and setting up a tequila distillery or nectar refinery?
- How would this relate to allowing value-added food production on other ag parcels – needs to all be grown on-site?  In Boulder County?  Would adding Winery open all value-added food production in the unincorporated county so long as the ingredients were grown in Colorado?

**Transportation**
- While tasting rooms would likely have the greatest effect on the traffic volume associated with wineries, the off-peak nature of winery hours of operation present some challenges to effectively evaluating the impact of the traffic generated.  Consequently, the transportation issues identified for wineries include this concern as well as ensuring appropriate access to sites and placement of signs in the ROW.
- Wineries interested in signage – TODS: tourist oriented directional signs.  The Standards allow for MUTCD-approved signs in the ROW.   There are recreational/directional signs in the MUTCD that could note the location of wineries but not advertise for a specific winery.
- County staff supports requiring a process (SU or LISR) for this use which would require a Transportation System Impact Analysis as described in the Transportation Standards.

**Building Code**
- Wineries/tasting rooms would require commercial occupancy which may trigger expensive retrofits to existing structures.

**Public Health**
- Tasting rooms do not typically serve food.  But if they do serve food for special events it would need to be catered by a licensed caterer or prepared in a licensed facility.
- Water utilized in the processing must be from a *public water source* as defined by CDPHE.  Public water systems such as Left Hand or a municipal water provider qualifies as a public water source.  So does water that has been tested, treated, and certified.  If the well is a *domestic* well (as defined by the State Engineer), it will need to be converted to a *commercial* well.  In Boulder County, this conversion requires an augmentation plan.
- What type/size OWS is needed?  Are there cut-offs for numbers of visitors/day the Code should specify that would align with existing size thresholds (2,000 gpd)?  Would it always require a Class V injection well because it is a commercial use?

**Parks and Open Space**
CE language typically allows only uses in the Agricultural category (4-502), and sometimes specifically limits uses to Open Ag uses.  Uses in the Agri-Business category (4-501) are not typically allowable.

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

## Exhibit 1

Exhibit A

**State**

- The Department of Agriculture has definitions for wine/mead/cider and "limited winery."  May have regulations for tasting rooms as well.
- There is a distinction between wine and beer by definition in the Colorado Liquor Code (administered by the Colorado Department of Revenue, Liquor and Tobacco Enforcement Division):
  - "Vinous liquors" means wine and fortified wines that contain not less than one-half of one percent and not more than twenty-one percent alcohol by volume and shall be construed to mean an alcohol beverage obtained by the fermentation of the natural sugar contents of fruits or other agricultural products containing sugar.
  - "Malt liquors" includes beer and shall be construed to mean any beverage obtained by the alcoholic fermentation of any infusion or decoction of barley, malt, hops, or any other similar product, or any combination thereof, in water containing more than three and two-tenths percent of alcohol by weight or four percent alcohol by volume.

**Other Concerns within this Issue**

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

## Exhibit 1

Exhibit A

**Agricultural Processing**

**Land Use Code – current regulations**
Two types of agricultural processing are described in the Land Use Code as a principal use – processing of plants and processing of animals.  Agricultural Products Processing and Storage (4-501.A.) is defined as, "The processing and storage of agricultural products *brought to the site* [emphasis added], including but not limited to cleaning, sorting, grading, packaging milling, or storing of products which are intended for direct human or animal consumption or use."  This doesn't allow the creation of, for example, value-added food products but rather is meant for preparing whole fruit, vegetable, and grain products for market.  One example of the use is the Miller/Coors/Molson granary facility north of Longmont.  Special use is required for these facilities in the Ag zone; it is a use by right in the Light Industrial or General Industrial zones.

Custom Meat or Poultry Processing Facility (4-501.C.) is defined as, "A facility for the processing of meat and poultry for individuals, not intended for resale on the premises, including but not limited to the butchering, cutting, dressing, and packaging of meat and poultry products."  It is allowed in the Ag and GI zones and the process is scaled to the intensity of the use: lower scaled processing is allowed through LISR instead of SU provided it doesn't exceed specified thresholds.

**Purpose of the current regulations**
The Land Use Code implements the goals and policies of the Boulder County Comprehensive Plan.  The comprehensive plan supports agricultural uses and the agricultural economy while also directing intense uses into urban areas.  This explains why these uses are allowed in limited areas (GI or LI zones) and through a planning process (either special use review or limited impact special use review) in the Agricultural zone district. The processing of food or value-added products is considered to be a Light Industrial Use (4-506.C.) and is allowed as a use by right in the GI and LI zones.

**Why consider changes to the Code?**
There have not been many requests for either of these as principal uses and staff does not find that either use needs a major overhaul.  However, there is room for improvement.
- Agricultural Products Processing and Storage is for ag products brought to the site.  It is assumed that processing and storage of ag products that were raised on the farm is an acceptable customary and incidental use in association with the farm.
- This use does not allow the manufacturing of value-added food products.  Perhaps the use classification should be more explicit and should direct the reader to the Light Industrial use (4-506.C.) which allows food processing.  Or perhaps we should amend the Code to allow the production of value-added food if all (or the majority) of the ingredients come from the same farm.

**Land Use Code – potential strategies for revision**
- Allow value-added products to be created on the farm provided all (?) of the ingredients come from the farm?  [Or perhaps this idea should not be included within Agricultural Products Processing and Storage but rather with Farm or Open Ag in the discussion of acceptable accessory uses.]

**Transportation**
Transportation and engineering issues for agricultural processing would be reviewed using the same tools and review criteria as any other commercial use.

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

**Building Code**
Are structures used for processing considered ag or commercial from a building code standpoint?

**Public Health**
- Commercial (or "certified") kitchens are not required to clean raw/uncut produce to deliver them to market.
- Certified kitchens are required to process raw agricultural products into food products. Certified kitchens can't be certified unless they have a public water system (for example, Left Hand or municipal water). Wells that have been tested, treated, and certified can become public water supplies (as defined by the Colorado Department of Public Health and Environment). If the well is a *domestic* well (as defined by the State Engineer), it will need to be converted to a *commercial* well if it is used as a public water supply. In Boulder County, this conversion requires an augmentation plan.
- Meat and poultry processing must also meet public health's standards (right?) as well as the USDA standards if the meat will be offered for retail sales to the general public.

**Parks and Open Space**
- Demonstration farms are allowed on CE-encumbered properties because they are Agricultural uses.

**State**
- The Colorado State Legislature approved a bill this session that allows individuals to make jams and jellies and other non-potentially hazardous food products to be produced using home kitchens rather than commercial kitchens under limited circumstances. For more information: http://www.cdphe.state.co.us/cp/index.html
- CDPHE requires a public water supply for certified kitchens
- State Engineer requires commercial wells for public water supplies

**Other Concerns within this Issue**
- Are structures used for processing considered agricultural or commercial from the Assessor's standpoint? (this would make a difference for property tax purposes… something we may want to advise property owners)

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

**Exhibit 1**

Exhibit A

**Demonstration Farm**

**Land Use Code – current regulations**

4-516-I lists Demonstration Farms as an accessory use to open agriculture through Limited Impact but only in A and unsubdivided RR zones

- A related educational facility, including a kitchen for food prep may be approved as part of this use
- This use does not include commercial, institutional, lodging, or recreational uses such as hay rides, petting zoos, corn mazes, day-care centers, or summer camps.

**Purpose of the current regulations**

Demonstration Farm was added to the code in 2006 (DC-05-002b).  From the staff recommendation to the BOCC:

> "One tool for current producers to test new technologies, train new producers and increase the market for their products is a demonstration farm.  The current Code has no provision for this type of facility as an accessory use to the agricultural use of a property.  In order to meet this need, Staff has proposed to allow demonstration farms as an accessory use to Open Agriculture Uses and approved through limited impact special review."

The docket file for DC-05-002b does not indicate why the use excluded day camps, lodging, and entertainment type uses but staff's recollection was that staff and farmers at the time wanted to exclude petting zoos and bouncy castles because they are not ag.  This additional provision (5.b.) seems to intend to exclude children's programs from demonstration farms.  This use is also limited to the A and RR (unsub.) zones, perhaps because these are the zone districts where we would expect to see a Farm and, as such, able to demonstrate farming, ranching, and agricultural practices?

**Why consider changes to the Code?**

- Clarifications are certainly warranted.  For example:
  - If school kids, CSA members, or someone interested in farming wants to take a tour/field trip, is this a demonstration farm use or is this a typical (customary and incidental) occurrence on a farm? Does it matter if there is a fee associated with the tour?
  - If kids are taking classes that include learning about animals as well as arts and crafts projects, is it considered a day camp or day care or demonstration farm?
  - Are CSA-member volunteer days part of a demonstration farm use, or are they volunteer employees which would be allowed by right?
- Demonstration Farm is currently only allowed as accessory to Open Agriculture, not to other ag operations.  Perhaps it should be allowed accessory to any operation that is a farm or where farming income (other than classes) is derived?
- Should LISR always be required or is there a minimal level of classes that could occur as a use by right?  (for example, if the number of people/trips didn't trigger the Home Occupation Requirements?)

**Land Use Code – potential strategies for revision**

- Include mechanisms that consider the cumulative impacts of the diversified farm model.
- Allow demonstration farm in other zone districts?
- Allow some educational use/tours as a use by right?
  - What will be the acceptable cutoffs? Parcel size a factor? Acceptance of fee a factor?

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

## Exhibit 1

Exhibit A

- o  Could classes be considered a home occupation if they are taught outside?
- Allow demonstration farm as an accessory use to other ag (agribusiness or intensive ag)?
- Process – is Limited Impact Special Review the best process or are there a certain number/size classes that could be allowed as a use by right?  (for instance, if the vehicle trips or number of people were comparable to the Home Occupation level?)
- Do we need to better explain types of classes that are allowed and which would not be allowed? Existing classes found on farms in the county include (but probably are not limited to): permaculture, growing from seed, soil health, backyard chickens, canning and preserving, wool spinning and dying, cooking, herbs and their medicinal uses, growing food at high altitudes, aquaculture, plein air (painting) classes, democracy school, cheese making, building your own backyard wood-fired oven, worm composting, cooking, beekeeping, mead-making, yoga retreats, corporate retreats, butchery, and there are probably more…

**Transportation**

Concerns from the public and farmers may include:

- Increased vehicle trips on rural roads (traffic, dust)
- Vehicle studies may be required from property owners
- Are there certain areas where this use will never be appropriate (think in terms of parcel configuration, site distance, roadway classification, etc.)?
- Is it OK to park in the right-of-way?  Under which circumstances?

The answers to these questions are largely determined by how the County would prefer parking to occur for land uses.  Generally speaking, parking is allowed in County ROW unless it is expressly prohibited (with "no parking" signs) or parking out of the travelled way cannot be achieved.  However, the LUC generally requires that parking spaces be located on site or at another site as managed by a parking agreement.  Transportation Department staff is in the process of developing a ROW agreement process and policy that could possibly include parking for land uses.  Staff thinking around this possibility includes:

- the need to evaluate/change either/both LUC or Standards  to allow safe use of ROW for periodic ag uses when insufficient on-site parking exists, and when only periodically occurs;
- the possibility of site specific agreements documented through either the LU permit, ROW use permit, access or special event permits could work to ensure flexibility and safety; and
- allowing this application when sufficient ROW exists off the paved shoulders.

There are some limits as to how helpful the existing evaluation tools may be due primarily to the seasonal and off-peak nature of demonstration farms.  At this time, our tools do not reflect a strong methodology for reviewing seasonal, off-peak, weekend traffic volume.  Consequently, the transportation issues identified for demonstration farms include this concern as well as ensuring appropriate access to sites and placement of signs in the ROW.

**Building Code**

- Is there a higher standard for buildings if the public is inside of them?
  - o  Is there are threshold?  Fewer than 50 people in the building = no change in occupancy?

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

**Exhibit 1**

Exhibit A

**Public Health**
- A commercial kitchen is required to create value-added agricultural products such as canned or pickled vegetables, salsas, cheese, etc.  Commercial kitchens also require a *public water source* as defined by CDPHE.  Public water systems such as Left Hand or a municipal water provider qualifies.  So does well water that has been tested, treated, and certified.  If the well is a *domestic* well (as defined by the State Engineer), it will need to be converted to a *commercial* well.  This conversion requires an augmentation plan in Boulder County.
- More than 25 people per day for more than 60 days per year triggers the requirement for a public water source.  (See above.)

**Parks and Open Space**
- Demonstration farms are allowed on CE-encumbered properties because they are considered agricultural uses.
    - Does the use "Demo Farm" need to remain as an Ag or Open Ag use to comply with the terms of most CEs?
- Does POS allow demonstration farms on land leased from POS?  How do tours fit?

**State**
- Colorado Cottage Food Act (SB-12-048) signed by the Governor – see Farm Stand worksheet

**Other Concerns within this Issue**
- How will the land/structures be assessed? There a big tax difference if the assessor sees the use as commercial rather than ag – we should make the public aware of this so they can consider all of the costs and benefits before establishing.

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

**Farm Camps**

**Land Use Code – current regulations**
- Currently no definition for *farm camp*, specifically.
- 4-504: Camp is found under Community Uses
  - Definition: A facility for registered participants to engage in organized group activities oriented toward nature and the outdoors. This use includes the provision of meals and lodging for participants but not for the general public. If customarily incidental to the use, camps may also be used for temporary meeting, recreation, education, or social facilities for associations or groups.
  - For camps existing after 11/4/10 allowed by special use review in A, for camps existing (legal nonconforming) before 11/4/10 permitted by right in A
- 4-516-I: Demonstration Farm specifically prohibits summer camp use
- 18-104: Definition of Agriculture specifically prohibits summer camp use

**Purpose of the current regulations**
To keep the rural unincorporated areas of the county rural with the recognition that camps occur in rural areas and may vary in scale.
- Camp use added to Land Use code in 2010
- Demonstration Farm added in 2006 – camps are prohibited from being associated with a demonstration farm use, perhaps because of concern that this use could become an "agritainment" use(?)

**Why consider changes to the Code?**
There is an argument made by farmers that introducing kids to farms develops a connection or appreciation with farming practices and an understanding of where food comes from.  This is an agriculturally-based activity that supplements/supports farming and there seems to be a desire from consumers for farms to provide these types of opportunities. Currently, there is no use category for farm camp and it could be argued that the definition for Camp excludes farm camps and does not explicitly describe day camps (just overnight camp).

**Land Use Code – potential strategies for revision**
- Potentially allow multiple principal uses for summer camp and farms to co-exist?
- Allow camps as an accessory use to farms (need to define) or incorporate into the definition for Demonstration Farm?
- Create definition of "diversified farm" that allows camp as a by-right use?
- Establish a minimum parcel size for this use?
- Require that farmer/applicants demonstrate how farming is the principal use of the property?
  - This could be through a new use classification for Farm which would have its own definition…
- Require that camp be ag-focused.  Since this typically involves children, there would probably need to be a certain level of fun time permitted…
- Prohibit overnight stays?
- Require license with the State or a letter from the State stating the camp is exempt

**Transportation**

# Exhibit 1

Exhibit A

- This use would generate multiple vehicle trips per day which would likely trigger a Transportation Impact Analysis

There are some limits as to how helpful the existing evaluation tools may be due primarily to the seasonal and off-peak nature of farm camps.  At this time, our tools do not reflect a strong methodology for reviewing seasonal, off-peak, weekend traffic volume.  Consequently, the transportation issues identified for farm camps include this concern as well as ensuring appropriate access to sites and placement of signs in the ROW.

**Building Code**
- Would a shed or barn or house used for a summer camp need to meet additional occupancy regulations? If so, is there a limited number of children who could participate without triggering those requirements – perhaps if the program is exempt from licensure from the state?

**Public Health**
- Licensed child care facilities require public water sources.  Public water systems such as Left Hand or a municipal water provider qualifies.  So does well water that has been tested, treated, and certified.  If the well is a *domestic* well (as defined by the State Engineer), it will need to be converted to a *commercial* well.  This conversion requires an augmentation plan in Boulder County.  Do child care facilities that are exempt from the Child Care Facility regulations require a public water source?
- What other concerns does Public Health have with water, food prep, commercial kitchens, OWS, etc?

**Parks and Open Space**
Summer camps are not currently permitted by the Land Use Code under the definition of Agriculture or Demonstration Farm therefore they are not allowed on CE-encumbered properties which allow only Agricultural uses.

**State**
A day camp is considered a Child Care Facility and must be licensed with the Colorado Department of Human Services, Division of Childcare as such (http://www.colorado.gov/oed/industry-license/27IndDetail.html) or they must receive an exemption letter from the state declaring that the program is exempt from the state requirements.

**Other Concerns within this Issue**
- Could be adult camps or family camps that may not be specifically for children.
- Perhaps there is a concern that these might become large, commercial operations?
- How will the Assessor look at these uses?

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

## Exhibit 1

Exhibit A

**Definition in Article 18 Related to Agriculture**

**Land Use Code – current definitions**

<u>18-104 Agriculture</u>
Uses involving the cultivation of land, production of crops, raising, breeding, and keeping of livestock, and the buying and selling of crops, products or livestock associated with the agricultural operation. Agriculture specifically does not include commercial, institutional, lodging, or recreational uses such as petting zoos, day-care centers, or summer camps.

<u>18-105 Agricultural Products</u>
Products intended for direct human or animal consumption such as vegetables, fruits, dairy products, eggs, grains, meat, poultry, fish, honey, hay, bedding plants and wool.

<u>18-149 Farm</u>
A parcel of land use for agricultural purposes.

**Purpose of the current regulations**

**Why consider changes to the Code?**

**Land Use Code – potential strategies for revision**
- Clarify (or add) definition of value-added products and where they can be sold/how much needs to come from farm/imported. Examples: jams/jellies, applesauce, wine, soap, candles, etc?
- Create clearer distinction between Open Ag (4-502.E.) and Intensive Ag (4-502D.)
- Add or revise definitions for agricultural uses including (but not limited to?):
  - Barn
  - Farm
  - Greenhouse
  - High Tunnel or Hoophouse
  - Residential Agriculture

**Transportation**

**Building Code**

**Public Health**

**Parks and Open Space**
Parks and Open Space suggests a clarification to the definition of Agriculture:
<u>18-104 Agriculture</u>

DC-11-0003 Agricultural Uses
Issue Identification Worksheets

# Exhibit 1

Exhibit A

Uses involving the cultivation of land, production of crops, raising, breeding, and keeping of livestock, and the buying and selling of crops, products or livestock associated with the agricultural operation. Agriculture specifically ~~does not~~ **only** include **specific uses defined in Section 4-502 of the Code, and does not include any other uses, such as agri-business,** commercial, institutional, lodging, or recreational uses such as petting zoos, day-care centers, or summer camps.

**State**
Potential concern with having a conflicting definition of some uses as the state?  Are any of these definitions found in the Colorado Revised Statutes?

**Other Concerns within this Issue**
What about ag uses in the Forestry zone district?

Some Definitions of <u>Farm</u>

**USDA:** Any operation that sells at least one thousand dollars of agricultural commodities or that would have sold that amount of produce under normal circumstances.

**Internal Revenue Code Section 2032A(e)(4) relative to estate tax valuation:** The term "farm" includes stock, dairy, poultry, fruit, furbearing animal, and truck farms, plantations, ranches, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards and woodlands.

**State of Oregon (this is a partial definition, it goes on to describe what a farm is not)**
**http://www.oregonlaws.org/ors/308A.056:** Farm use means the current employment of land for the primary purpose of obtaining a profit in money by:
   a) Raising, harvesting and selling crops.
   b) Feeding, breeding, managing or selling livestock, poultry, fur-bearing animals or honeybees or the produce thereof.
   c) Dairying and selling dairy products.
   d) Stabling or training equines, including but not limited to providing riding lessons, training clinics and schooling shows.
   e) Propagating, cultivating, maintaining or harvesting aquatic species and bird and animal species to the extent allowed by the rules adopted by the State Fish and Wildlife Commission.
   f) On-site constructing and maintaining equipment and facilities used for the activities described in this subsection.
   g) Preparing, storing or disposing of, by marketing or otherwise, the products or by-products raised for human or animal use on land described in this section.
   h) Implementing a remediation plan previously presented to the assessor for the county in which the land that is the subject of the plan is located.
   i) Using land described in this section for any other agricultural or horticultural use or animal husbandry or any combination thereof.

**Sec. 39-1-102, CRS (Article 39 is the Taxation section):** "Farm" means a parcel of land which is used to produce agricultural products that originate from the land's productivity for the primary purpose of obtaining a monetary profit.

**Exhibit 1**

## Shannon, Abigail

| | |
|---|---|
| From: | Erik Johnson <ejohnson@indra.net> |
| Sent: | Tuesday, March 06, 2012 8:37 AM |
| To: | Shannon, Abigail |
| Cc: | Johnson Erik; bcfapc@googlegroups.com |
| Subject: | Land Use Revisions - Food and Agriculture Policy Council Survey |
| Attachments: | Ext.FAPC.LU survey summary.2.10.12._pdf.pdf |

6 March 2012
Abby Shannon
Boulder County Land Use
Dear Abby -
The Boulder County Food and Agriculture Policy Council has prepared and distributed a survey on land use codes and how they affect the farming and ranching community of Boulder County. The purpose of the survey is to provide additional input to your department as you prepare proposed revisions to the code sections that govern agricultural lands and businesses. The survey is made up of 25 questions for landowners and operators on the existing usage of their land, and on their plans for expanded uses, and also questions on how the code is enforced and implemented. The survey was distributed to various E-mail lists including those of the county extension agent and the Boulder Farmers' Market.

We received responses back from 44 farmers, ranchers, and landowners. This represents about 6% of the total number of farms in Boulder County. Responses were received from farms with a range of sizes including a number of small operations, but also 7 responses from farms of 100 acres or more. We feel that this is a significant sample of the agricultural community, and that the responses received are relevant to your work.

After reviewing the results of the land use survey, we have drawn the following conclusions about how the land use code should be revised for agricultural uses. For each recommendation we have listed the number of the survey question or questions that lead us to our conclusions.

- The code should allow a wide range of agricultural uses by right in rural and semi-rural areas of the county. Questions #14 and 15.
- Many respondents express interest in on-farm processing. We discussed this at some length at our 16 February council meeting. Food processing is very much connected to public health, and should be governed by a complex of regulations including state law, county health department requirements, and the land use code. However, as long as food safety concerns are addressed, we encourage the land use code to allow certain types of on-farm processing of locally grown food crops. Questions #16, 17, 18.
- Additional housing for farm labor is a tricky subject since it potentially conflicts with density and allowed dwelling units, but it appears to be a real concern and needs to be addressed. Questions #20 and 21.
- Necessary structures like greenhouses and farm stands should be allowed as long as safety concerns are addressed. Question #22.

1

**Exhibit 1**                                                                    Exhibit B

- Negotiating the land use codes and working with the land use department seem to be challenging in some cases. We recommend an Agricultural Land Use Handbook with relevant code sections explained and including application forms. You have mentioned the possibility of an Agricultural Specialist within the department who could focus on ag questions and applications, and we endorse this idea. Questions #10 and 11.

We hope you find these recommendations helpful. Thank you for your work updating the agricultural land use codes.
Best regards
Erik Johnson
for the Boulder County Food and Agriculture Policy Council

2

**Exhibit 1**

Exhibit B

## CSU Extension/Boulder County FAPC Land Use Survey



| **1. What are your principal crops or agricultural products? (select all that apply)** | | |
|---|---|---|
| | **Response Percent** | **Response Count** |
| • Alfalfa | 20.0% | 9 |
| • Barley | 4.4% | 2 |
| • Corn (dry) | 8.9% | 4 |
| • Sugar Beets | 4.4% | 2 |
| • Small Grains | 8.9% | 4 |
| **• Vegetables** | **46.7%** | **21** |
| • Beef | 20.0% | 9 |
| • Dairy | 0.0% | 0 |
| • Sheep | 11.1% | 5 |
| • Goats | 0.0% | 0 |
| • Chickens | 24.4% | 11 |
| • Grass hay | 44.4% | 20 |
| • Sunflowers | 2.2% | 1 |
| • Dry beans | 6.7% | 3 |

## Exhibit 1

Exhibit B

| | | | |
|---|---|---|---|
| • Flowers | | 13.3% | 6 |
| • Herbs | | 22.2% | 10 |
| • Other (comment field) | | 20.0% | 9 |

| | |
|---|---|
| Other (please specify) | 14 |

| | |
|---|---|
| answered question | 45 |
| skipped question | 0 |

### 2. How much acreage do you have in production?

| | Response Percent | Response Count |
|---|---|---|
| • 0 – 10 acres | 53.3% | 24 |
| • 10 – 20 acres | 6.7% | 3 |
| • 20 – 50 acres | 13.3% | 6 |
| • 50 – 100 acres | 11.1% | 5 |
| • 100 – 500 acres | 8.9% | 4 |
| • 500 + acres | 6.7% | 3 |
| answered question | | 45 |
| skipped question | | 0 |

**Exhibit 1**

## 3. Do you farm or manage multiple parcels that are at separate locations but are part of your operation?

|  |  | Response Percent | Response Count |
|---|---|---|---|
| Yes |  | 42.2% | 19 |
| No |  | 57.8% | 26 |
|  | answered question |  | 45 |
|  | skipped question |  | 0 |

## 4. How far do you haul your ag products for sale or processing?

|  |  | Response Percent | Response Count |
|---|---|---|---|
| 0-5 miles |  | 36.4% | 16 |
| 5-15 miles |  | 34.1% | 15 |
| 15-50 miles |  | 25.0% | 11 |
| More than 50 miles |  | 4.5% | 2 |
|  | answered question |  | 44 |
|  | skipped question |  | 1 |

**Exhibit 1**

### 5. How far do you need to travel to purchase supplies for your operation – equipment, fuel, seed, inputs?

|  | Response Percent | Response Count |
|---|---|---|
| 0-5 miles | 9.1% | 4 |
| 5-15 miles | 31.8% | 14 |
| **15-50 miles** | **43.2%** | **19** |
| More than 50 miles | 15.9% | 7 |
| answered question | | 44 |
| skipped question | | 1 |

### 6. Does Boulder County have enough agricultural input suppliers?

|  | Response Percent | Response Count |
|---|---|---|
| Yes | 23.3% | 10 |
| **No** | **76.7%** | **33** |
| answered question | | 43 |
| skipped question | | 2 |

**Exhibit 1**

### 7. Have you applied for a building permit, a grading permit, or a special use review in the past 5 years in connection with your agricultural business? If yes, please describe.

| | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | 20.0% | 9 |
| No | | 80.0% | 36 |
| | Please describe | | 8 |
| | answered question | | 45 |
| | skipped question | | 0 |

### 8. Have you received notice of a code violation?

| | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | 11.4% | 5 |
| No | | 88.6% | 39 |
| | answered question | | 44 |
| | skipped question | | 1 |

**Exhibit 1**

## 9. Have you have worked with the land use department?

|  | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | 46.7% | 21 |
| No | | 53.3% | 24 |
| | answered question | | 45 |
| | skipped question | | 0 |

## 10. If yes, was the process efficient? Was it completed in a reasonable length of time?

|  | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | 31.8% | 7 |
| No | | 68.2% | 15 |
| | answered question | | 22 |
| | skipped question | | 23 |

**Exhibit 1**

## 11. Were the responses consistent when dealing with the Land Use staff?

| | Response Percent | Response Count |
|---|---|---|
| Yes | 36.4% | 8 |
| No | 63.6% | 14 |
| answered question | | 22 |
| skipped question | | 23 |

## 12. Have you been put in the position of dealing with complaints from neighbors?

| | Response Percent | Response Count |
|---|---|---|
| Yes | 26.8% | 11 |
| No | 73.2% | 30 |
| Please describe | | 11 |
| answered question | | 41 |
| skipped question | | 4 |

**Exhibit 1**

**13. Do you have multiple activities in your farm operation – production, retail sales, processing, agri-tourism?**

|  |  | Response Percent | Response Count |
|---|---|---|---|
| Yes |  | 38.6% | 17 |
| No |  | 61.4% | 27 |
|  | answered question |  | 44 |
|  | skipped question |  | 1 |

**14. Would you like to have multiple activities in your farm operation?**

|  |  | Response Percent | Response Count |
|---|---|---|---|
| Yes |  | 72.7% | 32 |
| No |  | 27.3% | 12 |
|  | answered question |  | 44 |
|  | skipped question |  | 1 |

**Exhibit 1**

Exhibit B

## 15. If yes, which on farm activities would you like to have?

| | | Response Percent | Response Count |
|---|---|---|---|
| Farm dinners | | 93.1% | 27 |
| Weddings | | 41.4% | 12 |
| Kids camps | | 34.5% | 10 |
| Corn mazes | | 10.3% | 3 |
| Bed and Breakfast | | 10.3% | 3 |
| | Other (please specify) | | 15 |
| | answered question | | 29 |
| | skipped question | | 16 |

## 16. Are you interested in being able to add value to your products by processing on site?

| | Response Percent | Response Count |
|---|---|---|
| Yes | 70.5% | 31 |
| No | 29.5% | 13 |
| answered question | | 44 |
| skipped question | | 1 |

**Exhibit 1**

**17. Do you have goals to develop possible value added products?**

|  | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | **66.7%** | **30** |
| No | | 33.3% | 15 |
| | answered question | | 45 |
| | skipped question | | 0 |

**Exhibit 1**

Exhibit B

## 18. If yes, select all that are of interest for value added products

| | Response Percent | Response Count |
|---|---|---|
| meat processing | 25.0% | 7 |
| oil production | 10.7% | 3 |
| food drying | 46.4% | 13 |
| food freezing | 32.1% | 9 |
| **canning** | **71.4%** | **20** |
| cheese making | 14.3% | 4 |
| grain milling | 21.4% | 6 |
| Other | 28.6% | 8 |
| Other (please specify) | | 12 |
| **answered question** | | **28** |
| **skipped question** | | **17** |

**Exhibit 1**

### 19. Do you sometimes worry about building and land use codes and their impact on your operation?

|  | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | 93.2% | 41 |
| No | | 6.8% | 3 |
| | answered question | | 44 |
| | skipped question | | 1 |

### 20. Do you have adequate housing on or near your farmed property for farm labor?

|  | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | 35.7% | 15 |
| No | | 64.3% | 27 |
| | answered question | | 42 |
| | skipped question | | 3 |

**Exhibit 1**

## 21. How far do your workers travel to come to work?

| | | Response Percent | Response Count |
|---|---|---|---|
| 0-5 miles | | 30.0% | 12 |
| **5-15 miles** | | **45.0%** | **18** |
| 15-50 miles | | 25.0% | 10 |
| More than 50 miles | | 0.0% | 0 |
| | | answered question | 40 |
| | | skipped question | 5 |

**Exhibit 1**

## 22. Which structures are necessary for your operation? Select all that apply.

| | Response Percent | Response Count |
|---|---|---|
| storage shed | 95.5% | 42 |
| pumphouses | 43.2% | 19 |
| greenhouses | 56.8% | 25 |
| processing and packing buildings | 31.8% | 14 |
| silos | 9.1% | 4 |
| housing | 45.5% | 20 |
| farmstands | 40.9% | 18 |
| other | 29.5% | 13 |
| Other (please specify) | | 17 |
| answered question | | 44 |
| skipped question | | 1 |

**Exhibit 1**

## 23. Is customer parking an issue for your operation?

| | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | 22.2% | 10 |
| No | | 77.8% | 35 |
| | answered question | | 45 |
| | skipped question | | 0 |

## 24. Do you plan on increasing your acreage in the future?

| | | Response Percent | Response Count |
|---|---|---|---|
| Yes | | 58.1% | 25 |
| No | | 41.9% | 18 |
| | answered question | | 43 |
| | skipped question | | 2 |

**Exhibit 1**

**25. If you want to make a change in your property – dig a pond, erect a structure, put up a sign, start a new type of business – do you know how to research the land use code for compliance?**

|  | Response Percent | Response Count |
|---|---|---|
| Yes | 55.6% | 25 |
| No | 44.4% | 20 |
| answered question | | 45 |
| skipped question | | 0 |

**Exhibit 1**

| Q1. What are your principal crops or agricultural products? (select all that apply) | |
|---|---|
| 1 | hogs | Jan 11, 2012 6:06 PM |
| 2 | Berries | Jan 4, 2012 12:57 PM |
| 3 | Hops, Honey | Jan 4, 2012 12:06 PM |
| 4 | Bees | Dec 19, 2011 2:12 PM |
| 5 | bedding plants to sell | Dec 19, 2011 12:52 PM |
| 6 | raspberries | Dec 18, 2011 9:44 PM |
| 7 | Hay | Dec 18, 2011 2:38 PM |
| 8 | Turkeys | Dec 18, 2011 6:53 AM |
| 9 | Fruit | Dec 17, 2011 4:42 PM |
| 10 | Horse Breeding - Honey Production | Dec 17, 2011 8:15 AM |
| 11 | turkeys, pigs | Dec 17, 2011 6:00 AM |
| 12 | pumpkins | Dec 17, 2011 5:45 AM |
| 13 | berries | Dec 16, 2011 6:29 PM |
| 14 | We are also planting apple and peach orchards. | Dec 16, 2011 5:00 PM |

**Exhibit 1**

| | **Q7.  Have you applied for a building permit, a grading permit, or a special use review in the past 5 years in connection with your agricultural business? If yes, please describe.** | |
|---|---|---|
| 1 | I am currently building a house and just a little over 5 years ago built a hay barn. | Feb 8, 2012 5:02 AM |
| 2 | Building permit for barn | Jan 10, 2012 11:33 AM |
| 3 | Barn | Jan 4, 2012 11:11 AM |
| 4 | Permit to build a greenhouse | Dec 18, 2011 6:53 AM |
| 5 | Horse barn and arena | Dec 17, 2011 6:08 PM |
| 6 | Loafing Shed, Hay Storage | Dec 17, 2011 8:15 AM |
| 7 | Gave up before it came to that over traffic surveys and possible health department requirements for a septic system | Dec 16, 2011 5:21 PM |
| 8 | In the future we would like the opportunity to offer fishing or art camps or farm dinners or to host weddings and other events. | Dec 16, 2011 5:00 PM |

**Exhibit 1**

| | **Q12.  Have you been put in the position of dealing with complaints from neighbors?** | |
|---|---|---|
| 1 | neighbor complaints of sights/noise and smell of our operation... | Jan 11, 2012 6:06 PM |
| 2 | mostly fencing concerns, cattle out of pastures. | Jan 11, 2012 9:34 AM |
| 3 | the neighbors that have been here for some time now really have not been a problem for me it is the new arrivials that dont understand what ag really involves. | Jan 11, 2012 9:15 AM |
| 4 | Direct/personal not official complaints regarding operation; handled directly/personally | Jan 10, 2012 11:33 AM |
| 5 | We lease from Boulder Cnty Open Space.  When we applied for the lease, neighbors objected, not wanting a farm on the land.  We and the neighbors attended a County Commission mtg.  The Cnty Comm. approved the lease. | Jan 4, 2012 12:57 PM |
| 6 | the surrounding neighbors objected to our initial leasing open space for farming operations | Dec 18, 2011 9:44 PM |
| 7 | I have a neighbor who doesn't understand the "Right to Farm" laws, and complains about my dogs barking. We use Great Pyrenees that are standard practice as livestock guardians. They protect our chickens and sheep from coyotes, and we won't stop using them because of a neighbor who is a bully. | Dec 18, 2011 6:53 AM |
| 8 | They complain on principle simple because their  neighbors wish to improve their property and lot in life. | Dec 17, 2011 6:08 PM |
| 9 | neighbor confused conservation easement with county open space and believed we were farming free on county open space | Dec 17, 2011 6:00 AM |
| 10 | smell from Turkey manure.  we spread it and disced in. smell was gone in a few days.  Used more composted materials since then.  found storage area farther away from complaining neighbor.  Comment- this neighbor is all about organic except when it sometimes gets a little too real.   customers parking in a neighboring business area on busy weekends-- created more oeverflow parking. Pointed out to neighboring land owner that his tenants were profiting from the additional seasonal business we brought to the neighborhood and the good relationship we had with those businesses | Dec 17, 2011 5:45 AM |
| 11 | Was related to unusual situation where drainage tiles had been blocked and complainer did not understand that | Dec 16, 2011 2:31 PM |

**Exhibit 1**

| | **Q15.  If yes, which on farm activities would you like to have?** | |
|---|---|---|
| 1 | cooking/farming classes, csa pick-up, retail sales | Jan 11, 2012 6:06 PM |
| 2 | Learning activities for school classes and community organizations; fundraisers for community organizations; music events | Jan 10, 2012 11:33 AM |
| 3 | retail sales | Jan 6, 2012 2:52 PM |
| 4 | farm stand | Jan 5, 2012 11:52 AM |
| 5 | farm stand | Jan 4, 2012 10:38 PM |
| 6 | Retail Sales from temporary booth | Dec 19, 2011 2:12 PM |
| 7 | To host 2 day horse clinics on site with guests staying over one night | Dec 18, 2011 7:39 AM |
| 8 | Classes, such as bird processing, etc. | Dec 18, 2011 6:53 AM |
| 9 | quiet reflection | Dec 17, 2011 8:19 AM |
| 10 | education | Dec 16, 2011 6:29 PM |
| 11 | Farms stand, Pumpkin patch, tours, CSA pickup | Dec 16, 2011 5:21 PM |
| 12 | Adult art camps and you-pick fruit | Dec 16, 2011 5:00 PM |
| 13 | Classes | Dec 16, 2011 3:42 PM |
| 14 | possible restaurant and/or brewery | Dec 16, 2011 3:31 PM |
| 15 | Adult educational programs | Dec 16, 2011 2:42 PM |

**Exhibit 1**

| Q18. | If yes, select all that are of interest for value added products | |
|---|---|---|
| 1 | I have thought about small scale grain storage. | Feb 8, 2012 5:02 AM |
| 2 | prepared foods | Jan 11, 2012 6:06 PM |
| 3 | honey production | Jan 5, 2012 8:36 PM |
| 4 | poultry processing | Jan 5, 2012 11:52 AM |
| 5 | honey production and processing | Dec 19, 2011 10:34 AM |
| 6 | I'm interested in wool production | Dec 18, 2011 7:39 AM |
| 7 | horse breeding and tree farming | Dec 17, 2011 6:08 PM |
| 8 | Salad Mix, BioDiesel, Compost | Dec 17, 2011 4:42 PM |
| 9 | skin care | Dec 17, 2011 8:19 AM |
| 10 | would like to add commercial kitchen or other food production facility | Dec 17, 2011 6:00 AM |
| 11 | Honey production and bottling | Dec 16, 2011 5:21 PM |
| 12 | farm and nature crafts | Dec 16, 2011 5:00 PM |

**Exhibit 1**

| **Q22.  Which structures are necessary for your operation? Select all that apply.** | | |
|---|---|---|
| 1 | multi-purpose building for retail/dinners/staff meetings, food processing, | Jan 11, 2012 6:06 PM |
| 2 | hay barn | Jan 5, 2012 8:36 PM |
| 3 | moveable hoophouses (unheated greenhouses) | Jan 5, 2012 11:52 AM |
| 4 | hoophouse | Jan 4, 2012 12:57 PM |
| 5 | Hay Barn | Jan 4, 2012 12:28 PM |
| 6 | Pavillion | Jan 4, 2012 12:06 PM |
| 7 | hay and equipment storage; buildings for repair and maintenance | Dec 18, 2011 2:38 PM |
| 8 | barns | Dec 18, 2011 7:39 AM |
| 9 | barn | Dec 18, 2011 6:53 AM |
| 10 | barn and arena | Dec 17, 2011 6:08 PM |
| 11 | Hoophouse | Dec 17, 2011 4:42 PM |
| 12 | Barns, Covered Hay Storage, Loafing sheds | Dec 17, 2011 8:15 AM |
| 13 | commercial kitchen | Dec 17, 2011 6:00 AM |
| 14 | equipment shelter | Dec 17, 2011 5:45 AM |
| 15 | on farm office | Dec 16, 2011 5:21 PM |
| 16 | Large kitchen, meeting area, bathrooms | Dec 16, 2011 5:00 PM |
| 17 | Mutli-purpose barn | Dec 16, 2011 2:42 PM |

**Exhibit 1**                                           Exhibit C



Boulder County Comprehensive Plan

# AGRICULTURAL

Goals, Policies, & Maps Element

A1985 Colorado State University - Boulder County Agricultural Survey revealed that the number one factor discouraging continued agriculture was not market economics but the stresses and impacts created from urban influences. Since 1978, over 18,000 acres or 28 square miles of agricultural lands have been annexed into the eight Boulder County municipalities located on the Plains. In combination with other land use activities, farm acreage in the county decreased from 287,466 in 1959 to 155,488 in 1987 and then slightly increased to 157,493 in 1992.

Another survey, conducted by the county Land Use Department in 1991, suggested that commodity prices and land speculation affecting property taxes had moved ahead of urbanization as the "...major hindrances to farming in Boulder County", although urban impacts and the loss of nearby agricultural support services remained high on the list of deterrents to continued agricultural activity. In combination, these pressures led to larger farms being carved up into 35 acre tracts, which by state statute are exempt from any subdivision review and design requirements, and sold to nonagricultural interests. This fragmentation has further complicated the viability of continuing traditional agriculture.

*A*griculturalland is a nonre-newable resource. Once public and private decisions are made that result in the conversion of agricultural land and/or water to nonagricultural uses, this vital resource is almost always irretrievably lost.

Since 1959, the Front Range has been consuming agricultural lands for other purposes at an average of 60,000 acres per year. Between 1959 and 1974, Boulder County led the State of Colorado in this category, a fact that formed one of the core reasons for the eventual development of the original edition of the Boulder County Comprehensive Plan. Trends and forces prompting the agricultural land conversion, including the influence of the state subdivision law known as Senate Bill 35, are amply documented in the 1978 Plan.

> Since 1978, 18,000 acres of agricultural land has been annexed into Boulder County's municipalities.

In spite of this discouraging array of statistics and pressures, Boulder County has pursued a number of methods to stem the loss of agricultural lands with varying degrees of success. Working with representatives of the agricultural community and following the policy direction established in the 1978 Comprehensive Plan, the county adopted a non-urban planned unit development process (NUPUD) in 1979. In simple terms, this form of subdivision offered landowners a development density of two dwellings per 35 acres and an additional dwelling for each 17.5 acre increment above that figure. In return, at least 75% of the total acreage had to be

## AMENDMENT STATUS

| Goals & Policies | Associated Maps | Background Element |
|---|---|---|
| Amended 7/16/97 | Amended 7/16/97 | Created 7/16/97 |



# Exhibit 1

deeded to the county in the form of a conservation easement which restricted activity on the easement to agriculturally-related or other rural land uses. Title remained with the landowner to do with as he or she saw fit consistent with the terms of the easement, although the easement was attached to the property and not the owner. The landowner could sell the lots for residential purposes and use the proceeds to augment agricultural income or keep them for family use. By September 1996, this process led to the creation of 146 NUPUDs and the conservation of 11,160 acres of land, some although not all of which remained in agricultural production or use. In 1995, the county supplemented the NUPUD with a transferable development rights program (TDR), allowing landowners to sell some or all of their development rights to another party based on essentially the same dwelling unit formula as used with the NUPUD. The purchaser then exercises the use of the purchased development rights in locations more appropriate for development, while the seller continues to own the land with a conservation easement attached to it. The TDR PUD process was authorized in 1994 through the adoption of the Plains Planning Area Element, a new addition to the county's *Comprehensive Plan*. That Element refocused the county's policies and intentions for managing unincorporated Plains lands by emphasizing that land uses "...should continue to be related to agricultural activities...and other activities consistent with the rural character of the county."

Another tool given a major boost by Boulder County voters in 1993 has been the funding of an aggressive open space program. One method employed for open space preservation has been the purchase of development rights, or PDRs. This methodology enables a landowner to sell the potential development rights while retaining title to the land for continued farming either by the owner or through leasing to others. The advantages of PDRs

> The key to preserving agricultural lands in the county is maintaining a healthy agricultural economy.

include effective land and water preservation at a cost below full purchase of title for the property, continued land management being in the hands of the owner or farmer or rancher vs. being a responsibility for the county, and keeping the property on the tax rolls. To date, the county has preserved 5,018 acres of agricultural land through PDRs. Conservation easements and fee purchases are also important contributions to the preservation of agriculture. Although they may not share the same benefits listed for PDRs, they offer their own unique values to the county's residents. Our intergovernmental agreement with the City of Boulder also promotes agricultural land preservation within the Boulder Valley Comprehensive Planning area of the county and is one of the stated Open Space Department purposes as defined in the City of Boulder's Charter. Other intergovernmental agreements around the county promote similar objectives.

## Agricultural Objectives

The objective of the subsequent policies is the preservation of the agricultural lands in the county, and their related uses, by whatever means are available to the county and effective in achieving this end. The county recognizes that agricultural lands do not exist in a vacuum. Without the ability to conduct economically viable agricultural activities upon them, agricultural lands become merely vacant lands. The key to preserving agricultural lands in the county is maintaining a healthy agricultural economy in the county. Therefore, a corollary objective of the subsequent policies is the encouragement, promotion, and fostering of agricultural enterprises and activities in the county.

In 1978, the state and county classified, identified and mapped the lands in the Plains portion of the county as to their potential agricultural productivity and significance. In order of significance, those mapped designations are "Lands of

**Exhibit 1**

Exhibit C

*Boulder County Comprehensive Plan*

National, Statewide and Local Importance," as well as "Other Agricultural Lands." The new Agricultural Element includes an updated Agricultural Lands Map of the *Boulder County Comprehensive Plan* which was last approved in 1978 which was prepared by the Natural Resources Conservation Service, formerly the Soil Conservation Service. The methodology employed in the updating involved using 1995 aerial photography (color slides) on a scale of eight inches to the mile. The data from the slides was transferred to the Boulder County Zoning Maps and then overlayed on the Soil Conservation Service original Prime Farmland Map. The same basic criteria was used as when the map was originally prepared [described in the Environmental Resources Element approved in 1986]. There was, however, a change in some of the soils information that brought some additional lands into the 'prime' classification. This change was not drastic. Irrigation is one of the main criteria in determining if the soils are considered 'prime' and this was the principal area looked at in revising the map. Areas that have had a major change in land use or are no longer being irrigated were excluded from the 'prime' classification. The Environmental Resources Element of the *Boulder County Comprehensive Plan* provides more information on the methodology and criteria used in the mapping of the Significant Agricultural Lands.

It remains the intent of the *Comprehensive Plan* and attendant land use codes to promote and assist in the preservation of agricultural lands for agricultural and other rural purposes. This stance is predicated on several decisions and conclusions reached by the county in the formulation of the original 1978 Comprehensive Plan which remain well-founded today. They include the recognition of agricultural lands as an important nonrenewable resource, the lack of services and infrastructure capabilities in the rural area to support other than a rural and agrarian

level of land use, the long standing position that an adequate range of urban services and related urban development can best be provided and maintained through municipal governments, the belief that compact urban development is the most efficient and appropriate way to retain agricultural lands and rural character, the maintenance of economic support for the agricultural community, and the county's commitment to the plains municipalities through intergovernmental agreements and other understandings to not compete with those municipalities for the provision of urban development or services in the unincorporated areas of the county.

It is important to note that, notwithstanding the county's continued backing of agricultural preservation and activity, there are intensities and kinds of agricultural uses that can have detrimental impacts on land, water and other components of the environment if not held accountable to some level of management and regulation. A commercial feed lot, for example, is a far different form of legitimate agricultural enterprise than is an alfalfa field in terms of its potential impacts. The *Comprehensive Plan* recognizes these differences and the carefully exercised responsibility the county must assume in balancing an earnest support for agriculture with necessary degrees of regulation to protect the health, safety and welfare of residents and the environment of Boulder County.

*The county shall foster & promote a diverse and sustainable agricultural economy.*

## Agricultural Goals

A.1 Future urban development should be located within or adjacent to existing urban areas in order to eliminate sprawl and strip development, to assure the provision of adequate urban services, to preserve agriculture, forestry and open space land uses, and to maximize the utility of funds invested in public facilities and services.

M.1 Agricultural enterprises and activities are an important sector of the Boulder

# Exhibit 1

Exhibit C

*Goals, Policies, and Maps Element*

County economy and the county shall foster and promote a diverse and sustainable agricultural economy as an integral part of its activities to conserve and preserve agricultural lands in the county.

B.7 Productive agricultural land is a limited resource of both environmental and economic value and should be conserved and preserved.

E.1 Preservation and utilization of water for agricultural purposes within the county shall be encouraged.

## Agricultural Policies

*Agricultural lands are depicted in the Agricultural Resources Map.*

AG 1.01 It is the policy of Boulder County to promote and support the preservation of agricultural lands and activities within the unincorporated areas of the county, and to make that position known to all citizens currently living in or intending to move into this area.

AG 1.02 The county shall foster and encourage varied activities and strategies which encourage a diverse and sustainable agricultural economy and utilization of agricultural resources.

AG 1.02.01 In instances where the county desires to purchase an interest as a means of protecting lands which have agriculture as their primary value, the purchase of development rights shall be preferred over fee simple purchase; however, the county should be willing to pursue other types of purchase arrangements when preferred by the landowner.

AG 1.03 It is the policy of Boulder County to encourage the preservation and utilization of those lands identified in the Agricultural Element as Agricultural Lands of National, Statewide, or Local Importance and other agricultural lands for agricultural or rural uses. The *Boulder County Comprehensive Plan* Agricultural Element Map shall include such lands located outside of the boundaries of any municipality or the Niwot Community Service Area.

AG1.04 In reviewing applications for new development, Boulder County shall consider potential impacts on existing adjacent agricultural uses and shall use its regulatory authority to mitigate those impacts which would be detrimental to the continuation of existing agricultural operations and activities and the establishment of new agricultural operations and activities. New development should be sited in such a way so as to minimize and/or prevent future conflicts.

AG1.05 It shall be the policy of Boulder County to keep the regulatory burden on various agricultural activities to the minimum necessary for identifying, addressing, and mitigating potential impacts in the areas of health, safety, and welfare.

AG1.05.01 It shall be the policy of Boulder County to allow the operation of existing nonconforming agricultural uses consistent with protection of the public health, safety, and welfare.

AG1.06   The county shall continue to support appropriate state and federal legislation designed to preserve agricultural resources.

AG1.07   The county shall continue to actively participate in state, federal, and local programs directed toward the identification and preservation of agricultural land.

AG1.08   The county shall encourage the development of resource management plans for significant native grassland ecosystems.

AG1.09   The county shall provide technical assistance to farmers and ranchers to help avoid conflicts over wetland and riparian management and the management of other sensitive or diminishing environmental resources as listed and periodically updated in the Environmental Resources Element. In doing so, the county shall seek the advice and expertise of other land, resource, and wildlife agencies and institutions to the extent the resources are available.

AG1.10   The county shall encourage the development of soil and water conservation plans to help assure sound resource stewardship and, where appropriate, may require such plans in land use applications subject to the county's discretionary review processes as defined in the county *Land Use Code*.

AG1.11   The county shall encourage that water rights historically used for agricultural production remain attached to irrigable lands and shall encourage the preservation

of historic ditch systems.

AG1.12   The county shall continue to discourage the fragmentation of large parcels of agricultural land and to encourage the assemblage of smaller parcels into larger, more manageable and productive tracts.

AG1.13   The county shall continue to monitor the application of these policies and attendant Boulder County land use codes, as to their effectiveness in preserving agricultural land and perpetuating agricultural uses in Boulder County while maintaining a reasonable use to the individual owner.

- **Infrastructure Development & Oil and Gas Operations on Agricultural Land**

AG 2.01   The county shall discourage the placement of new utility infrastructure upon agricultural lands. The county supports using existing easements or other public rights-of-way to minimize the impacts to agriculturally productive land.

AG 2.01.01   If a thorough analysis of alternatives concludes that routing/siting of facilities is necessary on or across agricultural lands, all construction activities will be located and performed so as to minimize disturbance to agricultural resources.

AG 2.01.02   If the infrastructure location is determined necessary, infrastructure construction activities across agricultural lands should not occur during

*The county encourages water rights historically used for agricultural production to remain with the land.*

# Exhibit 1

the growing season.

AG 2.01.03 Any agricultural lands and water resource systems disturbed by infrastructure construction shall be restored to their former productivity.

**The following policies apply only to oil and gas operations.**

AG 2.02 Oil and gas exploration, development, and production activities which affect agricultural operations shall be designed to minimize impacts to agricultural lands and water resource systems.

*Staff from the Parks & Open Space Department are knowledgeable about weed & pest management issues & may be able to provide guidance.*

AG 2.03 Reclamation and restoration plans shall be required upon permitting and be implemented upon plugging and/or removal of all oil and gas well and production facilities, or upon abandonment, and shall include all appropriate measures to return the land to productive agriculture.

AG 2.04 The county shall use its regulatory authority to minimize the impacts of oil and gas operations on agricultural lands and ensure complete restoration of the area through the use of financial bonds, other forms of financial security or other appropriate regulatory measures to the extent authorized by law.

● **Weed and Pest Management**

State statutes (Article 5.5 of Title 35, C.R.S. 1973, and as amended by House Bill 96-1008) require counties to develop and enforce weed and pest management plans on all unincorporated lands under county jurisdiction. While the Agricultural Element is considered the most appropriate

portion of the *Comprehensive Plan* in which to codify the following policies, they apply across the county and are also cross referenced in the Plan's section entitled "Additional County-wide Policies."

AG 3.01 The county shall support state and federal legislation which encourages management of noxious weeds.

AG 3.02 The county shall actively participate in state, federal, and local programs directed toward Integrated Pest Management programs for noxious weeds, and vertebrate and insect pests.

AG 3.03 The county shall use, and encourage all land owners to use, Best Management Practices, which may include chemical, fire, mechanical, biological, cultural control for weeds; chemical, physical, and cultural control for vertebrate pests; and chemical, biological and cultural control for insects.

AG 3.04 The county shall use and encourage the use of certified weed free products such as hay, mulch, gravel, bedding material, and general construction material.

AG 3.05 The county shall make available to all landowners educational materials and assistance in developing and implementing management plans to control pests.

**Exhibit 1**                                                                                           Exhibit D



# "COLORADO COTTAGE FOODS ACT" FACT SHEET

Colorado Department
of Public Health
and Environment

> **This Fact Sheet is developed to establish uniform interpretation and application of the recently enacted "*Colorado Cottage Foods Act (Act).*"  This fact sheet is provided by the Colorado Department of Public Health and Environment, Division of Environmental Health & Sustainability.  Additional information about the Act, may be obtained by calling 303-692-3645, or visiting the division's web page - www.cdphe.state.co.us/cp**

This Act was incorporated into the *Food Protection Act* and modified the definition of a retail food establishment to <u>not</u> include:

> "A HOME, COMMERCIAL, PRIVATE OR PUBLIC KITCHEN IN WHICH A PERSON PRODUCES FOOD PRODUCTS SOLD DIRECTLY TO CONSUMERS PURSUANT TO THE "*COLORADO COTTAGE FOOD ACT*", SECTION 25-4-1614."

This document is intended to serve as direction to local public health agencies (LPHA) as to what can and cannot be produced in a home kitchen and the mechanism of delivery of these products under the provisions of the *"Colorado Cottage Foods Act."*

**1.  What is the effective date of the law?**

The effective date was March 15, 2012, the date the Governor signed the bill.  The Bill contained a "Safety Clause" which establishes the signature date as the date the bill became law and enacted. *[Section 8]*

**2.  Within the Cottage Foods Act, what foods can be produced and sold?**

Pursuant to the Act, a producer is permitted to manufacture and "…*SELL ONLY A LIMITED RANGE OF FOODS THAT ARE NONPOTENTIALLY HAZARDOUS AND THAT DO NOT REQUIRE REFRIGERATION.  THESE FOODS ARE LIMITED TO SPICES, TEAS, DEHYDRATED PRODUCE, NUTS, SEED, HONEY, JAMS, JELLIES PRESERVES, FRUIT BUTTER, BAKED GOODS, AND CANDIES."  [25-4-1614(2)(b)]*

**3.  Can value added fruits and vegetables now be sold without a retail license or wholesale food registration?  Value added means prepped, washed, cut and/or bagged fruits or vegetables.**

No.  Products are limited to those listed in the Act*.*  Products outside of this listing would fall under the appropriate regulatory authority/structure.  See Interpretive Memos 99-02 and 04-03. *[Section 25-4-1614(2)(b)]*

**4.  Are all baked goods allowed?**

Only non-potentially hazardous baked goods are allowed.  Certain baked goods are actually potentially hazardous, for example, some pumpkin and cream pies, cheese cakes and pastries will support pathogenic growth and therefore require refrigeration.  When such baked goods are brought to the attention of an LPHA, the producer will need to show, through laboratory verification, that the pH and water activity of the product are within the parameters for a non-potentially hazardous food in order to continue producing the product under this provisions of this law. *[Section 25-4-1614(2)(b)]*

**Exhibit 1**

5. **Where and to whom can the foods permitted by the Act be sold?**

The foods produced must be sold only on the producer's premises, at the producer's roadside stand, or at a farmer's market, community-supported agriculture organization, or similar venue. These foods can _only_ be sold directly to the end user ("_ultimate consumer_"), and shall not be sold or distributed further. Selling or providing these food products to grocery stores or other retail food establishments is prohibited. *[25-4-1614(2)(a), 25-4-1614(2)(d)(I) and (II) and 25-4-1614(5)]*

6. **What does the term "similar venue" mean when listing the types of locations/venues where these food items can be sold?**

The intent is to sell these products where fresh locally sourced foods are more easily available to all consumers, not commercially but on a small-scale basis, directly to the end user. Similar venue was not specifically defined in the Act.

7. **Do the foods sold at farmers markets need to be sold packaged?**

Yes. As foods sold under this Act must have an affixed label, such foods must be packaged. Raw, uncut fruits and vegetables are not subject to this or the *Food Protection Act*. *[25-4-1614(3)(a) and 25-4-1602(14)(j)]*

8. **Do vendors at Farmers Markets selling eggs still need to hold a Retail Food License to sell eggs?**

Yes and the egg producer needs to be recognized as an approved source by the Colorado Department of Agriculture (CDA). Additional licensing may be required by CDA and/or USDA depending on their flock size or sell volume. See CDA's website at  http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1167928196642 for additional information . *[35-21-105]*

9. **Do cottage food producers need pre approval prior to initiating their operation?**

No; however, a LPHA may create a voluntary electronic registry in which a producer may choose to participate. *[25-4-1614(8)]*

10. **How do we determine net revenues for these home producers?**

The intent of the Act was not to create a regulatory framework or reporting requirements for these types of operations. If an LPHA suspects noncompliance with the Act or receives a complaint, the LPHA could investigate the producer and request records to make that determination. *[Section 1 Legislative Declaration]*

11. **How is the net revenue determined?  Is it by broad category, i.e., baked goods or is each individual produced capped at $5,000 annually?**

Each individual flavor of jam, type of spice, type of cake, etc., would represent a distinct revenue stream of $5,000. *[Section 1 Legislative Declaration and 25-4-1614(2)(e)]*

12. **What actions should be taken if disallowed or unapproved foods are produced?**

If a local public health agency becomes aware of a person operating outside of the provision of the *"Colorado Cottage Foods Act"* and producing foods that are not allowed as listed in section 25-4-1614(2)(b), C.R.S., under their authorities in the *Colorado Pure Food and Drug Law*, section  25-5-406, C.R.S., they may embargo and/or condemn the product in question. *[25-5-406(4) and 25-4-1614(4)]*

Additionally, a local public health agency (LPHA) may utilize the enforcement provisions of the *Food Protection Act* under 25-4-1610, *Unlawful acts*, specifically paragraph (b) of that section, which disallows the operation of a retail food establishment without a valid license. *[25-4-1610((1)(b)]*

**Exhibit 1**                                                    Exhibit D



Colorado Department
of Public Health
and Environment

# Division of Environmental Health and Sustainability

Inside:

| | |
|---|---|
| FAQs | 2 |
| Allowed and Prohibited Food | 2 |
| Labeling Requirements | 3 |
| Sample Label | 3 |
| Eggs | 3 |
| Training | 4 |
| Key Definitions | 4 |

**Can I Sell My Cottage Foods to Restaurants?**

Cottage food operators are not allowed to sell their cottage food products to local restaurants or grocery stores. These types of sales are considered "wholesale" and are not allowed under the law.

Cottage food operators must sell their cottage food products directly to the consumer.

# Colorado Cottage Food Act becomes law

In 2012, the Colorado Legislature enacted Senate Bill 12-048 allowing individuals to produce, sell and store certain types of "cottage food" products in an unlicensed home kitchen. A copy of the bill can be found at

http://www.cdphe.state.co.us/cp/index.html

Cottage food products include such items as spices, teas, dehydrated produce, nuts, seeds, honey, candies, jams, jellies and certain baked goods.

Cottage food operations require no license or permit from the Colorado Department of Public Health and Environment and are not inspected by any state or local government entity.

Net sales for each product produced by a cottage food operation must not exceed $5,000 annually. Products must be sold directly by the cottage food

operator to the end consumer. Sales by consignment or to retail food or wholesale food establishments are prohibited.



Cottage food products must be labeled in accordance with the requirements as outlined in Section 25-4-1614, C.R.S.

# Cottage food complaints:  know the rules!

The Colorado Department of Public Health and Environment may investigate any complaint received concerning  cottage food operations.

If your cottage food operation is the subject of a complaint, you must allow a state or local public health employee in your cottage food operation to conduct an inspection.

The employee will inspect your cottage food operation to determine compliance with applicable laws, rules and regulations.

If, as a cottage food producer, you produce foods that are not allowed by the provision of the Colorado Cottage Foods Act, a local public health agency has the authority to em-

bargo and/or condemn the product in question. Since the production of foods not allowed under the Colorado Cottage Foods Act would require a license and a commercial facility, a local public health agency may use the enforcement provisions of the Food Protection Act to obtain compliance.

**Exhibit 1**

Exhibit D

# What types of Cottage Foods can I produce?



As a cottage food operator, you are allowed to produce certain food items which are considered nonpotentially hazardous.

The table (at right) provides a listing of acceptable cottage food products.



If you have any questions regarding the production of a particular cottage food product please contact your local public health agency or the Division of Environmental Health and Sustainability at 303- 692-3645.  A listing of local public health agencies by county can be found at:

http://www.cdphe.state.co. us/opp/locallist.html



| Nonpotentially Hazardous Foods |
| --- |
| Spices |
| Teas |
| Dehydrated Produce |
| Nuts |
| Seeds |
| Honey |
| Jams, Jellies and Preserves |
| Fruit Butter |
| Candies |
| Certain Baked Goods |

| Examples of What Cottage Foods are Not Allowed |
| --- |
| Fresh or dried meat or meat products including jerky |
| Canned fruits, vegetables, flavored oils, salsas, etc. |
| Fish and shellfish products |
| Canned pickled products (corn relish and pickles) |
| Raw seed sprouts |
| Baked goods such as cream, custard or meringue pies and cakes or pastries with cream cheese icing or fillings |
| Milk and dairy products including hard or soft cheeses and yogurt |
| Cut fresh fruits and vegetables or juices made from fresh fruits or vegetables |
| Ice and ice products |
| Barbecue sauces, ketchups or mustards |
| Foccaccia-style breads with vegetables or cheeses |

## Frequently Asked Questions

**Question:** How do I sell my cottage food products?

**Answer:** You may sell your cottage food products from your residence directly to the consumer. Sales are also approved at farmers' markets and roadside stands.

**Question:** Am I able to deliver my cottage food products?

**Answer:** Yes, you may deliver your cottage food products directly to the consumer .

**Question:** Do I need a permit or license for my cottage food operation?

**Answer:** No, you do not need a state permit or license for your cottage food operation. However, you should check with your city or county for any other requirements or recommendations they may have.

**Question:** Is there any limit to how much I can earn from my cottage food operation?

**Answer:** Yes, cottage food operators are limited to $5,000 in net sales per product each year. It is the operator's responsibility to comply with applicable laws, rules and regulations regarding the collection of sales tax.

# Labeling Requirements for Cottage Foods

The cottage food law requires specific labeling requirements for the sale of cottage food products.

A cottage food operation may only sell cottage food products which are offered with a label containing the following information (printed in English):

◆ The identification of the cottage food product;
◆ The producer's name and the address at which the cottage food was produced;
◆ The producer's current phone number and email address;
◆ The date on which the food was produced;
◆ A complete list of ingredients; and
◆ The following statement: "This product was produced in a home kitchen that is not subject to state licensure or inspection and that may also process common food allergens such as tree nuts, peanuts, eggs, soy, wheat, milk, fish and crustacean shellfish. This product is not intended for resale. "

A sample is shown below  and may assist with developing your cottage food product label.



**Chocolate Chip Cookie**

*Joe Baker*

*123 Safe Food Ave.*
*Anywhere, CO 80XXX*
*303-555-1234*
*jbbaker@cookie.com*

**Manufacture Date: March 15, 2012**

Ingredients: Enriched flour (wheat flour, niacin, reduced iron, thiamine, mononitrate, riboflavin and folic acid), butter (milk, salt), chocolate chips (sugar, chocolate liqueur, cocoa butter, butterfat (milk), soy lecithin as an emulsifier), walnuts, sugar, eggs, salt, artificial vanilla extract, baking soda.

DISCLAIMER:  This product was produced in a home kitchen that is not subject to state licensure or inspection and that may also process common food allergens such as tree nuts, peanuts, eggs, soy, wheat, milk, fish and crustacean shellfish.  This product is not intended for resale.

### Can I Make Salsas or Barbecue Sauce?

Processing of low-acid foods by retort canning or processing of acidified foods is not allowed by a cottage food operator.

These types of products must be commercially processed to ensure sterility under conditions of non-refrigerated storage and distribution.

Canning or processing acidified foods must be done in a state licensed or registered facility.

## Selling of Eggs at a Farmers' Market

Eggs sold directly from your own property, or from a Community Supported Agricultural Organization, are not subject to licensing or inspection.  Eggs cannot be sold at a farmers' market without a retail food license. In order to sell your eggs at a farmers' market, you must be recognized as an approved source. If you obtain a Small Egg Producer/Dealer license from the Colorado Department of Agriculture, you would be recognized as an approved source. Additional licensing may be required by CDA and/or USDA depending on a producer's flock size or sell volume. See CDA's website below.

http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1167928196642



**Exhibit 1**

Exhibit D

## Terms and Definitions

**Home -** Means a primary residence occupied by the producer producing the food allowed by the Colorado Cottage Foods Act.

**Nonpotentially Hazardous -** Means any food or beverage that, when stored under normal conditions without refrigeration, will not support the rapid and progressive growth of microorganisms that cause food infections or food intoxications.  Does not include low-acid or acidified foods.

**Producer -** Means a person who is a resident of Colorado and who prepares non-potentially hazardous foods in a  home kitchen or similar venue for sale directly to consumers.

# Cottage Food operations requires training



The Colorado Cottage Foods Act requires "producers to be certified in safe food handling and processing by a third-party certifying entity, comparable to and including the United States Department of Agriculture or the Colorado State University Cooperative Extension Service, and must maintain a status of good standing in accordance with the certifying entity practices and procedures, including attending any classes required for certification."  Safe food handling courses should include topics on safe food sources, personal hygiene, sanitation of equipment, worker illness, food temperature control, safe water, sewage disposal, pest control, proper hand washing, and control of toxics.

Safe food handling courses that meet this training requirement include:

### Did you know?

Raw, uncut produce can be sold in Colorado without licensing or registration. The FDA's Good Agriculture Practices provide recommendations for safe practices to assure produce is safe for consumption.

http://www.fda.gov/food/resourceforyou/consumers/ucm114299

ServSafe® Food Protection Manager Certification— a comprehensive food safety training offered by Colorado State University Extension. **http://www.ext.colostate.edu/safefood/safetyworks/servsafe.pdf.**

Contact your local public health agency, who may offer this training.

ServSafe® online certification from the National Restaurant Association Educational Foundation at **http://www.servsafe.com/home.**

National Environmental Health Association's Certified Professional Food Manager —  details can be found at **http://www.nehatraining.org/.**

Colorado State University Extension will post additional cottage food materials on the Colorado Farm to Market website at: **http://cofarmtomarket.com/.**

**Exhibit 1**

Exhibit E

### Shannon, Abigail

| | |
|---|---|
| From: | Jim Williams <jimewill99@hotmail.com> |
| Sent: | Monday, April 02, 2012 11:44 AM |
| To: | Shannon, Abigail |
| Subject: | RE: Beekeeping in Boulder County |

Hi Abby,

I think beekeeping is a great idea and should be allowed everywhere in Boulder County. Honey bees are very tame and bred for their ability to work with people. When a beekeeper finds that his bees are not behaving properly, the colony gets a new tamer queen and very shorlty the colony is back to normal. Since wild bees are visible throughout Boulder County, I'm not sure that a colony in someone's back yard poses a threat to society.

The Boulder neighborhoods are sorely missing pollinators. Ten years ago, the Gunbarrely neighborhood that I live in was alive with honey bees. This year, I have seen no bees, only the stingy little yellow jackets. Perhaps the county will step fill the void and support more folks keeping bees in their backyards. In ten more years, it would be nice if every neighborhood had at least one community or private bee colony and perhaps Open Space will get involved and set up Apiary's in open space for citizens to have a place to home their bees and polliunate all the wild flowers and grasses one the hillsides. Only time and proactive folks at the county will allow this to happen.

I'd recommend you chat with some of the following folks to get an idea of what might work for Boulder County. The following list of folks are some of the founders of beekeeping in Boulder and a great source of information on best practices.

Tom Theobald,
Niwot Honey Farms,
bkpr.tom@indra.com, 303.652.2266
http://www.frontrangeliving.com/cooking/Honeybee.htm

Miles McGaughey, President,
Boulder County Beekeepers' Association
http://www.bouldercountybeekeepers.org/

John Green, Treasurer,
http://nocobees.org/web/

Beth Conrey, President,
Berthoud, Co. 970-532-0329,
Colorado State Beekeepers Association
http://coloradobeekeepers.org/

Please let me know if I can help in anyway. Thanks for looking into Urban Farming practices as I think it is very necessary for our community and our children's future.

1

**Exhibit 1**

## Shannon, Abigail

| | |
|---|---|
| From: | Bruce W. Warren <bwarren@niwotlaw.com> |
| Sent: | Friday, May 04, 2012 11:55 AM |
| To: | Shannon, Abigail |
| Subject: | Ag Uses Impacts |

Hi Abby,


I won't make the neighborhood meeting on Monday, but would generally state that the impacts of agricultural uses are positive in Boulder County.   In your words, "I think we should be doing everything we can as a community to help farmers maintain their businesses. "


Biff Warren


* * * * * * * * * * * * *

Bruce W. Warren

Warren, Carlson & Moore, LLP
www.niwotlaw.com
P.O. Box 610
Niwot, CO 80544-0610
303 652-2433; 303 652-2449 (fax)

The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to info@niwotlaw.com.

------------------------------------------------------------------------------------------------
---------

U.S. TREASURY DEPT. CIRCULAR 230 NOTICE:  Unless expressly indicated, any U.S. Federal tax advice included in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. Federal tax-related

1

**Exhibit 1**                                                                         Exhibit E

## Shannon, Abigail

| | |
|---|---|
| From: | Martin Tobias <daedalus33@yahoo.com> |
| Sent: | Friday, May 04, 2012 12:24 PM |
| To: | #LandUsePlanner |
| Subject: | Comment on Project #: SPR-09-002: DUMLER detached |

Project #: SPR-09-002: DUMLER detached
8047 Neva Road
http://www.bouldercounty.org/property/build/pages/docketdetails.aspx?docid=312

To the Boulder County Commissioners,

I respectfully oppose this Application in its present form. In the worst case, it has the potential for creating a nightmare for the people living around the property (including, possibly, my family) and if you discount that possibility, I suggest that you would be failing in your duty to safeguard our interests.

Personally, I have no problem with the proposed garage or with the driveway that would provide access. Nor would I personally have a problem with Mr. Dumler keeping "a few" chickens in his back yard to provide chickens and eggs for family consumption.  But the Application does not state how many chickens the coop will house, nor whether the purpose is farming them for commerce. The problem is that if the purpose is commerce, by my calculation (per document "P29KeepingAnimals.pdf") Mr. Dumler could keep up to 112 chickens on his 1.12 acre property (1.12 acres x 2 Animal Units x 50 chickens).

Since there is nothing in the Application that predicts otherwise, I respectfully ask the Commissioners to consider that worst case, which is that the venture eventually becomes a 112-chicken farm, even though it may well start out with a much smaller number.  (I am not a farmer and I don't know how many chickens can reasonably be housed in a 156 square foot coop; I would be surprised if it were 112.)

The Meadowdale area is an established and quiet residential community, not a farming community, and having a 112-chicken farm spring up at 8047 Neva Road would likely have major adverse impacts (such as odors from chickens and chicken waste, round-the-clock animal and machinery noises, greatly increased traffic, and loss of property values) on a lot of families living around there, including mine.

Here is a draft list of questions that I respectfully suggest Boulder County and affected homeowners should consider, to assess the possible scope of that adverse impact.

* what will be the scale of the poultry-raising activity?
  * is my calculation of 112 birds maximum, correct?
  * will all the birds always be chickens? Or will other poultry be be raised also?
  * how many mature birds does Mr. Dumler plan to have on-site, at any time?
  * how many of those will be males? (Roosters are noisy)
  * will the birds ever be permitted to roam outside the coop?
  * what government agency will be responsible for enforcing that upper limit?
  * would a commercial poultry-raising operation have any employees not resident at that address? (increased traffic)

* regarding waste and waste removal...

1

## Exhibit 1

   * what regulations (local and/or federal) apply to the removal and/or disposal of the poultry litter? ("poultry litter" consists of rice hulls or wood chips after they are spread on the floors of poultry houses to soak up poultry manure.)
   * what agencies will be responsible for enforcing it?
   * how will the waste be stored on site? (solid and/or liquid?) (odor, insects, vermin)
   * how and how often will solid waste be removed from the site? (includes poultry litter, feathers, and maybe carcasses)
   * how and how often will liquid waste be removed from the site?
   * how will solid waste ultimately be disposed of?  (trash collection? landfill?)
   * how will liquid waste ultimately be disposed of?
   * will there be a waste pond?  (odor, insects)

 * will poultry be butchered on site?
   * if so, exactly where would that be performed?
   * if so, would there be refrigeration equipment on site and where would that be installed? (noise)

 * will the chicken coop be heated in the winter and/or cooled in the summer?
   * if so, how? Will motors or compressors be used? (noise)

 * if raising poultry for commerce, how much additional traffic will be generated along Neva Road? (estimate)
   * taking delivery of supplies? (Poultry food? Fresh poultry litter?)
   * shipping out eggs?
   * shipping out live poultry?
   * shipping out butchered poultry?
   * selling eggs at the front door?
   * waste removal?

 * what recourse would affected homeowners have in the event that the poultry-raising activity prevents quiet enjoyment of their homes?
   * what would they be able to do about noise from the birds, and from associated machinery?
   * what would they be able to do about odor from the birds and/or the waste?
   * what would they be able to do in the event that insects and/or vermin and/or predators (raccoons, coyotes) are attracted to the chicken coop and/or the poultry waste?

Therefore, if it is within the Commissioners' power, I respectfully request that you require that the Application be amended by Mr. Dumler by addition of a legally binding declaration of the maximum number of chickens that will ever be housed, together with a legally binding declaration of the purpose of the venture (family consumption versus commerce), and then hold a Public Hearing so that the people living around the property can fairly assess the possible scope of the adverse impacts of the "chicken coop."

Sincerely,

Martin Tobias
8198 Dry Creek Circle
Niwot, CO 80503

2

**Exhibit 1**

Exhibit E

## Shannon, Abigail

| | |
|---|---|
| From: | Dick Dunn <rcd@talisman.com> |
| Sent: | Friday, May 04, 2012 6:14 PM |
| To: | Shannon, Abigail |
| Subject: | Farm Stands comment (re Prelim Issue Identification worksheets) |

Abby -
I have two comments on the "Preliminary Issue Identification" material.  Is email like this sufficient to have the comments included in what is presented?  (I'll send two separate messages since my comments pertain to different headings in the document.)

Pertaining to what can be sold at Farm Stands:  Under "State" (p.7 of
draft) it notes the consequences of recently signed SB 12-048 "Colorado Cottage Foods Act".  However, second paragraph under "Public Health" is inconsistent with this, still prohibiting "Value-added food products"
without a commercial kitchen and retail food license.

Shouldn't this be changed to make it clear that foods which fall within the classification of SB 12-048 may be sold at farm stands?  After all, if someone can come to our house to buy (for example) raspberry jam, why shouldn't we be able to sell it at our farm stand?  The Cottage Foods act applies to anybody in Colorado, but it is of particular interest to farmers.

Thank you,
Dick Dunn        rcd@talisman.com        Hygiene, Colorado  USA

1

# Exhibit 1

Exhibit E

---

## Shannon, Abigail

| | |
|---|---|
| **From:** | Dick Dunn <rcd@talisman.com> |
| **Sent:** | Friday, May 04, 2012 7:57 PM |
| **To:** | Shannon, Abigail |
| **Subject:** | Wineries comment (re Prelim Issue Identification worksheets) |

Abby -
Second of two comments which I'm requesting be passed along to the Planning Commission, this one concerning the Wineries section.

Re wine being an "agricultural product" or not:  Grapes used for wine and apples used for cider are generally of varieties not suitable for direct consumption.  The fermentation is part of the agricultural production; it is a biological activity.  Perhaps the best term for wine/cider/mead (and a term used for them in other domains) is "finished agricultural products".
Note WTO considers wine an agricultural product.

Winery regulation is a situation where Boulder County is curiously behind the times and behind other counties in Colorado. (We're supposed to be leaders, not followers!)  It hasn't mattered an awful lot because we're in a challenging area for growing traditional (European cultivar) wine grapes.  But new world varieties and newer hybrids are opening up the agricultural potential of the county.  Also, fermented cider and perry (fermented pear) are seeing an explosive growth in the US now...and the county has a lot of land well-suited to premium apples and pears.  We (growers/producers) need the county to set regulations which will allow us to ride this wave.

Wine and cider are also of particular interest to us because they have such high revenue potential per acre:  We have so much development pressure in the county; low-return crops don't give farmers much help in resisting offers to sell to developers.  Consider that an acre of hay might produce 150 bales in a good year, which is under $1000 gross.  That same acre planted to (for example) cider apples might produce 1600 gallons, which is more like $80,000 gross.  And need I mention that the cider gives tax revenue to the county?

I support allowing small scale wineries in unsubdivided RR.  Building codes and other land-use regs are sufficient to keep them within reason.  Small producers should be encouraged--they add very much to diversity, interest, and agri-tourism.

Under Land Use Code:  What is the purpose of the suggestion of a minimum parcel size of possibly 10 acres?  At typical production levels this is about 40 tons of grapes or perhaps 100 tons of apples--this could be well beyond what a single producer or family might be able to handle.  It's a comfortable number for a small winery, but challenging as a lower limit.

Question at the end of the Land Use Code section asks "Would adding Winery open all value-added food production in the unincorporated county so long as the ingredients were grown in Colorado?"  Will this question be moot in light of the Cottage Foods Act?

1

**Exhibit 1**                                                    Exhibit E

## Shannon, Abigail

| | |
|---|---|
| From: | David Pinkow <pinkow@gmail.com> |
| Sent: | Sunday, May 06, 2012 5:17 AM |
| To: | Shannon, Abigail |
| Subject: | Farms |

Hi Abby,

I am a strong, but passive, supporter of the Boulder County farm policy. It seems like a great idea to me that farming in the vicinity of Boulder is maintained and encouraged and know that otherwise many financial, social and urban pressures would make this impossible.

To me, maintenance of a varied social, economic and industrial (in the broadest sense) environment is important. Local farming is an important part of this, and I think that locally/regionally grown and produced products and food will become increasingly important.

Boulder County is in the forefront of many things, and I think that the maintenance of family farming is one of the best.

I also have serious reservations about GMO products and am not willing to accept industry's assertions about the safety and benefits of the products they have developed.

Dave Pinkow

1

**Exhibit 1**                                                    Exhibit E

## Shannon, Abigail

| | |
|---|---|
| From: | Mary Anne D'Agata <cuisinequeen2000@yahoo.com> |
| Sent: | Sunday, May 06, 2012 8:45 PM |
| To: | Shannon, Abigail |
| Subject: | May 7 LUL meeting |

I will not be able to attend this meeting tomorrow, but as I live rural outside of the Hygiene area I would like to stay in contact about these issues and if I can add my 2 cents now I think it is all right for folks to set up small stands in their yards to sell extra produce they grow for themselves. The Farmers Market Association is incredibly expensive for small growers to participate in and I remember a time in Boulder county when it was fun to drive around to the all the small stands with our kids and buy fresh produce, eggs and berries.

I think the abusive commercial uses of some of these oversize hay barns or garages should be looked into a lot more closely by the zoning commission, they run extensive power lines in across your land and voila your neighbor isn't storing hay or cars like they were approved for, (wink, nod, rubber stamp) they have full blown commercial businesses with FedEx and UPS pick up and deliveries scheduled daily. Colorado Horse Rescue is an example of commercial biz gone bad in a residential area, the hazmat disaster down the street at 65th and Nelson Rd this past fall another, and Chance Acres subdivision is full of business / residential violations that fly under the radar from commercial trucking to machine shops. When these people sell their property, others move in and continue to run commercial businesses. No one from zoning board looks around out here and fines these activities or makes them tear them down.

Instead of harassing the actual farmers out in rural areas driving their machinery from field to field on rural roads where they make their living, we really should be doing 'anything' we can to encourage their agri-business ventures. Start with lowering speed limits eliminating the back road raceways to IBM, Seagate and Amgen. Stop 'paving' and 'improving' dirt roads so we can have safe areas to ride horses. How about eliminating the every weekend bicycle races that happen out here all the time? Boulder throws these races out in the same area around Hygiene all the time where it is a hazard to commute to work, or get around normally for the residents from sun up to sundown with the continual daily flow of bicyclists that ride out here ignoring cars, livestock and pedestrians by riding all over the road not the shoulder, stop signs and lights are ignored, traffic laws are not enforced for pack riders congesting roadways. Give residents out here a break all ready and have these races limited to one a month or less. Believe me we pay for the privilege of our peace and quiet by our taxation rate on our properties and should be able to benefit from it by not having to deal with these arrogant idiots in spandex with nothing better to do riding around out here all the time. Hold these races in downtown Boulder, Longmont, Lafayette, Louisville and inconvenience the locals there for a change and see how many races get approved....we are not entertained but inconvenienced daily.

Anyway that is my 2 cents, let me know if there are future meetings to be held on area use as they come up and you get others input.

Mary Anne D'Agata

1

**Exhibit 1**

## Shannon, Abigail

| | |
|---|---|
| From: | sue lion <lionink@wildblue.net> |
| Sent: | Sunday, May 06, 2012 10:47 PM |
| To: | Shannon, Abigail |
| Subject: | Ag use meeting May 7 |

Hi Abby,

Thanks for sending me the pdf of issues you are considering. I won't be able to come to the meeting Monday night but would like to be kept on the list.

In my opinion, I do think we should keep agriculture defined as what you grow, you can sell, within the rules and regs of "ag" land. Not only does that gives local farmers the ability to have a sustainable operation, it speaks to the environmental impact of shipping from far distances.

I'm also against permanent structures and size of operations in areas that would impact the quality of life of the neighbors. More is not necessarily better.

I think there needs to be some system in place that holds farmers/ag people accountable for what they sell and build - regular inspections, for example. I can see a hoophouse go up one season, then someone tires of it, and it becomes run down and disheveled, then becomes an eyesore or hazard, especially in the windy season.

Thanks for taking my comments,

Sue Lion


--
Sue Lion : ink  |  303.499.9891  |  **lionink@wildblue.net**

1

**Exhibit 1**                                                                 Exhibit E



## BCHA RECOMMENDATIONS
## LAND USE CODE DISCUSSION: AGRICULTURE

For the past several decades, the **Boulder County Horse Association (BCHA)** has spent many hundreds of hours working closely with the Land Use Department to create a set of "horsekeeping regulations" that everyone could live with.

We believe that the existing Land Use Code has been working extremely well, and in fact we have been unable to obtain any information from Staff that it hasn't. There have been few, if any, complaints from the public – and in a "complaint-driven process" such as Boulder County Land Use, that information in itself is a remarkable indicator of success!

We are also unable at this time to determine whether there are elements of the horsekeeping components that seriously need to be changed.

Therefore, if it isn't broken, we strongly suggest not trying to fix it. Regulations just for the sake of having regulations is not a good use of anyone's time or resources.

**We do have a few recommendations at this initial stage of the "Agricultural" section discussion:**

1) **Keep the definition of "Agriculture" as outlined in 18-104** ("Uses involving the cultivation of land, production of crops, raising, breeding, and keeping of livestock and the buying and selling of crops, products or livestock associated with the agricultural operation.")

2) **Add a definition of "Normal Farming Practices,"** which is currently not in the Code. We suggest something similar to the US Army Corps of Engineers' definition, which is: "normal farming operations include cultivating, harvesting, minor drainage, plowing, and seeding" (Clean Water Act Section 404); and add the phrase "livestock grazing."

3) **Support Agritourism.** Agriculture in Boulder County is diverse and colorful. The agriculture community would benefit economically, and the spin-off economic benefits would extend to the entire County, if Land Use constraints on activities such as B&B's and Farm Stays were made less burdensome. We suggest reducing the levels of review and other requirements on these uses in the Agriculture Zoning District.

**We remain, as always, willing to work with Staff to provide more information about the realities of horsekeeping in Boulder County, and to be part of a task force with Staff to revise the Code if necessary.**

**Exhibit 1**                                                                  Exhibit E

## Shannon, Abigail

| | |
|---|---|
| From: | perkmarsh@comcast.net |
| Sent: | Monday, May 07, 2012 9:22 AM |
| To: | Shannon, Abigail |
| Subject: | Re: Ag Neighbor Meeting - May 7, 2012 |

There are TWO very large houses on property now ,one in final stages of construction and if the additional new construction is suppose to be an indoor riding arena it will be the first one i've ever heard of with a concrete floor and it certainly does not look as if it could function as that...all this is right next to the creek and evidently floodplain rules do not apply to this property, to say nothing of the fact that the rules that encouraged the Eldo residents to create a waste water treatment plant to protect the creek do not apply to this property..a horse/cattle facility right next to the creek???What's up with that?? AND yes,it offends me visually as does the size ..right next to the bridge at the beginning of Mesa trail ( Eldorado Springs Trailhead) Letty Perkins

**From:** "Abigail Shannon" <ashannon@bouldercounty.org>
**To:** perkmarsh@comcast.net
**Sent:** Wednesday, April 25, 2012 8:27:19 AM
**Subject:** RE: Ag Neighbor Meeting - May 7, 2012

Letty,

I'm guessing this is in reference to the large house and indoor riding arena on the north side of Eldorado Springs Drive. What is it about the project you do not like? The visual impacts of the large house and riding arena? The environmental impacts of these structures? The environmental impacts of horses? Do you feel like the Board of County Commissioners didn't value your opinion? Land Use staff and the Board of County Commissioners follow the Land Use Code when we review and approve (or deny) development. We can't amend the Land Use Code if we don't know what is broken. I hope you'll consider calling me to discuss your experience in greater detail. My direct line is 720.564.2623. The best time to call me today will be around lunchtime or after 3:00.

Sincerely,

Abby Shannon

**From:** perkmarsh@comcast.net [mailto:perkmarsh@comcast.net]
**Sent:** Tuesday, April 24, 2012 10:46 PM
**To:** Shannon, Abigail
**Subject:** Re: Ag Neighbor Meeting - May 7, 2012

After that fiasco you people allowed at the east side of the beginning of Mesa Trail don't even pretend to listen to reason or address environmental concerns,you're a joke--a bad one..Letty Perkins

1

**Exhibit 1**

Shannon, Abigail

| | |
|---|---|
| From: | Aaron Harber <aharber@msn.com> |
| Sent: | Monday, May 07, 2012 9:30 AM |
| To: | Shannon, Abigail |
| Cc: | Cindy Domenico; Will Toor; Deb Gardner |
| Subject: | Expansion of activities on agriculturally-zoned properties |



**GOLDEN RUN FARMS, LLC**

**2500 North 119th Street, Lafayette, CO 80026-9216**

**(303) 666-6161   Info@GoldenRun.com   www.GoldenRun.com**

7 May 2012

Boulder County Planning Commission

c/o Ms. Abigail Shannon

Boulder County Land Use Department

2045 13th Street

Boulder, CO 80302

RE: Agricultural Land Use Regulation Improvement

Dear Abby,

Thanks very much for sending the draft to me.  It is clear the County's current policies are too restrictive and discourage creative thinking on the part of agricultural property owners.  In regard to my conversations with Dale Case and others, my suggestion for one of the best ways the County could help those of us engaged in agricultural activities (such as on my 320-acre farm)

1

**Exhibit 1**

would be to allow uses which generate income on the property which are not necessarily agricultural in nature.

The current limitations regarding what business activities can be conducted on ag properties is severely limiting and self-defeating.  By allowing a wider range of activities, the County would allow those in agriculture to (1) better survive the vagaries of agricultural markets and (2) allow farming families to stay on their properties.  I would hope the County would seek to promote both goals.

Obviously, there should be limits on these activities but my suggestion would be for the County to try and avoid the complex process of micromanaging these activities and, instead, achieve the same result by limiting their financial scope.  One example would be to limit such activities to a maximum annual revenue (e.g., $250,000) or annual profit (e.g., $100,000) total with the property owner responsible for reporting his or her results annually.

Another approach would be to limit the activity to a percentage of the revenue generated by formal agricultural activities.  So, for example, if the limit were 50% and a farm generated $100,000 in gross income, the supplementary activities would be limited to a maximum of $50,000.

The Planning Commission and the Commissioners probably have a number of additional ideas but I think this approach could be very effective in encouraging entrepreneurial activities which ultimately preserve more of the farms and ranches in Boulder County.

Please share this with the Planning Commissioners and do feel free to call me any time at (303) 666-6161.

Sincerely yours,

Aaron Harber

2

**Exhibit 1**                                                    Exhibit E

## Shannon, Abigail

| | |
|---|---|
| From: | K. Starek <starek@mac.com> |
| Sent: | Monday, May 07, 2012 2:47 PM |
| To: | Shannon, Abigail |
| Subject: | Re: Ag Comments due Tues, Meeting Tonight |

Thanks Abby.

Comments:

Special Events:

*Why do weddings need to be different? Why not allow weddings based on whether they fit whatever other regulations are adopted?  In other words, why would a 75 person wedding be more impactful to a neighbor than a 75 person farm dinner?... The wedding should certainly be required to have a meal which should be required to be farm food (just as the farm dinner should) so that it stays primarily a farm centered event.

*The Mariposa County special events codes seem excellent and well thought through. We would strongly support adoption of these codes as presented. The addition of up to 3 annual large events (150?) also seems like a good idea with a temporary permit. We think 250 is a huge event and should only be allowed in appropriate places (like Frog Belly- i.e. huge, out of the way farms).

*To limit farms to  5-10 events of 25-75 people when 12 regular Home Events are allowed at up to 99 people for residential properties seems counter productive unless this would be in addition to the Home Events rule for farms.


Agricultural Structures:

Commercial vs. residential greenhouses and hoophouses:

*We think citizens should have the right to grow their own food without overly burdensome constraints imposed by zoning restrictions. Because of natural growing season constraints in our area, we think that residential as well as commercial growing structures should be encouraged and that including them in residential floor areas would be counterproductive in part due to taxation and the fact that there are already strict size regulations on residential square footage. However, neighbors and impacts are obviously important. Perhaps passive growing structures could be allowed with the same setback type requirements and with the square footages to be based on a percentage of allowed residential sq. footage on site. Perhaps, for example, if a given site is allowed a 3,000 square foot house, they would also have a right to a 1,500 square foot growing space- (50% of allowed residential, or something like that).


Agricultural Worker Housing:

1

**Exhibit 1**                                                                                     Exhibit E

*We agree that provision "f" is problematic. We are in the process of building one of these ADUs. When we die, our kids will inherit this farm and may not want to live there. It will have an ADU and they may want to continue to own the property and keep it in farming as an asset that benefits them as well as the community. If they opt to keep it in farming and not live there, they will have a large ADU problem as it will no longer be legal. We do not believe that owners living/ working on the farm should be important. The intention and incentives should be to keep the property in farming the land well, not to control where the owners live and work. Perhaps the point should be that the residents of both houses should be working on the farm if the owner does not live there. There is an old adage that the most important infrastructure on a farm is people and community. Also, to paraphrase Wendell Berry, it takes more people to "use the land well" than it does to just "use the land".

*Another version of this issue also came up for us when we first bought our property. It had an ADU on it that was in very bad shape. While we were in the process of going through land use to get permission to revitalize the farming infrastructure on our property, we allowed the Black Cat farm to move temporarily into the main house on the property because they were under "extreme farm duress". In order to allow them to continue their farm operations, they needed a place for their poultry, their pigs and them while they waited in line for an open space parcel that could accommodate them. As you can imagine it is not easy to find a short term rental when you have a large livestock herd. In the end this created the situation where we were not living on the property and therefore the ADU was no longer legal even though we were in the process of bringing back the full agricultural use of the property and helping other local farmers to successfully establish their own farms. We think that the point should be to keep (and to cultivate) farmers and ranchers who are committed to sustainable local production, not to keep the owners on the farms under any and all circumstances.

*I am sure that there are other issues that could come up as well. What if we want or need to move for some reason? Would it be a bad thing for two families other than us to be farming the land? This rule also would keep a farmer who is renting or leasing a farm from having access to a potentially very useful ADU, thus creating an uneven playing field. Just because a farm/ranch operator cannot afford to buy the land does not mean that they could not use the help intrinsic with an ADU.

*We strongly believe that provision "f" is an unnecessary complication that is not helping the cause of keeping farmers on the land.

Thanks again Abby. Best. Karel and Alice Starek.

On May 7, 2012, at 8:20 AM, Shannon, Abigail wrote:

Hi everyone,
There was a typo in the email I sent to you on Friday. Comments regarding the document I sent to you are due tomorrow, Tuesday, May 8 at 9:00 am. I attached it again for your convenience. The purpose of sending this document to you is to let you review the same information that Planning Commission will be discussing at their meeting on May 16 and, if you are able, to provide comments in writing for the Planning Commission to consider. To those of you who have already sent comments to me – thank you!

I hope to see you tonight at the community meeting for neighbors of agricultural properties. It starts at 6:00 pm in the Commissioner's Hearing Room, 3rd floor of the Courthouse. The purpose of the meeting is for you to let staff know what you like and don't like about living near farms so that we can add to the Issue Identification document if there are concerns that we haven't identified.

2

**Exhibit 1**                                                                    Exhibit E



5971 Scotswood Court Boulder,Colorado 80301  Phone:303-516-9031  Fax:303-516-9360   Email: bouldercreekwine@msn.com

# Memo

To:             Boulder County Planning Commission
From:           Jackie Thompson, Owner
                Boulder Creek Winery
Date:           5/6/2012
Re:             Winery Signage Regulations


As owner of a tourist-oriented winery in Boulder I would like to comment on just one small element of the proposed changes to Land Use Regulations for Wineries: **TODS Signs** (Tourist Oriented Directional Signs).

<u>BACKGROUND</u>
I opened my winery in 2003 in an industrial park in Gunbarrel.
By 2004 it was apparent that a large number of tourists hoping to visit my tasting room were having a very difficult time locating me.

Having noticed two other Guide Signs in Gunbarrel:

(Shelby American Collection)

(Leanin' Tree)

I requested through CDOT a similar sign:



**Exhibit 1**

At that CDOT informed me that wineries had been the subject of a totally new TODS (Tourist Oriented Directional Signs) Program that they had specifically developed for wineries. They advised me to apply for a TODS sign, which I did in early 2005:



CDOT promptly processed and approved the sign, but the County denied the sign because it advertised a specific business.

## CURRENT PROPOSAL
As part of Winery Land Use discussions earlier this year, I brought the issue up again. After a bit of discussion it seemed logical to make the sign generic, like the Brown Guide Signs:



Staff is supportive of this approach and recommended that it be considered in the context of the Land Use Regulations currently under consideration.

## SUMMARY
Since the primary objective of such a sign is to assist tourists in finding our tasting room, I do not care if the sign is brown or blue, or if it has my business name on it or just the generic term "winery."

I think this is reasonable compromise. Thank you to your Staff for their assistance, and thank you in advance for your consideration of this issue.

2

**Exhibit 1**

Farm Stand in Our Neighborhood.
Anhawa Manor, Rural Residential Zoning.
May 5, 2012

Because we are zoned Rural Residential and in a Subdivision Boulder County currently does not allow us to sell vegetables on our properties.
On Monday May 8, 2012 there will be a town hall meeting to discuss options for community or individual Farm Stands.

I would like to request a variance to allow either an individual Farm Stand or a combined Farm Stand for our Community.

Please join me in this request by signing my petition.
Sincerely

Kat Connelly

*Kat Connelly*

Do you want a Farm Stand in our Community?

| Name | Address | Yes | No |
|------|---------|-----|-----|
| Kathleen Connelly | 9214 Anhawa Ave. | X | |
|  | 15 | X | |
| Denis Hamel | | | |
| Debbie Puzo | 9225 Anhawa Ave | X | |
| David Jackson | 9245 Anhawa Ave | X | |
| Dennie Zabler | 12931 Sheramdi St | X | |
| Marily Swan | 12931 Sheramdi St | X | |
| Suzanne Barrett | 12911 Sheramdi St. | X | |
| Judy Gold | 12871 Sheramdi St. | X | |
| Lanny & Linda Bergeson | 9119 Jotiva Dr | X | |
| Andy Patterson | 9176 Aldan Dr | X | |
| Patricia Yarman | 9179 Aljan Dr. | X | |
| Jim Whitley | 12854 Anhawa | X | |
| Sherry Knoll | 12887 Anhawa Ave | | |
| Tom Smith | 12887 Anhawa Ave. | | |

**Exhibit 1**

Do you want a Farm Stand in our Community?

| Name | Address | Yes | No |
|---|---|---|---|
| Sandra Lanham | 12904 Anhawa | ✓ | not in open space |
| Esther Armitstead | 12839 Sheridan | ✓ | |
| Wendy Close | 12924 Anhawa | ✓ | |
| Linda Jackson | 9204 Anhawa | — | } not in open space |
| Fed Jails | " " | — | |
| Cesar Marquina | 12803 anhawa | ✓ | |
| Belinda Marquina | " " | | |
| Mark Venske | 12869 ANHAWA | ✓ | |
| Annetta M. Ramsey | 12851 Anhawa | ✓ | |
| John Pazour | 12827 Anhawa | ✓ | |
| Judith E. Yeager | 12846 Anhawa Roc | ✓ | |
| Stan Dovis | 12777 ANHAWA AVE | ✓ | |
| Betty Bethune | 12624 Anhawa Ave | ✓ | |
| Evie Witter | 12648 Anhawa ave | — | |
| Mand Dale | 9111 JOTIPA DR | ✓ | |
| Don L Davis | 9111 Jotipa Dr | | ✓ |
| Janis Griffin | 9140 Jotipa Pr | | |

**Exhibit 1**

Exhibit E

Do you want a Farm Stand in our Community?

Name          Address                    Yes          No

Lloyd Temper, 9265 Anhawa     Yes     ✓

_James J_____ 9165 dot-ipa     Yes !

Kurt & Nichd  720-272-4220    yes

Debby Precht  ( 303) 772-7310  yes!

_Sharon Mott_  (303) 772-5579  yes

Ken Raper  303-921-7369 / 9148 Fleetwood Ave.

Yes _L. Martindale_  303 651-6691  yes  9135 Fleetwood ave

Doug P. Jackson  303 651-6390  YES
           9126 Fleetwood

_Neil Shirt_  12822 SHERAND) ✓

Tomasz Kuchovski  12891 SHERAND)

John R Lee  12932 SHERAND, ST      YES

Priscilla Snow 9294 Anhawa Av  yes

Mike Smith yes  9356 Anhawa Ave

Bob Smith yes                    yes

Wayne Halut  9336 Anhawa Ave yes

**Exhibit 1**

Exhibit E

Do you want a Farm Stand in our Community?

| Name | Address | Yes | No |
|------|---------|-----|-----|
| Jean Billing | 9396 Anhawa | | |
| Louise Jackson | 9458 Anhawa | yes | |
| Carol Parker | 9478 ANHAWA | YES | |
| Drew Neal | 9427 Anhawa Ave | yes | |
| Dianne Torbeck | 9385 Anhawa Ave | yes | |
| Dixie Sterkel | 9365 Anhawa Ave | yes | |
| Patti Puzo | 9345 Anhawa Ave., | YES | |
| Marilyn Palmer | 9285 Anhawa Ave | " | |
| Diane Loos | 9457 Anhawa Ave | Yes | |

# BOOKCLIFF VINEYARDS

Exhibit 1

May 8, 2012

Boulder County Planning Department
Abigail Shannon
2045 13th Street
Boulder, CO 80302

Dear Abby:

Below are our comments with regard to your work identifying agriculture issues for the upcoming Planning Commission Study Session:

**(notes in red by BookCliff Vineyards)**

**Purpose of the current regulations**

*The Land Use Code regulations are a means to implement the Boulder County Comprehensive Plan (BCCP). The Boulder Valley Comprehensive Plan (BVCP), Intergovernmental Agreements (IGAs), and perhaps the Building Code may also help explain or indicate the purpose of the regulations.*
Wineries are compatible with the purpose of the comprehensive plan. If you visit wine country in Oregon or California it does not have an industrial look and feel, but rather looks agricultural.  There are over 200 wineries in country side surrounding Portland and it still looks very rural.  It might be thought that Oregon makes special provisions for wineries because viticulture makes up a large part of the agricultural activities in the area but actually it is a small percentage of the land use.

*... skip to page 14 Re Wineries ...*

In addition, we have a provision that states, "On-site means agricultural and horticultural products that are grown on parcels under the same ownership, lease or contract as the parcel on which the Accessory Agricultural Sale use is located" (4-516.A.5.a). The intent of this provision is to allow someone who leases POS land to sell ag products on private land they also own. It is good because it allows us to consider the total farm as one unit regardless of ownership or parcel patterns. It is not good

**Exhibit 1**                                                                                    Exhibit E

because it doesn't say the "other lands" need to be in Boulder County. It might be vegetables in Brighton or a vineyard in Mesa County, CO, or ag products from out of state (this is a correction we should make).  **Consider the possibility of growing the grapes where the climate is favorable and produce the value-added product (for example wine) where it is convenient to the consumer, for example the front-range. Forcing wineries to be in industrial zones just because the grapes are grown in a different county seems artificial.  The traditional location of wineries is in agricultural settings not in buildings that contain dry cleaning operations.**

**Land Use Code – potential strategies for revision based on stakeholder meeting**
Propose allowing wineries on a small scale in A (perhaps unsubdivided RR) through SU as an Agri-Business use
Require that grapes must be from Colorado  **(75% to allow for weather events, etc.)**
Require that some grapes/fruit/bees come from the parcel where the production is occurring? (This would serve as a demonstration of the growing and perhaps development of locally-grown inputs)  **(Demonstration vineyard OK, but keep it minimal ... we don't want to have to buy "specialized farm equipment" to meet this requirement).**
Establish a maximum floor area for storage, tasting room, wine production (2,000 sq ft?)  **(this size is not a viable business winery ... 10,000 SF would be more feasible as a <u>minimum</u> for a "real winery business" as opposed to a gentleman farm with a hobby winery.)**; establish minimum parcel size (10 acres?)   **(The size of the parcel needs to be proportionate to the size of the winery .... a 2,000 SF winery can't support the mortgage of a 10-acre parcel of land, although a 10,000 SF winery might). Oregon allows for up to a 10,000 SF building for agricultural processing (which includes wineries) without special review.**

Allow as a home occupation provided:
o  Tasting rooms prohibited; OR tasting rooms allowed if it would generate fewer than 16 ADT, AND
o  No retail sales from the property unless it is in conjunction with a Farm (new use classification TBD) and accessory agricultural sales  **Under the 90/10 rule for wineries the 90% includes value-added products namely the wine and the 10% are non-agricultural products related to wine.**

What about growing potatoes and setting up a vodka distillery?

What about growing agave and setting up a tequila distillery or nectar refinery?

**Exhibit 1**

How would this relate to allowing value-added food production on other ag parcels – needs to all be grown on-site? In Boulder County? Would adding Winery open all value-added food production in the unincorporated county so long as the ingredients were grown in Colorado? **The terrior is expressed in the wine. Colorado wine based on the soil and climate tastes different from wine made in France, Chile or California. I don't know whether this is true for spirits and beer and other alcoholic products. Distilleries and breweries as far as I know are not tied to the crop cycle and produce all year round. There is also the question whether breweries and distilleries would be interested in locating in Boulder County.**

### Transportation
While tasting rooms would likely have the greatest effect on the traffic volume associated with wineries, the off-peak nature of winery hours of operation present some challenges to effectively evaluating the impact of the traffic generated. Consequently, the transportation issues identified for wineries include this concern as well as ensuring appropriate access to sites and placement of signs in the ROW.

Wineries interested in signage – TODS: tourist oriented directional signs. The Standards allow for MUTCD-approved signs in the ROW. There are recreational/directional signs in the MUTCD that could note the location of wineries but not advertise for a specific winery.  **(Generic "WINERY" signs, whether they are brown or blue, would be great - specific wineries need not be advertised. )**
County staff supports requiring a process (SU or LISR) for this use which would require a Transportation System Impact Analysis as described in the Transportation Standards. **(The State already has a TODS sign review process... the County should not require anything onerous beyond the existing process for TODS signs.)**

### Building Code
Wineries/tasting rooms would require commercial occupancy (right?) which may trigger expensive retrofits to existing structures.  **(There should be a minimum threshold (perhaps 2,000 SF Home Occupation wineries with tasting rooms with less than 16 ADT?) below which this should not apply.**

### Public Health
Tasting rooms do not typically serve food. But if they do serve food for special events it would need to be catered by a licensed caterer or prepared in a licensed facility. Water utilized in the processing must be from a *public water source* as defined by CDPHE. Public water systems such as Left Hand or a municipal water provider qualifies as a public water source. So does well water that has been tested, treated, and certified. If the well is a *domestic* well (as defined by the State Engineer), it will need

**Exhibit 1**

Exhibit E

to be converted to a *commercial* well. In Boulder County, this conversion requires an augmentation plan.  **(This should not apply to Home Occupation wineries )**

What type/size OWS is needed? Are there cut-offs for numbers of visitors/day the Code should specify that would align with existing size thresholds (2,000 gpd)? Would it always require a Class V injection well because it is a commercial use? **(Wineries typically only use water to wash and rinse equipment ... and normal restroom use.)**

Thanks for allowing us to have input,

John Garlich
BookCliff Vineyards

**Exhibit 1**                                          Exhibit E

## Shannon, Abigail

| | |
|---|---|
| From: | Zia Parker <ziaparker@yahoo.com> |
| Sent: | Tuesday, May 08, 2012 9:03 AM |
| To: | Shannon, Abigail |
| Subject: | Comments on Boulder County Land Use Codes in regard to Agriculture |

Hello,
I will comment briefly, as I am selling my farm at 6481 N 63rd St. and moving out of Boulder County. My great-grandparents homesteaded 40 miles West of my farm, Willow Way.
I have lived in Boulder since 1952, but the County Codes have made it unfeasible for me to continue to live here.

I was required to undergo a Low Impact Special Use Review Process because I wanted to teach a Permaculture Class (100 hour course) on my Ag zoned property in the Spring of 2008.
This process became onerous in terms of time, money and cognitive attention to the point of impasse.
The economy, the inaccessibility of refinance or loan modification also have influenced my decision to leave Boulder County, but none of these influences was as
great as the unreasonable character of the Boulder County Land Use Codes.

Mark up another "road kill" to the Boulder County Land Use bureaucratic steamroller.

Some say the County did the best they could in the case of Willow Way farm, given their responsibility to follow the codes. In my perspective, the County Commissioners carried out an unreasonable and unnecessarily strict interpretation of the codes in these ways:
severe limit on tours, etc
engineered traffic study
limit parking to the back
denying parking at neighbors, and neighboring park


All of these rulings of the County Commissioners were draining on the lifeblood of the farm.
However, lack of communication of the bureaucratic process of the LISUR was the real clencher.
I was handed a hefty application packet, and given next-to-nil coaching in the process, or its implications.
When I was asked to outline the schedule of all uses and car-trips to the farm for the Use Review, I was not told that I would be required to follow that schedule to the exact day and hour into the non-foreseeable future. That only an onerous bureaucratic process would provide the possibility of changing that schedule.

For 35 years, I have had a practice in Movement Therapy in Boulder. That is the income that could have supported the farm. Many Boulder County farmers have some professional pay-level job to support their farm operations. The Use Review requirements cut that income for me. I could not spontaneously add a class or a weekend workshop when the need arose from my client base. This was devastating to me financially.

It is clear that the Land Use Department is oblivious to the time-demands of farming. Returning to endless bureaucratic processes to change every tiny detail can be lethal to a farm.

1

**Exhibit 1**

I have two simple suggestions for the Boulder County Land Use Department in regard to Agriculture codes, and in regard to the entire Land Use code:

1) **At every opportunity for choice, choose sustainability**. Support projects and goals which are designed to support sustainability and the common good.
The Boulder County Comprehensive Plan, and the mandate of the voting population are clearly in support of sustainability, support them.

2) When in the course of everyday business, it becomes apparent that the codes are not reasonable and do not support sustainable projects or goals, **change the codes.**
Create a means for changing code which is more streamlined. We are in the winds of change. Environmental imperatives are demanding that we adapt on every level.
**The process by which Codes can be changed must be simplified, and amenable to the common good.**

In the case of Willow Way farm, simply changing the code to allow for portable latrines could have "saved the farm".  Of course, allowing well-designed composting toilets would be a better and more sustainable path, but simply allowing Porta-Potties would have provided the support that Boulder County's first applicant for "Demonstration Farm" sorely needed.

I am moving where the grass is greener-- to Ecuador, where "nature's rights" have been named in the Constitution, where is it possible to implement the sustainable practices I have been teaching in the Permaculture Design Course.

"White flight" is a term to describe white people fleeing a neighborhood because of fear of people of color moving into a neighborhood.
"Green flight" describes dedicated environmentalists that flee an area because it does not support green lifestyles. That is me. I also consider myself to be a "code refugee".
It is time to wake up, and support sustainability in every way possible at every opportunity possible.

Zia Parker

```
--
Zia Parker
Willow Way Wellness & Permaculture Farm
6481 N 63rd St.
Niwot, CO 80503
willowwaywellness.com
303-530-1415
```

2

**Exhibit 1**                                                          Exhibit E

## Shannon, Abigail

| | |
|---|---|
| From: | Wyatt Barnes <wyatt@redwagonorganicfarm.com> |
| Sent: | Tuesday, May 08, 2012 8:47 AM |
| To: | Shannon, Abigail |
| Subject: | Re: FW: Ag Neighbor Meeting - May 7, 2012 |

Abby

I skimmed the 25 page document you sent out. There were a few thing I saw that I wanted to mention- the part about selling produce from land you control is not specific to Boulder County or even the state of Colorado. I was thinking Boulder County or counties that touch Boulder County.

I mentioned at the meeting last night about the loopholes being created by the farm worker housing. I think the burden of proof that your are farming needs to be reasonably high to make it so a non farmer can not just build additional housing on their property. I was thinking sales receipts of $100k or something easily reachable by a working farm but difficult enough that someone would not start a farm operation of that scale just to build an extra house.

My other thought was about the explanation of why the small farms want or need these changes. I think you understand the issues but don't know if the explanation would be clear to someone new to the issue. I see the issue as - land and living expenses are very high- small farms are limited in production and it is hard to produce and sell enough to be profitable- many of the small farms are doing it for a community connection - the additional revenue from classes etc is critical to the financial success of the small farms- if we want a local small scale food system we need to legalize many of the things in your document.

thanks

Wyatt


On Fri, May 4, 2012 at 11:05 AM, Shannon, Abigail <ashannon@bouldercounty.org> wrote:

Hello Ag Stakeholder Email List,

Please see the email below. This is an announcement regarding the Monday Ag Neighbor meeting. It is also an announcement for the May 16 Planning Commission meeting. Please read! Particularly paragraphs 4 and 5!

Thanks,

Abby

1

**Exhibit 1**

Shannon, Abigail

From:          John Wilkens <john.wilkens@zoinkmail.com>
Sent:          Tuesday, May 08, 2012 8:05 AM
To:            Shannon, Abigail
Subject:       Re: Ag Comments

Dear Ms Shannon,

I cannot be at the meeting tonight, but would like to share with you my comments:

I live in the South Vale subdivision one mile northeast of Marshall off Cherryvale Road.  I have few (or minimal) problems with many of the small agricultural uses detailed in your document.  I am, however, one of those homeowners who was embroiled in the bruising fight over the expansion of the Zell-Peppet property.

One of my beefs arises over the amount of construction allowed for pleasure horse use under the rubric of agricultural use.  Without rehashing the fight of a year ago, the primary issues are: 1) The 15,000 sf Zell-Peppet riding arena will alter the rural character of this area.  2) The Zell-Peppets are already operating a near-commercial facility which, under current regulations, allows up to 12 boarders along with concomitant traffic, dust, and noise associated with that use.  (A similar buildup seems to be happening near the Eldorado Springs trailhead -- large houses and horse facilities being built adjacent to public open space.)

I believe that Boulder and Boulder County's agricultural zoning codes are in need of revamp with regard to pleasure horse use.  What might have been sufficient 25 years ago is no longer relevant and should be updated to mitigate the new uses (and abuses) being allowed under them.

Secondly, the current process of land use applications notification is not serving the community (and, in the case of the Zell-Peppet review, actually precipitated a contentious confrontation over the proposed expansion).  The neighbors of the South Vale subdivision did not receive adequate notification of the proposed expansion until the "official" postcard arrived two weeks prior to the comment period deadline.  Such a short deadline short-circuited any civil discussion between South Vale and the Zell-Peppets, and the South Vale neighbors immediately jumped to "confrontational mode" (e.g., public protests) when faced with having to come together as a group, come up to speed researching the issue, and formulating a response to both the Zell-Peppets and the county commissioners within less than 12 days.

Once locked into public confrontation, it was very difficult to interact with the Zell-Peppets and no friendly negotiation to modify their plans to the satisfaction of everyone was possible.  The county was left with angry letters (in the files and in the newspapers), and the calling of a confrontational public meeting (which, judging by the mid-afternoon time slot, the sharp glances of the county attorney, and the unanimous decision of the commissioners was simply a procedural show to mollify public outrage).

Such a short time period between public notification and public feedback serves only to foment confrontational reactions instead of neighborly problem solving.  How is the public served by stirring up hostile relations between neighbors and neighborhoods following such a process?  If

1

# Exhibit 1

anything, once a hostile confrontation is triggered, there ought to be resources that could be enlisted (e.g., a better explanation of the rules and regulations by staff, or even mediation provided by another county agency) to prevent the outrage from reaching the commissioners and ending in a time-wasting meeting where the outcome is predetermined.

Bottom line: If the county has an obligation to notify neighbors of development actions that impact a particular area, it should be as interested in facilitating public input without fostering confrontation between neighbors that leaves ill will in its wake.

I hope you will consider these comments and formulate ways to make things work for both sides.  Boulder is blessed with having a mix of rural, urban, and open space, but as our population continues to grow, confrontation over how this blend is managed in the future will only increase.

Sincerely,

John Wilkens
5927 South Vale Road
Boulder, Colorado  80303

On May 7, 2012, at 08:20 , Shannon, Abigail wrote:

Hi everyone,
There was a typo in the email I sent to you on Friday.  Comments regarding the document I sent to you are due tomorrow, Tuesday, May 8 at 9:00 am.  I attached it again for your convenience.  The purpose of sending this document to you is to let you review the same information that Planning Commission will be discussing at their meeting on May 16 and, if you are able, to provide comments in writing for the Planning Commission to consider.  To those of you who have already sent comments to me – thank you!

I hope to see you tonight at the community meeting for neighbors of agricultural properties.  It starts at 6:00 pm in the Commissioner's Hearing Room, 3rd floor of the Courthouse.  The purpose of the meeting is for you to let staff know what you like and don't like about living near farms so that we can add to the Issue Identification document if there are concerns that we haven't identified.

Abby

_Abby Shannon, AICP_
_Senior Planner, Boulder County Land Use_
_ashannon@bouldercounty.org_
_303.441.3930_
_Stay informed! Sign up for email updates from the Boulder County Land Use Department:_
_http://www.bouldercounty.org/gov/media/pages/listserv.aspx_

<Prelim Issue Identification worksheets 4May12.pdf>

2

**Exhibit 1**                                                                    Exhibit E

Shannon, Abigail

From:          Dick Miller <dmiller@mikaag.com>
Sent:          Tuesday, May 08, 2012 10:41 AM
To:            Shannon, Abigail
Cc:            Case, Dale; Card, Adrian; Bell, David; bcfapc@googlegroups.com;
               scott@mikaag.com
Subject:       RE: Ag Comments due Tues, Meeting Tonight


Abby...


As a past member of FAPC I know we encouraged you to look at land use regulations that were
hampering and presenting obstacles to the agricultural community in Boulder County. Reading
the 25 pages of your attachment it appears that you have taken the opposite position. As I read
your material it refers to more control, standardization, and restrictions except for "local foods".
You mention Brighton vegetables and West Slope fruit like they should be considered as
undesirable alternatives to products grown in Boulder County. God forbid someone were to sell a
California avocado, a Florida lime, a New Mexico hatch chile pepper, along with their Boulder
County grown tomatoes to make salsa in Boulder County other than King Soopers, Safeway, or
Whole Foods. Your lack of agronomic experience is showing. There are many reasons various
vegetables and fruit are not grown in Our county due to soil types, well water availability, heat
units or growing degree days, land costs, expensive housing issues, and even over controlling
land use restrictions. That you have the ability to influence, the others you can't.


The meetings that I attended were heavily weighted with imposing more restrictions to restrict
competition from existing operations. I don't think that is the job of your land use department but
is a free market function. If somebody can do it better, offer more value, or better quality or
service they deserve the right to do so without county imposed restrictions. Finally it bothers me
you seek guidance and reference material from Mariposa County California and the State of
Oregon which are not considered to be friends of agriculture. Why didn't you consult with
Colorado Farm Bureau or the Colorado Farmers Union organizations? You really didn't address
and propose solutions to agricultural housing, sign codes restrictions, non local product
restrictions to round out and broaden farm market selection, or numerous other real problems
that exist. They still are at the root of our problems. I know you have worked diligently to try to
improve the land use code but you need to look at it from the agricultural perspective that when
it comes to your LUD, less is better.


In closing, my sarcastic response is not to be critical, so don't take it personally, but to make you
and your department think about the real solutions that need to formulated to help the entire local
agricultural industry. Agricultural zoning is not to "provide and serve as desirable buffer between
urban communities" as you stated in a meeting but is to allow agriculture "Boulder County
farmers and ranchers" to prosper, flourish and go about their business of producing food and
fiber with minimal local interference.

1

**Exhibit 1**                                                                      Exhibit E

Dick Miller

**From:** Shannon, Abigail [mailto:ashannon@bouldercounty.org]
**Sent:** Monday, May 07, 2012 8:21 AM
**To:** Shannon, Abigail
**Subject:** Ag Comments due Tues, Meeting Tonight

Hi everyone,

There was a typo in the email I sent to you on Friday.  Comments regarding the document I sent to you are due tomorrow, Tuesday, May 8 at 9:00 am.  I attached it again for your convenience.  The purpose of sending this document to you is to let you review the same information that Planning Commission will be discussing at their meeting on May 16 and, if you are able, to provide comments in writing for the Planning Commission to consider.  To those of you who have already sent comments to me – thank you!

I hope to see you tonight at the community meeting for neighbors of agricultural properties.  It starts at 6:00 pm in the Commissioner's Hearing Room, 3rd floor of the Courthouse.  The purpose of the meeting is for you to let staff know what you like and don't like about living near farms so that we can add to the Issue Identification document if there are concerns that we haven't identified.

Abby

_____

*Abby Shannon, AICP*
*Senior Planner, Boulder County Land Use*
*ashannon@bouldercounty.org*
*303.441.3930*

*Stay informed! Sign up for email updates from the Boulder County Land Use Department:*

*http://www.bouldercounty.org/gov/media/pages/listserv.aspx*

2