**Exhibit 3**

# In Defense of Plausibility: *Ashcroft v. Iqbal* and What the Plausibility Standard Really Means

I.  INTRODUCTION
II.  BACKGROUND: PLEADING IN THE CONTEXT OF HISTORY AND SUPREME COURT PRECEDENT
    A.  *Historically, Highly Technical Pleading Requirements Impaired Substantive Justice*
    B.  *Adoption of the New Rulemaking Process and New Rules Aimed at Achieving Substantial Justice*
    C.  *The Court Established "Simplified Notice Pleading" to Facilitate Decisions on the Merits*
    D.  *For Half of a Century, Notice Pleading Prevailed Over Attempts to Raise Standards*
    E.  *The Court Introduced the Plausibility Standard and Retired the No-Set-of-Facts Test*
    F.  *For Two Years, the* Twombly *Standard Confused Lower Courts*
III.  FACTS AND PROCEDURAL HISTORY
IV.  ANALYSIS: THE TWO-PRONGED APPROACH TO THE PLAUSIBILITY STANDARD
    A.  *Applying the First Prong: The Fact-Conclusion Distinction*
    B.  *Applying the Second Prong: The Meaning of Plausibility*
V.  CRITICISM: SHOULD THE COURT HAVE ADOPTED THE PLAUSIBILITY STANDARD?
    A.  *Did the Plausibility Standard Raise Pleading Standards, Thus Harming Plaintiffs?*
    B.  *Did the Court have Sufficient Reason to Adopt the Plausibility Standard?*
    C.  *Are There Too Many Difficulties in the Application of the Plausibility Standard?*
    D.  *Did the Court Violate the Rulemaking Process?*
VI.  IMPACT: RULE 12(B)(6) MOTIONS UNDER THE PLAUSIBILITY STANDARD
VII.  CONGRESS SHOULD NOT ENACT LEGISLATION TO OVERRULE *TWOMBLY* AND *IQBAL*
VIII.  CONCLUSION

**Exhibit 3**

## I. INTRODUCTION

In May 2009, *Ashcroft v. Iqbal* divided the Supreme Court of the United States over one of the most basic questions in civil procedure—what must a plaintiff plead to get into court?[1]  The five-to-four decision has since been hailed as "the most significant Supreme Court decision in a decade for day-to-day litigation in the federal courts."[2]  Moreover, it may soon become "the most frequently cited Supreme Court case by the lower federal courts in all of American history."[3]  The critics of the Court find it most alarming that *Iqbal* arguably makes it easier for federal courts to dismiss a complaint before giving the plaintiff an opportunity to discover and present its evidence.[4]  In the particular case, the Court threw out a suspected terrorist's claim against former U.S. Attorney General John Ashcroft and FBI Director Robert Mueller, which alleged that the claimant's detainment following the September 11 terrorist attacks was solely the result of discrimination based on race, religion, or national origin.[5]  The Court's critics warn, however, that suspected terrorists are not the only ones at risk.  They argue that *Iqbal* is "a sweeping decision with the potential to impact every plaintiff in a civil lawsuit . . . ."[6]  In fact, they have identified numerous plaintiffs whose rights they argue have already been violated by the decision, including an epilepsy patient suffering multi-organ failure,[7] Coca-Cola trade unionists in

---

1.  *See* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

2.  Adam Liptak, *9/11 Case Could Bring Broad Shift on Civil Suits*, N.Y. TIMES, July 20, 2009, at A10, *available at* http://www.nytimes.com/2009/07/21/us/21bar.html (quoting Thomas C. Goldstein, an appellate lawyer with Akin, Gump, Strauss, Hauer & Feld in Washington, D.C.).

3.  Kim Briggeman, *Supreme Court's* Ashcroft *Ruling Will Be One of Most-Cited Cases, UC-Irvine Law Dean Says*, MISSOULIAN (Mar. 9, 2010), http://missoulian.com/news/state-and-regional/article_f2c6be1a-2b3e-11df-827d-001cc4c03286.html (quoting Erwin Chemerinsky, Dean of the University of California, Irvine School of Law, in a statement at the University of Montana Law School).

4.  *See, e.g.*, Tony Mauro, *Plaintiffs Lawyers See Broad Impact of High Court's Decision on Detainees*, NAT'L L.J. (May 20, 2009), http://www.law.com/jsp/article.jsp?id=1202430832057 ("University of Richmond School of Law professor Carl Tobias . . . said *Iqbal* is so significant that it in effect rewrites Rule 8 of the Rules of Civil Procedure.  'Judges will have more discretion to dismiss cases earlier,' Tobias said."); Liptak, *supra* note 2 ("*Ashcroft v. Iqbal* . . . makes it much easier for judges to dismiss civil lawsuits right after they are filed."); Herman Schwartz, *The Supreme Court Slams the Door*, NATION (Oct. 12, 2009), http://www.thenation.com/article/supreme-court-slams-door (explaining that under *Iqbal*, "businesses that discriminate against minorities, corporations that sell harmful products and many other wrongdoers can escape having to answer in court for their actions, no matter how blatant or egregious the violation, for the *Iqbal* decision gives judges virtual carte blanche to dismiss a case without allowing the plaintiff any pretrial examination"); *see also infra* notes 178 and accompanying text.

5.  *See Iqbal*, 129 S. Ct. at 1942, 1954.

6.  Mauro, *supra* note 4 (quoting Ian Millhiser, a lawyer with the National Senior Citizens Law Center).

7.  *See* Frey v. Novartis Pharm. Corp., 642 F. Supp. 2d 787, 796 (S.D. Ohio 2009) (plaintiff alleged a defect in the drug Trileptal, and a motion to dismiss without leave to amend was granted under *Twombly* standards); *see also* Alison Frankel, *Two More 'Iqbal' Dismissals Emerge in*

## Exhibit 3

Columbia,[8] protesters of President George W. Bush,[9] anti-abortion protestors,[10] members of the Popular Democratic Party in Puerto Rico terminated from employment at La Fortaleza,[11] an African-American Philip Morris employee,[12] owners of insulated baby-bottle coolers,[13] a concerned airline passenger placed on the terrorist watch-list,[14] an inexperienced investor in commercial real estate,[15] a prescription drug insurance provider that paid out millions for an atypical antipsychotic drug,[16] and a sixty-year-

---

*Product Liability Cases,* AM. L. LITIG. DAILY (Aug. 4, 2009), http://www.law.com/jsp/article.jsp?id =1202432738346.

8. *See* Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252 (11th Cir. 2009) (plaintiffs alleged that Coca-Cola was involved in kidnap, torture, and murder committed by Columbian paramilitary); *see also* Alison Frankel, *11th Circuit Invokes "Iqbal" in Affirming Dismissal of Alien Tort Claims Against Coca-Cola and Bottlers,* AM. L. LITIG. DAILY (Aug. 13, 2009), http://www.law.com/jsp/ article.jsp?id=1202432993839.

9. *See* Moss v. U.S. Secret Serv., 572 F.3d 962 (9th Cir. 2009) (plaintiffs alleged violation of First Amendment rights by the Secret Service).

10. *See* McTernan v. City of York, 577 F.3d 521 (3d Cir. 2009) (plaintiffs alleged violation of free exercise and first amendment rights). In *McTernan,* the plaintiffs sought to stand on the ramp granting wheel chair access to the abortion clinic but were refused permission by a police officer. *Id.* at 524.

11. *See* Ocasio-Hernadez v. Fortuno-Burset, 639 F. Supp. 2d 217 (D.P.R. 2009) (plaintiffs alleged discrimination based on political affiliation in addition to violation of other constitutional rights); *see also* Argeropoulos v. Exide Techs., No. 08-CV-3760, 2009 WL 2132443 (E.D.N.Y. July 8, 2009) (plaintiff alleged discrimination and harassment because of his national origin and perceived sexual orientation). The court posited that the hostile work environment claim might have survived under the older standards, but did not under *Iqbal. Id.* at *6.

12. *See* Fletcher v. Phillip Morris USA, Inc., No. 3:09CV284-HEH, 2009 WL 2067807 (E.D. Va. July 14, 2009) (plaintiff alleged race and gender discrimination).

13. *See* Suarez v. Playtex Prods., Inc., No. 08 C 2703, 2009 WL 2212315 (N.D. Ill. July 24, 2009) (plaintiffs alleged that the baby-bottle coolers contained lead). The claims were dismissed without prejudice. *Id.* at *4. Plaintiffs' consumer fraud claim was dismissed for failure to comply with Federal Rule of Civil Procedure 9. *Id.* at *3. Plaintiffs' negligence claim was dismissed for failure to allege injury, an essential element of a claim for negligence. *Id.* Plaintiffs' unjust enrichment claim was dismissed because it "hinge[d] on the viability of the other counts." *Id.* at *4. Each of these claims was dismissed for reasons independent of the plausibility standard. Therefore, they would have been dismissed under pre-*Twombly* standards. *See* Frankel, *supra* note 7.

14. *See* Tooley v. Napolitano, 586 F.3d 1006 (D.C. Cir. 2009) (plaintiff alleged illegal wire taps after suggesting to a Southwest Airlines representative that airlines should screen all luggage for bombs). The D.C. Circuit affirmed the dismissal "for reasons distinct but not inconsistent with the holding in *Iqbal." Id.* at 1007. The D.C. Circuit further concluded that these allegations were claims "flimsier than doubtful or questionable . . . essentially fictitious . . . not realistically distinguishable from allegations of 'little green men' of the sort that Justice Souter recognized in *Iqbal* as properly dismissed on the pleadings." *Id.* at 1009 (citations omitted) (internal quotation marks omitted).

15. *See* Owens v. Gaffken & Barriger Fund, LLC, No. 08 Civ. 8414(PKC), 2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009) (plaintiff alleged securities fraud and breach of contract among other claims).

16. *See* Pa. Emps. Benefit Trust Fund v. Astrazeneca Pharm., No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686 (M.D. Fla. July 20, 2009) (plaintiff alleged false marketing of the drug Seroquel); *see also* Andrew Longstreth, *Citing* Ashcroft v. Iqbal*, Florida Judge Dismisses Seroquel False Marketing Suit,* AM. L. LITIG. DAILY (July 21, 2009), http://www.law.com/jsp/tal/digestTAL.jsp?id= 1202432427316&Citing_Ashcr%0D%0Aoft_v_Iqbal_Florida_Judge_Dismisses_Seroquel_False_M

**Exhibit 3**

old National Forest Agency employee with sensory deficit condition.[17]

The Court's influential decision turned upon its interpretation of the Federal Rules of Civil Procedure.[18]   Under Rule 8(a)(2), pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."[19]  Instead of referring to the half-century-old "notice" pleading standard,[20] the Court formulated a "plausibility" standard for evaluating every civil complaint.[21]  Under the plausibility standard, "only a complaint that states a *plausible* claim for relief survives a motion to dismiss."[22]  The use of that one word—plausibility—has created substantial controversy.[23]  From one perspective, the *Iqbal* decision merely settled the debate about whether the standard established two years earlier in *Bell Atlantic Corp. v. Twombly* applies in every civil case.[24]  (Of course, that begs the question whether *Twombly* was a good decision in the first place.) From another perspective, *Iqbal* "messed up" the federal rules[25] and effectively "abandon[ed] the liberal pleading rules which have prevailed for decades."[26]  Since the ruling, legal professionals have argued about whether

arketing_Suit.

17.  *See* Riley v. Vilsack, 665 F. Supp. 2d 994 (W.D. Wis. 2009) (plaintiff alleged age and disability discrimination).

18.  As of January 15, 2010—only eight months after the decision—it has been cited 4,698 times by lower courts according to Westlaw's KeyCite display.  This number does not include the cases in which judges have considered the effect of the case without citing it, including a couple of high profile cases.  *See* Liptak, *supra* note 2 ("The judge hearing the claims of the falsely accused Duke lacrosse players has asked for briefing on whether their lawsuit against Durham, N.C., can pass muster under Iqbal.  But the judge considering a case against John C. Yoo, the former Bush administration lawyer, said it could move forward despite Iqbal because the suit contained specific allegations about Mr. Yoo's conduct in justifying the use of harsh interrogation methods.").

19.  FED. R. CIV. P. 8(a)(2).  Failure to state a claim upon which relief can be granted is sufficient justification to dismiss a plaintiff's claim.  FED. R. CIV. P. 12(b)(6).

20.  The "notice" standard requires "fair notice of what the plaintiff's claim is and the grounds upon which it rests" and has been frequently repeated by federal courts for almost fifty years.  5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202, at 94 (3d ed. Supp. 2009).

21.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

22.  *Id.* (emphasis added).

23.  Liptak, *supra* note 2 (drawing attention to the word "plausible" as well as to the phrase "common sense").

24.  *See Iqbal*, 129 S. Ct. at 1953 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554 (2007)); *see also* Mauro, *supra* note 4 ("Since *Twombly*, there has been a dispute over whether it applies beyond the antitrust setting, but *Iqbal* now makes broader application of the rule clear.  'That debate is over' in the wake of *Iqbal*, says Jane Willis, a partner at Ropes & Gray in Boston.  'The decision gives district court judges quite a bit more guidance' on how much factual information pleadings must contain.").

25.  Justice Ruth Bader Ginsberg, a former civil procedure professor and dissenter in both *Twombly* and *Iqbal*, told a group of federal judges that "the court's majority [in *Iqbal*] messed up the federal rules" of civil procedure.  Liptak, *supra* note 2; *see also* Tony Mauro, *Plaintiffs Groups Mount Effort to Undo "Iqbal" Ruling*, NAT'L L.J. (Sept. 21, 2009), http://www.law.com/jsp/article.jsp?id=1202433931370; Stephen C. Webster, *9/11 Decision Allows Judges to Toss Civil Suits They Disfavor*, RAW STORY (July 21, 2009), http://rawstory.com/08/news/2009/07/21/911-decision-allows-judges-to-toss-civil-suits/.

26.  Mauro, *supra* note 4 (quoting Ian Millhiser, a lawyer with the National Senior Citizens Law Center).

114

**Exhibit 3**

the rules need to be changed and, if so, by what means.[27]   Additionally, members of Congress have proposed legislation to overrule the Supreme Court's decision in *Ashcroft v. Iqbal*.[28]

Part II of this Note provides the general historical background that gave rise to the Federal Rules of Civil Procedure, as well as the Supreme Court's treatment of pleading standards over the last half-century.[29]   Part III briefly presents the factual setting and procedural history for *Ashcroft v. Iqbal*.[30] Part IV analyzes the two-pronged approach to the plausibility standard.[31] Specifically, it covers how the Court distinguishes between facts and conclusions and how the Court determines whether pleadings contain a plausible claim of entitlement to relief.  Part V discusses both sides to each of the four major criticisms of the Court's opinion: (A) that the plausibility standard raised pleading standards, harming plaintiffs; (B) that the Court did not have sufficient reason for adopting the plausibility standard; (C) that there are too many difficulties in the application of the plausibility standard; and (D) that the Court violated the rulemaking process.[32]   Part VI summarizes the impact of the decision on Rule 12(b)(6) motions to dismiss.[33]   Part VII discusses Congress's proposed legislation and the problems with its members' attempt to overturn *Ashcroft v. Iqbal*.[34]   This Note concludes with the suggestion that the plausibility standard is nothing more than an explication of Rule 8(a)(2) and the long-standing procedure for dismissal where there is an insufficient pleading of fact.[35]

---

27. *See infra* notes 167–300 and accompanying text.
28. *See infra* note 336 and accompanying text.
29. *See infra* notes 36–94 and accompanying text.
30. *See infra* notes 95–113 and accompanying text.
31. *See infra* notes 114–164 and accompanying text.
32. *See infra* notes 165–306 and accompanying text.
33. *See infra* notes 307–335 and accompanying text.
34. *See infra* notes 336–356 and accompanying text.
35. *See infra* notes 357–375 and accompanying text.

**Exhibit 3**

II. Background: Pleading in the Context of History and Supreme Court Precedent

A. *Historically, Highly Technical Pleading Requirements Impaired Substantive Justice*

At common law,[36] the courts required writs—special, formulaic language associated with approximately thirty kinds of claims—to adjudicate cases.[37] Under the writ system, rulings on the sufficiency of writs were highly unpredictable.[38] Litigants could gain access to courts by repeating the allegations, which were held sufficient in previous cases, despite factual inaccuracies, and risked dismissal if they did not.[39] This system not only incentivized dishonesty in the pleadings, but also impeded the courts' efforts to achieve just results.[40]

In the United States, reform efforts began in the nineteenth century.[41] Those efforts gave rise to code pleading, which replaced writs with "facts," and the thirty forms with "causes of action."[42] One of the objectives of the codes was to "revise, reform, simplify, and abridge" rules for pleading.[43] Still, courts continued to hold pleadings insufficient for failure to satisfy any one of numerous requirements.[44] To make matters worse, requirements were sometimes based on problematic distinctions, such as those between facts and law.[45] Despite the reformers' desire to make the law accessible to

---

36. "[Common law pleading] developed in the English courts of common law after the Norman Conquest and applied in legal actions in [the United States of America] until the pleading reforms of the middle and the latter part of the nineteenth century . . . ." Charles E. Clark, *History, Systems and Functions of Pleading*, 11 Va. L. Rev. 517, 519 (1925).

37. Stephen C. Yeazell, Civil Procedure 333 (7th ed. 2008). Justice Stevens characterized these rules, mentioning the Hilary rules of 1834, as "Byzantine" and "hypertechnical." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 573–74 (2007) (Stevens, J., dissenting) (citing 9 W. Holdsworth, History of English Law 324–27 (1926)).

38. Yeazell, *supra* note 37, at 337.

39. *Id.* ("For example, by the eighteenth century a pleader might allege that defendant, 'with force and arms[,] broke and entered the close [i.e., fenced property of the defendant], trampled on, consumed, and spoiled the grass and herbage of the property. . . .' Such allegations stated a claim for a form of trespass, one of the recognized common law writs. In fact, the dispute might be over who really owned the property in question, and the allegations of trampling and the like were just conventions, designed to get a court to decide who owned the property.").

40. *See id.* Due to factual inaccuracy in the pleadings, parties arrived at court unprepared to inform the court because they had little or no knowledge about the contested issues. *Id.* This made it unlikely that the court would reach a just outcome. *Id.*

41. *Id.* Reform efforts were led by David Dudley Field, an influential New York lawyer. *Id.* For a history of the Field Codes purporting to "dispel [various] misconceptions about civil procedure," see generally Stephen N. Subrin, *David Dudley Field and the Field Code: A Historical Analysis of an Earlier Procedural Vision*, 6 Law & Hist. Rev. 311 (1988). For Justice Stevens's perspective on the historical relevance of David Dudley Field's New York Code of 1848, see his dissent in *Twombly*, 550 U.S. at 574 (Stevens, J., dissenting).

42. Yeazell, *supra* note 37, at 338.

43. Subrin, *supra* note 41, at 316 (quoting N.Y. Const. of 1846, art. VI, § 27).

44. Yeazell, *supra* note 37, at 338.

45. Clark, *supra* note 36, at 534. "[T]he codifiers and the courts failed to appreciate that the

# Exhibit 3

ordinary people,[46] code pleading led to the unfortunate dismissal of meritorious civil claims due to the technical failings of complaints.[47]

## B.  *Adoption of the New Rulemaking Process and New Rules Aimed at Achieving Substantial Justice*

The Rules Enabling Act of 1934 gave the Supreme Court "the power to prescribe general rules of practice and procedure . . . for cases in the United States district courts and courts of appeals," provided that the rules did "not abridge, enlarge or modify any substantive right."[48]  In 1938, the new process produced the Federal Rules of Civil Procedure.[49]  In response to past formalism, these new rules brought greater flexibility.[50]  For example, Rule 8(a)(2) requires "a short and plain statement," meant to prevent dismissals due to technical failings, to encourage courts to adjudicate claims on their legal merits.[51]

## C.  *The Court Established "Simplified Notice Pleading" to Facilitate Decisions on the Merits*

In 1957, the Supreme Court ruled in *Conley v. Gibson* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond

---

difference between statements of fact and statements of law is almost entirely one of degree only." *Id.* (citing Walter Wheeler Cook, *Statements of Fact in Pleading Under the Codes*, 21 COLUM. L. REV. 416, 442 (1921) and Edson R. Sunderland, *The Michigan Judicature Act of 1915*, 14 MICH. L. REV. 273, 551 (1916)).  In Justice Stevens's words, "[a] difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead 'facts' rather than 'conclusions,' a distinction that proved far easier to say than to apply." *Twombly*, 550 U.S. at 574 (Stevens, J., dissenting) (citing Jack B. Weinstein & Daniel H. Distler, *Comments on Procedural Reform: Drafting Pleading Rules*, 57 COLUM. L. REV. 518, 520–21 (1957) and Cook, *supra*, at 417).  To provide another example, under the code pleading system, courts sustained a demurrer when the allegations were either too specific or too general—either "mere evidence" or "mere conclusions"—which led to more litigation over pleadings. YEAZELL, *supra* note 37, at 338.

46.  Subrin, *supra* note 41, at 319.

47.  YEAZELL, *supra* note 37, at 338.

48.  28 U.S.C. § 2072(a)–(b) (2008).  Due to subsequent developments, the modern system actually began in 1958 (more than two decades after the Rules Enabling Act).  Thomas E. Baker, *An Introduction to Federal Court Rulemaking Procedure*, 22 TEX. TECH L. REV. 323, 324 (1991).  For an antecedent history of the Rules Enabling Act itself, see Stephen B. Burbank, *The Rules Enabling Act of 1934*, 130 U. PA. L. REV. 1015, 1035–98 (1982).

49.  Lori A. Johnson, *Creating Rules of Procedure for Federal Courts: Administrative Prerogative or Legislative Policymaking?*, 24 JUST. SYS. J. 23, 24 (2003).

50.  Subrin, *supra* note 41, at 327.

51.  *Id.* at 329; *see also* YEAZELL, *supra* note 37, at 357.  Pleadings are to be construed so as to do substantial justice. *See* FED. R. CIV. P. 8(e).  The Supreme Court noted this in 1957, *see* Conley v. Gibson, 355 U.S. 41, 48 (1957), and has recognized the historical significance of this phrase in 2009, *see* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (acknowledging that "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . .").

**Exhibit 3**

doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief."[52]   According to the Court, a complaint should not be dismissed for failure "to set forth specific facts to support its general allegations."[53]   Under the Court's interpretation of the Federal Rules of Civil Procedure, "all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[54]   Emphasizing the "notice" function of pleadings, the Court dubbed the new standard "simplified notice pleading."[55]   The goal of this approach was "to facilitate a proper decision on the merits."[56]   It unequivocally recognized the inferiority of a system wherein "one misstep by counsel may be decisive to the outcome" of a case.[57]

## D.   *For Half of a Century, Notice Pleading Prevailed Over Attempts to Raise Standards*

In 1993, the Supreme Court in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit* held that a federal court may not "apply a 'heightened pleading standard'—more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure . . . ."[58] Within the context of this Section 1983 civil rights case, the Court declined to accept any arguments intended to justify a standard requiring greater "factual detail and particularity . . . ."[59]

Although the Court did not have the opportunity to decide whether "expensive and time-consuming discovery" justified raising the pleading standard in qualified immunity cases specifically,[60] it rejected generalized attempts to characterize a heightened pleading standard as a mere reflection of the complexities in the underlying substantive law.[61]   Also, according to

---

52.  *Conley*, 355 U.S. at 45–46 (emphasis added).

53.  *Id.* at 47.

54.  *Id.* at 47 (footnote omitted).

55.  *Id.* at 47–48.  The Court radically de-emphasized the need for pleadings to define the disputed facts and issues. *See id.* Under the Court's construction, facts and issues would be defined through "the liberal opportunity for discovery and other pretrial procedures . . . ." *Id.*

56.  *Id.* at 48.

57.  *Id.*

58.  Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).

59.  *Id.* at 164, 167.  The Fifth Circuit's rule required "factual detail and particularity . . . includ[ing] why the defendant-official cannot successfully maintain the defense of immunity" in cases against governmental officials. *Id.* at 167 (citing Elliot v. Perez, 751 F.2d 1472, 1473 (5th Cir. 1985)).

60.  *Id.* at 166.  Respondents argued that discovery has the potential to eviscerate government officials' immunity from suit and disrupt government functions. *Id.*  The Court had no occasion to decide the matter because municipalities do not enjoy qualified immunity from suit. *Id.* at 166–67.

61.  *Id.* at 167–68.  Respondents argued that the Fifth Circuit's pleading standard is not heightened but merely reflects a fact of litigation that "the degree of factual specificity required of a complaint by the Federal Rules of Civil Procedure varies according to the complexity of the

**Exhibit 3**

the Court, the Rule 11 obligation to make a reasonable pre-filing inquiry into the facts did not carry a requirement for greater detail in complex cases because it was "impossible to square" that interpretation of Rule 11 with notice pleading.[62]   Furthermore, the Rule 9(b) requirement of greater particularity only applied to the actions enumerated—fraud and mistake—and not to other actions arising from complicated factual scenarios.[63]   The Court's opinion implicitly showed approval for "the liberal system of 'notice pleading,'" which it expressly described as the system set up by the Federal Rules.[64]   The Court was thus satisfied with the outcome under which "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later."[65]

In 2002, the Supreme Court reiterated its approval of notice pleading in *Swierkiewicz v. Sorema N. A.* by holding that "imposing the Court of Appeals' heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2) . . . ."[66]   The Court based its decision both on the reasoning set forth in *Leatherman* and the language and history of the Federal Rules of Civil Procedure, rejecting "technical forms of pleading" and requiring "substantial justice" on the merits.[67]   The Court acknowledged the argument that "allowing lawsuits based on conclusory allegations of discrimination to go forward will burden the courts and encourage disgruntled employees to bring unsubstantiated suits,"[68] but rejected it without investigating the "practical merits" because a heightened pleading standard "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."[69]   Remarkably, concerns about conclusory allegations without significant factual enhancement caused the Court to change its rhetoric in just five years.[70]

---

underlying substantive law." *Id.* at 167.

62.  *Id.* at 168.  Respondents argued that requiring greater factual specificity in complicated cases "is consistent with a plaintiff's Rule 11 obligation to make a reasonable pre-filing inquiry into the facts." *Id.* at 167.

63.  *Id.* at 168.

64.  *Id.*

65.  *Id.* at 168–69.

66.  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002).

67.  *Id.* at 513–14.

68.  *Id.* at 514.

69.  *Id.* at 514–15 (citing *Leatherman*, 507 U.S. at 168).  Furthermore, the Court said, "Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. 'Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.'" *Id.* at 515 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

70.  *See* 5 WRIGHT & MILLER, *supra* note 20, § 1216, at 239 (contrasting the "mood of the Court" from *Leatherman* and *Swierkiewicz* to *Twombly*).  *See generally* Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

**Exhibit 3**

*E.   The Court Introduced the Plausibility Standard and Retired the No-Set-of-Facts Test*

In 2007, the Supreme Court in *Bell Atlantic Corp. v. Twombly* instituted a significant change.[71]  It introduced the "plausibility standard"[72] and retired the "no set of facts" test.[73]  In its explanation of "what a plaintiff must plead in order to state a claim," the Court expressed its continued approval of the *Conley* "notice" pleading standard, stating that the "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . .'"[74]  However, the Court criticized the *Conley* no-set-of-facts test because it could not be taken literally.[75]  The Court reasoned that, if it were taken literally, the test would permit any claim to survive a motion to dismiss unless "its factual impossibility may be shown from the face of the pleadings . . . ."[76]  The Court saw this outcome as unacceptable; thus, it retired the no-set-of-facts test.[77]

In the antitrust context, compliance with the plausibility standard set forth by the Court required "allegations plausibly suggesting (not merely consistent with) agreement reflect[ing] the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'"[78]  The allegations must be enough to "nudge" the "claims across the line from conceivable to plausible . . . ."[79]  To meet this standard, the complaint "does not need detailed factual

---

71.  *See Twombly*, 550 U.S. 544.

72.  *Id.* at 560.

73.  *Id.* at 563.

74.  *Id.* at 554–55.

75.  *Id.* at 560–63 (quoting Conley v. Gibson, 355 U.S. 41, 45–46 (1957)).

76.  *Id.* at 561.  The Court of Appeals for the Second Circuit had applied the test literally in order to reverse the dismissal.  *Id.* at 553 (citing Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005)).  It reasoned that "a court would have to conclude that there is no set of facts that would permit a plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." *Id.*  The Supreme Court disapproved of the no-set-of-facts test because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Id.* 561 (alteration in original).  To demonstrate the problem with the literal no set of facts test, Gregory Katsas argued that:

> [L]iterally applied, the "no set of facts" test is absurd: a complaint identifying some source of law (say, the Fifth Amendment), and alleging only that the sky is blue, *would* state a claim because there are many sets of possible facts, consistent with the sky's being blue, that could establish Fifth Amendment liability.

*Access to Justice Denied:* Ashcroft v. Iqbal*: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary*, 111th Cong. 57 (2009) [hereinafter *Hearing*] (prepared statement of Gregory G. Katsas, Partner, Jones Day, and former Assistant Attorney General, U.S. Dept. of Justice).

77.  *Twombly*, 550 U.S. at 563.

78.  *Id.* at 557.

79.  *Id.* at 570.

**Exhibit 3**

[Vol. 38: 111, 2010]                                   *In Defense of Plausibility*
                                                          PEPPERDINE LAW REVIEW

allegations . . . ."[80]   However, a showing "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."[81]   In response to the criticism lodged by dissenting Justices, the Court plainly asserted in footnote fourteen that it did "not apply any 'heightened' pleading standard" to reach its conclusion,[82] and, at the end of the opinion, it reasserted that it "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim of relief that is plausible on its face."[83]   Rather than allaying concern, these assurances merely contributed to the confusion caused by the mixed signals subsequently identified by lower courts.[84]

*F.   For Two Years, the* Twombly *Standard Confused Lower Courts*

In *Erickson v. Pardus*, one month after *Twombly*, the Supreme Court vacated a dismissal for failure to state a claim.[85]   The Tenth Circuit attempted to apply the *Twombly* standard, determined that the plaintiff's allegations were "conclusory," and affirmed the dismissal on that basis.[86]   In response, the Supreme Court declared that "it was error for the Court of Appeals to conclude that the allegations in question . . . were too conclusory . . . ."[87]   Without explaining its reason, the per curiam opinion described the Tenth Circuit's holding as one that "departs in [a] . . . stark . . . manner from the pleading standard mandated by the Federal Rules of Civil

---

80.  *Id.* at 555 (citing Conley v. Gibson, 355 U.S. 41, 47 (1957) and Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994)).

81.  *Id.* (citing Papasan v. Allain, 478 U.S. 265, 286 (1986) ("on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'")).

82.  *Id.* at 569 n.14.

83.  *Id.* at 570.

84.  *See, e.g.,* Iqbal v. Hasty, 490 F.3d 143, 155 (2d Cir. 2007).

85.  Erickson v. Pardus, 551 U.S. 89, 90 (2007) (per curiam).

86.  *Id.*

87.  *Id.* at 93.   The Court of Appeals' error may have been that the allegations were not conclusory from the Supreme Court's point of view, or the error may have been that deeming allegations conclusory in order to dismiss a complaint is an erroneous approach altogether—the Supreme Court did not specifically say.   It is even possible that the Supreme Court merely regretted that it was a *pro se* plaintiff who had his complaint dismissed on a procedural issue without leave to amend.   *See* Erickson v. Pardus, 198 Fed. Appx. 694, 700 (10th Cir. 2006).   Most likely, the Court said that it was an error to label the allegations conclusory because they were not conclusory.   The problem that the district court identified was failure to plead an essential element.   *See* Erickson v. Pardus, No. 05 CV 00405 LTB MJW, 2006 WL 650131, at *7 (D. Colo. Mar. 13, 2006).   Failure to plead an essential element is not the same as failure to provide non-conclusory allegations.   The alternative explanation—that the Court of Appeals' entire approach was erroneous—is also not tenable in light of the Court's own reasoning in *Twombly*, which involved identifying conclusory allegations that are not entitled to an assumption of truth, although this had not been made clear by the Court until *Iqbal*.   *See* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951 (2009).

## Exhibit 3

Procedure . . . ."[88]   The Supreme Court cited only two rules, both from *Twombly*:

> Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.

However, the Court neglected the opportunity to elucidate *Twombly*'s impact on motions to dismiss.[89]   So, the Court's readers were consigned to debate fruitlessly about *Twombly*'s application and limitations[90]—whether the plausibility standard was applicable only to antitrust cases, complex cases, or cases about which the Supreme Court had not ruled otherwise.[91]

When *Ashcroft v. Iqbal* reached the Second Circuit, the Court of Appeals wrestled with the implications of *Twombly* and reached the conclusion that *Twombly* "called for a 'flexible 'plausibility standard,' which

---

88. *Erickson*, 551 U.S. at 90. The District Court dismissed the complaint for failure to state a claim without deeming any allegations conclusory. *See Erickson*, 2006 WL 650131, at *12. The magistrate judge found that the plaintiff's Eighth Amendment claim failed because it did not allege that "as a result of the discontinuance of the treatment itself shortly after it began or the interruption of treatment for approximately eighteen months he suffered any harm, let alone substantial harm, than what he already faced from the Hepatitis C itself," which is an essential element of his claim under the deliberate indifference standard. *Id.* at *7. Rather than relying on the grounds for dismissal stated in the District Court, the Court of Appeals deemed the complaint insufficient due to the plaintiff's allegations being "conclusory." *Erickson*, 198 Fed. Appx. at 698, 700. For this procedure, the Tenth Circuit cited its own pre-*Twombly* rules distinguishing between facts and conclusions. *Id.* at 697–98 (citing Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) and Tal v. Hogan 453 F.3d 1244, 1252 (10th Cir. 2006) ("A motion to dismiss under Fed. R. Civ. P. 12(b)(6) admits all well-pleaded facts in the complaint as distinguished from conclusory allegations.")) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be granted.").

89. *Erickson*, 551 U.S. at 93–94 (citation omitted).

90. *See, e.g.*, Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("The issues raised by *Twombly* are not easily resolved, and likely will be a source of controversy for years to come."); 5 WRIGHT & MILLER, *supra* note 20, § 1216 ("[C]ourts continue to struggle with the meaning of 'plausibility.'"); Symposium, *The Future of Pleading in the Federal System: Debating the Impact of* Bell Atlantic v. Twombly, 82 ST. JOHN'S L. REV. 849 (2008) (indicating the existence of significant controversy); Edward D. Cavanagh, Twombly, *The Federal Rules of Civil Procedure and the Courts*, 82 ST. JOHN'S L. REV. 877, 889 (2008) ("[T]he uncertainty of the *Twombly* holding is creating confusion in the lower courts . . . ."); J. Douglas Richards, *Three Limitations of* Twombly*: Antitrust Conspiracy Inferences in a Context of Historical Monopoly*, 82 ST. JOHN'S L. REV. 849, 849 (2008) ("[T]he Supreme Court has thrown litigants and lower courts into confusion . . . ."); Ettie Ward, *The After-Shocks of* Twombly*: Will We "Notice" Pleading Changes?*, 82 ST. JOHN'S L. REV. 893, 895 ("We have yet to parse fully the impact of *Twombly* or how significant an adjustment to practice it will require . . . ."). *But see* Richard M. Steuer, *Plausible Pleading:* Bell Atlantic Corp. v. Twombly, 82 ST. JOHN'S L. REV. 861, 862–63 (2008) ("There can be little doubt that the Supreme Court purposefully recalibrated the pleading requirements under Rule 12(b)(6) in *Twombly*. . . . [*Twombly*] provide[d] plenty of insight into what will and will not suffice under the pleading standard that the Court announced.").

91. *See* Douglas G. Smith, *The* Twombly *Revolution?*, 36 PEPP. L. REV. 1063, 1081–88 (2009) (discussing the various ways *Twombly* might be limited, but arguing that the Court rejected many of the limitations suggested by commentators).

122

# Exhibit 3

obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*'"[92] Judge Cabranes of the Second Circuit concurred but urged the Supreme Court to clarify the matter.[93]

In an amicus brief, professors of civil procedure, concerned about the "erosion of longstanding pleading standards," explained that *Twombly* "ha[d] been cited over 6,500 times by lower federal courts, many of which have expressed confusion over the proper interpretation and application of that decision."[94] The Supreme Court took up the question, and, in so doing, allowed a suspected terrorist's implausible pleadings to divide its members.

## III. FACTS AND PROCEDURAL HISTORY

Within two months of September 11, 2001, Javaid Iqbal was arrested by agents of the Federal Bureau of Investigation and the Immigration and Naturalization Service.[95] Iqbal was a thirty-three-year-old Muslim from Pakistan living with his wife in Hicksville, New York, and working as a cable television installer in Long Island when he was arrested and charged with using a Social Security card that did not belong to him.[96] He was imprisoned in the Metropolitan Detention Center in Brooklyn.[97] During his detainment, Iqbal was designated a person "of high interest" to the September 11 investigation and was moved to the Administrative Maximum Special Housing Unit (Admax-Shu) within the same prison.[98] In Admax-

92. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1944 (2009) (citing Iqbal v. Hasty, 490 F.3d 143, 157–58 (2d Cir. 2007)).

93. *Id.* at 1945 (citing *Hasty*, 490 F.3d at 178 (Cabranes, J., concurring)).

94. Brief of Professors of Civil Procedure and Federal Practice as Amici Curiae in Support of Respondents at 2, Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) (No. 07-1015), 2008 WL 4792462. Additionally, Stephen C. Yeazell, a civil procedure professor and casebook author, suggested that various possible meanings exist for *Twombly*. *See* YEAZELL, *supra* note 37, at 363–64 ("Some sections of the opinion suggest [that *Twombly* is significant for one's understanding of pleading], reinterpreting Conley v. Gibson. The dissent, written by a former antitrust lawyer (Justice Stevens) and a former civil procedure teacher (Justice Ginsberg), suggest these sections were not necessary to decide the case. . . . Other sections suggest that *Twombly* is less a case about pleadings generally than about pleadings in cases that are likely to require extensive (and expensive) discovery. . . . Perhaps one can be confident only in predicting that it will be malpractice for a defendant seeking a 12(b)(6) dismissal in federal courts not to cite *Twombly*, and that it will take several years for the courts to decide whether the decision was an aberration or a significant change of course. Evidence of both propositions can be found in a statistic: six months after *Twombly* was decided, it had been cited in 2,400 judicial opinions.").

95. *Iqbal*, 129 S. Ct. at 1943.

96. Linda Greenhouse, *Court to Hear Challenge from Muslims Held After 9/11*, N.Y. TIMES, June 17, 2008, at A16, *available at* http://www.nytimes.com/2008/06/17/washington/17scotus.html?_r=2&fta=y. Javaid Iqbal was arrested on November 2, 2001. *Id.*

97. *Id.*

98. *Iqbal*, 129 S. Ct. at 1943.

**Exhibit 3**

Shu, he was placed in solitary confinement and allegedly suffered serial body cavity searches, beatings, extreme temperatures, and other harsh conditions.[99] After several months, he pleaded guilty to the criminal charge for document fraud.[100] He served a term in prison and was finally removed to Pakistan, his country of citizenship.[101]

In 2004, Iqbal brought a lawsuit against former Attorney General of the United States John Ashcroft, Director of the FBI Robert Mueller, and thirty-two others, including some of the corrections officers that had day-to-day contact with Iqbal.[102] Iqbal alleged that Ashcroft, Mueller, and some of the other defendants discriminated against him "solely on account of [his] religion, race and/or national origin" by labeling him a person of high interest and subjecting him to unnecessarily cruel and inhumane conditions in Admax-Shu.[103] Ashcroft and Mueller moved to dismiss the complaint for failure to state allegations sufficient to overcome their entitlement to qualified immunity as government officials.[104] The district court applied the no-set-of-facts test and denied their motion.[105] Ashcroft and Mueller appealed to the Second Circuit.[106] While awaiting appeal, *Twombly* retired the no-set-of-facts test.[107] The appellate court wrestled with *Twombly*, concluded that it did not apply in the particular case, and affirmed the denial.[108] Ashcroft and Mueller petitioned the Supreme Court to review the motion to dismiss and were granted certiorari.[109]

The Supreme Court applied the *Twombly* standard.[110] It held that Iqbal's complaint "failed to plead sufficient facts to state a claim" against Ashcroft and Mueller, the only two defendants before the Court.[111] The case was remanded to the Second Circuit and, in turn, to the District Court to determine whether Iqbal would be granted leave to amend his complaint.[112] Iqbal then entered settlement negotiations with the government, but he was allowed the option of amending his pleadings to include newly obtained

---

99.   *Id.* at 1944; Greenhouse, *supra* note 96.

100.   *Iqbal*, 129 S. Ct. at 1943; Greenhouse, *supra* note 96.

101.   *Iqbal*, 129 S. Ct. at 1943; Greenhouse, *supra* note 96.

102.   First Amended Complaint and Jury Demand, Elmaghraby v. Ashcroft, No. 04 CV 1809 (JG) (JA) (E.D.N.Y. Sept. 30, 2004), 2004 WL 3756442; *Iqbal*, 129 S. Ct. at 1943.   Ashcroft and Mueller were the only defendants before the Supreme Court in *Ashcroft v. Iqbal*. *Iqbal*, 129 S. Ct. at 1944.

103.   First Amended Complaint and Jury Demand, *supra* note 102, ¶¶ 96–97.

104.   *Iqbal*, 129 S. Ct. at 1944.

105.   *Id.*; Elmaghraby v. Ashcroft, No. 04 CV 01809 JG SMG, 2005 WL 2375202, at *9, *36 (E.D.N.Y. Sept. 27, 2005).

106.   *Iqbal*, 129 S. Ct. at 1944.

107.   *Id.*

108.   *Id.*; Iqbal v. Hasty, 490 F.3d 143, 155–58, 177 (2d Cir. 2007).

109.   Ashcroft v. Iqbal, 128 S. Ct. 2931, 2931 (2008); *see also Iqbal*, 129 S. Ct. at 1944.

110.   *Iqbal*, 129 S. Ct. at 1949–52.

111.   *Id.* at 1954.   The Court expressed no opinion concerning the sufficiency of Iqbal's complaint against the defendants other than Ashcroft and Mueller. *Id.* at 1952.

112.   *Id.* at 1954; Iqbal v. Ashcroft, 574 F.3d 820 (2d. Cir. 2009) (per curiam).

124

**Exhibit 3**

[Vol. 38: 111, 2010]                                      *In Defense of Plausibility*
                                                        PEPPERDINE LAW REVIEW

facts possibly sufficient to satisfy the *Iqbal* Court's standard.[113]   The principal source of controversy involved the Court's application of the *Twombly* standard.

### IV.  ANALYSIS: THE TWO-PRONGED APPROACH TO THE PLAUSIBILITY STANDARD

The heart of the Court's opinion involved identifying and applying the proper method for evaluating the sufficiency of Iqbal's complaint.[114] Following the framework established in *Twombly*, the Court "beg[a]n by taking note of the elements a plaintiff must plead to state a claim" under the relevant substantive law.[115]   Next, the Court examined the complaint and applied the "two-pronged approach" to the *Twombly* plausibility standard.[116] First, the Court "identif[ied] the allegations in the complaint that [were] not entitled to the assumption of truth."[117]   The identification prong requires distinguishing between facts and legal conclusions because only factual allegations are entitled to an assumption of truth.[118]   Second, the Court considered "the well-pleaded, non-conclusory *factual* allegations" in order to determine whether those allegations "plausibly suggest an entitlement to relief."[119]

The analytical framework used to apply the plausibility standard gives rise to two initial questions.  First, how does the Court distinguish between facts and conclusions?  Second, how does the Court determine whether the allegations plausibly suggest an entitlement to relief?

---

113.  Mauro, *supra* note 25.  Iqbal's lawyer, Alex Reinert, believes that Iqbal has obtained facts sufficient to meet the standard in amended pleadings.  *Id.*

114.  *Iqbal*, 129 S. Ct. at 1947.

115.  *Id.*

116.  *Id.* at 1950.

117.  *Id.* at 1951.

118.  *See id.*  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.* at 1949 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  As Justice Souter would have it, some factual allegations would not be entitled to the presumption of truth if sufficiently fantastic.  *Id.* at 1959 (Souter, J., dissenting) ("[A] court must take the allegations as true, no matter how skeptical the court may be. . . .  The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel." (citations omitted)).

119.  *Id.* at 1950–51 (majority opinion) (emphasis added).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 1950 (citing *Twombly*, 550 U.S. at 556).

**Exhibit 3**

*A. Applying the First Prong: The Fact-Conclusion Distinction*

The Court offered several descriptions to assist in proper delineation between facts and conclusions. Allegations do not need to be "detailed" to be factual.[120]  Non-factual, conclusory allegations include "an unadorned, the defendant-unlawfully-harmed-me accusation," "labels and conclusions," "a formulaic recitation of the elements of a cause of action," "naked assertion[s] devoid of further factual enhancement," and "[t]hreadbare recitals of the elements of a cause of action."[121]  Additionally, "bare assertions" and "bald allegations" without factual content are conclusory.[122] Recognizing a potential pitfall, the Court explained that allegations should not be deemed conclusory on the basis that they are "unrealistic or nonsensical," "too chimerical to be maintained," or "extravagantly fanciful."[123]

Apart from these generalized guideposts, the Court's direction comes primarily from its examples. In *Ashcroft v. Iqbal*, the following allegations were considered conclusory: "[P]etitioners 'knew of, condoned, and willfully and maliciously agreed to subject [Iqbal]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'"[124] Furthermore, the allegation that "Ashcroft was the 'principal architect' of this invidious policy and . . . Mueller was 'instrumental' in adopting and executing it" was also considered conclusory.[125]  In comparison, the following were considered factual allegations: "[T]he [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11."[126] In *Erickson v. Pardus*, the following was considered factual (or non-conclusory):

> Dr. Bloor's decision to remove petitioner from his prescribed hepatitis C medication was "endangering his life." . . . [T]his medication was withheld "shortly after" petitioner had commenced a treatment program that would take one year, . . . he was "still in

---

120.  *See id.* at 1949 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).

121.  *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted) (fourth alteration in original).

122.  *Id.* at 1951 (citing *Twombly*, 550 U.S. at 555).

123.  *Id.* This is consistent with the instruction for applying the second prong that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable" and chances of recovery are remote. *Twombly*, 550 U.S. at 556.

124.  *Iqbal*, 129 S. Ct. at 1951 (citations omitted) (third alteration in original).

125.  *Id.* (citations omitted).  By labeling these allegations conclusory, the Court likely meant that the allegations were insufficient to support the legal conclusion that the policy was invidious.  It could not mean that Iqbal's allegations that Ashcroft was the principal architect and that Mueller was instrumental in executing the policy were conclusory because those were factual allegations specific to the case.  In any event, this determination would not have altered the outcome of the case.

126.  *Id.* (second alteration in original).

126

**Exhibit 3**

need of treatment for this disease," and . . . the prison officials were in the meantime refusing to provide treatment.[127]

In *Twombly*, by contrast, "a naked assertion of conspiracy" was conclusory.[128]

While facts and conclusions are clearly not separate, water-tight categories, there is a common thread in the Court's analysis of the first prong. Factual allegations tend to be those specific to the factual setting out of which the case arose, not generally applicable to every case of its type.[129] They are specific, but not necessarily detailed.[130] Conclusory allegations are "naked," "bare," "bald," and "devoid" of factual enhancement.[131] So, to determine whether an allegation is entitled to an assumption of truth, it is reasonable to conclude that the Court means only to exclude those legal conclusions on the extreme end of the fact-conclusion continuum.[132]

### B. *Applying the Second Prong: The Meaning of Plausibility*

Addressing the second prong, the Court explained that for allegations to plausibly suggest an entitlement to relief, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'"[133] a condition that is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[134] It "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

---

127. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).   It was erroneously deemed "conclusory" by the Court of Appeals. *See supra* text accompanying note 87.

128. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) (citing DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 56 (1st Cir. 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint.")); *see also Iqbal*, 129 S. Ct. at 1951.

129. *See supra* notes 120–128 and accompanying text.   For example, every religious discrimination case would allege that the defendant discriminated on the basis of religion, but only plaintiffs involved in Iqbal's specific factual setting would allege that he suffered beatings while detained in Admax-Shu.

130. *See supra* notes 120–128 and accompanying text.   Specific allegations are different from detailed allegations.   For example, a plaintiff could make the specific allegations that the defendant wore an FBI jacket if it was specific to his case, not an element of the claim.   That would be different from providing detailed allegations that defendant wore a black, nylon FBI jacket with ten buttons on the front and large, yellow letters on the back.   Both allegations would be specific, but the latter contains more detail.

131. *See supra* notes 120–128 and accompanying text.

132. *See supra* notes 120–131 and accompanying text.

133. *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570).

134. *Id.* (citing *Twombly*, 550 U.S. at 556).

**Exhibit 3**

defendant has acted unlawfully" or more than factual allegations "merely consistent" with the defendant's liability.[135]   Put another way, plausibility requires the plaintiff to plead enough non-conclusory, factual content to show that, if the factual allegations and reasonable inferences from those allegations are true, the plaintiff's entitlement to relief is not just speculative, but believable.[136]

There are two minor nuances and one major point of potential confusion in the Court's analysis.  One nuance is that "well-pleaded facts giv[ing] rise to a plausible inference" that the plaintiff is entitled to relief are not sufficient to satisfy the plausibility requirement, but "facts plausibly *showing*" entitlement are sufficient.[137]   A plausible showing is more than a plausible inference; the former "suggests" entitlement.[138]   The other nuance stems from the statement that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[139]   Here, there is a subtle distinction between a plausible inference and a reasonable inference—only allegations giving rise to the latter are sufficient to state a claim.[140]

The major point needing clarification is that the second prong is *not* concerned with whether the factual allegations are believable.[141]   Factual allegations are fully and unequivocally entitled to an assumption of truth.[142] The plausibility question refers to whether it is minimally believable, not just speculative, that the plaintiff will be entitled to relief *assuming that the factual allegations are true and provable at trial.*[143]

---

135.  *Id.* (quoting *Twombly*, 550 U.S. at 556–57).

136.  One civil procedure professor offers a "descriptive" theory that plausibility is a "requirement that a complaint—through the use of objective facts and supported implications—describe events about which there is a presumption of impropriety."  A. Benjamin Spencer, *Understanding Pleading Doctrine*, 108 MICH. L. REV. 1, 1 (2009).  Likewise, the Ninth Circuit has summarized that, under *Twombly* and *Iqbal*, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009).

137.  *Iqbal*, 129 S. Ct. at 1952 (emphasis added).

138.  *See id.*  In other words, a plausible showing is made when the factual allegations give rise to a reasonable inference that plaintiff is entitled to relief, not merely a plausible inference.  A plausible inference that plaintiff is entitled to relief is less than what the plausibility standard requires.

139.  *Id.* at 1949.

140.  Factual allegations that give rise to a reasonable inference are sufficient to state a claim.  *Id.* Factual allegations that give rise to a plausible inference are not sufficient to state a claim.  *Id.* at 1952.  It is assumed here that the inference in question is the inference whether, based on the factual allegations, the plaintiff would be entitled to relief.

141.  The first prong does not permit judges to deem allegations conclusory on the basis that they are unbelievable.  *See supra* note 123 and accompanying text.  Neither does the second prong permit judges to dismiss a complaint based on personal disbelief.  *See infra* note 289 and accompanying text.

142.  *Iqbal*, 129 S. Ct. at 1950–51.

143.  *See supra* notes 133–135 and accompanying text.  During oral argument, Justice Breyer posed a hypothetical scenario to determine how this would "work in an ordinary case."  Transcript of Oral Argument at 13, Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) (No. 07-1015), 2008 WL 5168391.

**Exhibit 3**

[Vol. 38: 111, 2010]                    *In Defense of Plausibility*
                                         PEPPERDINE LAW REVIEW

There are several indications that the plausibility standard sets a minimal threshold. The use of the terms "nudge" and "enough heft" reveal the picture that the Court has in mind—like pushing a cardboard file box (something with which lawyers are familiar) over a line on a smooth concrete floor.[144] A sports metaphor might look like a football team (in the absence of an opposing team) moving the ball an inch across the line of scrimmage, or a golfer lightly chipping a ball onto a nearby, large, flat green. The allegations have to push the complaint barely past the line of conceivability into the realm of plausibility.[145] The requisite plausible showing requires only slightly more than either impossibility on the face of the pleadings, sheer possibility, pleadings merely consistent with entitlement, or pleadings giving rise to no more than a plausible *inference* of entitlement.[146] Further, a plausible showing is accomplished by allegations giving rise to a *reasonable* inference of entitlement.[147] It does not, however, require allegations that make entitlement more likely than not.[148]

Further conjecture may yield a yet fuller picture tending to indicate that

---

The hypothetical situation involved allegations that the president of Coca-Cola personally placed a mouse in a bottle. Transcript of Oral Argument, *supra*, at 13. Attorney General Garre suggested that the president would be able to avoid the deposition because the allegation was not plausible under *Twombly*. Transcript of Oral Argument, *supra*, at 14. Garre's suggestion was incorrect because that factual allegation would be entitled to an assumption of truth. *Iqbal*, 129 S. Ct. at 1949. Justice Souter corrected him, explaining that:

> But Mr. Garre, you are using the word "plausible" or you're taking the word "plausible" out of Bell Atlantic, I think, and you are using it to mean something that probably can be proven to be true. Bell Atlantic drew that distinction. The plausibility there is a plausibility that if they prove what they says [sic] they will—they will establish a violation.

Transcript of Oral Argument, *supra*, at 14–15.

144. *See* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 (2007).

145. The sports metaphors are merely meant to illustrate the amount of force needed to meet the plausibility standard. Readers may note other similarities and differences by which to compare or distinguish the analogy to pleading. I note only the following: The primary deficiency in the football-team analogy is that a football team typically faces an opposing team that attempts to prevent the offensive team from crossing the line of scrimmage. The factual allegations face no opposing force; rather they are entitled to the assumption of truth. *Iqbal*, 129 S. Ct. at 1950–51. One deficiency in the golfer analogy is that the golfer does not act as a member of team whereas the factual allegations can support one another. Plotkin v. IP Axess Inc., 407 F.3d 690, 702 (5th Cir. 2005) (referring to a "set of facts"). Another deficiency is that while the golfer is often at risk of swinging with too much force and missing the green entirely, the plaintiff generally does not face the *same risk of* pleading too much factual content.

146. *See supra* notes 133–143 and accompanying text.

147. *See supra* notes 133–143 and accompanying text.

148. *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556); *see also Contra Pleading Standards*, 123 HARV. L. REV. 252, 253 ("The Iqbal decision will allow federal courts to dismiss a complaint whenever they believe that, given the allegations in the complaint, it is more likely than not that no illegal conduct occurred."); Andrew F. Halaby, *Pleading Analysis Under* Iqbal: *Once More unto the Breach!*, 46 ARIZ. ATT'Y 34, 34 (2009) (suggesting that "probability" means "more than 50 percent likelihood.").

**Exhibit 3**

plausibility sets a relatively low bar. In conjunction with *Iqbal*, a majority of the circuits have continued to apply the rules that in reviewing a motion to dismiss all reasonable inferences are drawn in favor of the plaintiff,[149] and the well-pleaded allegation must be interpreted in the light most favorable to the plaintiff.[150] The applicability of these long-standing rules suggests that the plausibility standard puts a minimal burden on plaintiffs. Additionally, the Court has consistently relied upon the forms for guidance.[151] So, reviewing courts should interpret *Iqbal* in a way that is consistent with the model complaints provided in the appendix of forms.[152] The factual allegations in the model complaint for negligence are sparse.[153] Assuming that the form states a plausible claim, the plausibility threshold must be relatively low.[154] Finally, the existence of an *obvious* alternative explanation

---

149. *See, e.g.*, Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010); Sanchez v. Pereira-Castillo, 590 F.3d 31, 41 (1st Cir. 2009); Cann v. Hayman, 346 Fed. App'x 822, 824 (3d Cir. 2009); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253, 255 (4th Cir. 2009); *In re* Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009); Kaye v. D'Amato, 357 Fed. App'x 706, 710 (7th Cir. 2009); Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009); al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009). *Contra Hearing*, *supra* note 76, at 89 (prepared statement of Debo P. Adegbile, Director of Litigation, NAACP Legal Defense and Educational Fund, Inc.) ("For five decades, when reviewing a complaint for sufficiency, courts had been directed to view allegations in the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in her favor. Under *Iqbal* and *Twombly*, the plausibility pleading standard undermines these presumptions and effectively gives the benefit of the doubt to the defendant.").

150. *See, e.g.*, Rhodes v. Prince, 360 Fed. App'x 555 (5th Cir. 2010); *Consumeraffairs.com, Inc.*, 591 F.3d at 255; Kaye v. D'Amato, 357 Fed. App'x 706 (7th Cir. 2009); Water Edge Living LLC v. RSUI Indem. Co., 355 Fed. App'x 318 (11th Cir. 2009); Arar v. Ashcroft, 585 F.3d 559, 567 (2d Cir. 2009) *cert. denied*, 130 S. Ct. 3409 (2010); Jebaco, Inc. v. Harrah's Operating Co., 587 F.3d 314, 318 (5th Cir. 2009); Gross v. Rell, 585 F.3d 72, 75 n.1 (2d Cir. 2009); Williams v. Sirmon, 350 Fed. App'x 294 (10th Cir. 2009); *Travel Agent Comm'n*, 583 F.3d at 903; McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009); Moss v. U.S. Secret Serv., 572 F.3d 962, 967 (9th Cir. 2009).

151. The Supreme Court has relied upon the appendix of forms in ruling on a motion to dismiss. *See, e.g.*, *Twombly*, 550 U.S. at 565 n.10; *id.* at 575–76 (Stevens, J., dissenting); Swierkiewicz v. Sorema N. A., 534 U.S. 506, 513 n.4 (2002); Conley v. Gibson, 355 U.S. 41, 47 (1957), *abrogated by Twombly*, 550 U.S. 544. *Contra Hearing*, *supra* note 76, at 79–92 (prepared statement of Debo P. Adegbile).

152. *See supra* note 151.

153. *See* FED. R. CIV. P., Appendix of Forms, Form 11.

154. The model complaint for a negligence claim involving a car accident is stated "[o]n <Date>, at <Place>, the defendant negligently drove a motor vehicle against the plaintiff . . . . As a result, the plaintiff was physically injured, lost wages or income, suffered physical and mental pain, and incurred medical expenses of $ <_____>." *Id.* Applying the first prong of the *Iqbal* test, the reviewing court would determine whether the phrase "negligently" is conclusory. *See supra* text accompanying notes 120–128. Although the allegation of negligence is a legal conclusion, it is not a bare averment because it provides factual enhancement such as the date, location, and event. So, it would probably not be conclusory. *See supra* text accompanying notes 120–128. If the court deemed "negligently" conclusory, it would evaluate the factual allegation that "the defendant . . . drove a motor vehicle against the plaintiff" in order to determine whether it plausibly suggest entitlement to relief. *See supra* text accompanying notes 115–119. If the model complaint still satisfies the plausibility standard, then the requisite factual allegations are clearly minimal. Even if "negligently" is non-conclusory and is therefore given the assumption of truth, the requisite allegations are minimal. Either way, alternative explanations exist under which the defendant would

**Exhibit 3**

renders the allegations less than a plausible showing, but the existence of an alternative explanation clearly still is permissible.[155]   Post-*Twombly* Supreme Court precedent implied that a "merely plausible or reasonable" inference was not as strong as an inference that is "at least as compelling as any opposing inference."[156]  So, the explanation offered by the plaintiff need not even be as compelling as existing alternatives.[157]

This interpretation is consistent with the Court's application of the standard in *Twombly* and *Iqbal*.  In *Iqbal*, the plaintiff alleged that "the FBI, under the direction of Defendant Mueller, arrested and detained thousands of Arab Muslim men as part of its investigation of the events of September 11."[158]  Taken as true, these allegations were "consistent with" but "d[id] not

---

not be liable.  For example, it is possible that the defendant drove his motor vehicle into the plaintiff in an intersection immediately after the plaintiff ran a red light.  Therefore, the plausibility threshold must be relatively low.  Obviously a more complicated claim might require more factual allegations, but that would be a function of pleading the claim and not of a raised standard.

155.  Allegations of a disproportionate impact on a national or religious group were not enough to show unconstitutional discrimination in *Iqbal* and that allegations of parallel conduct were not enough to show conspiracy in *Twombly* because there were obvious alternative explanations for both sets of allegations.  *See infra* notes 159, 161 and accompanying text.

156.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007) ("An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.  To qualify as 'strong' within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").  Assuming that the Court has been and will continue to be consistent with its language, these statements give rise to a more robust understanding of the plausible showing requirement.  Taking all of these statements together, the likelihood of entitlement to relief runs a spectrum: impossible on the face of the pleadings (0%); which is less than a sheer possibility or merely consistent; which is less than, or equal to, a plausible inference; which is less than a plausible showing; which is less than, or equal to, a reasonable inference; which is less than an at-least-as-compelling-as-any-opposing-inference inference (e.g., 50%-50% or 30%-30%-30%-10% or 49%-49%-2%); which is less than, or equal to, an equally-as-likely-as-not inference (50%-50%); which is less than a more-likely-than-not inference (greater than 50%).  Furthermore, the existence of an obvious alternative explanation renders the inference less than a plausible showing.  However, the existence of an alternative explanation seems to be fully acceptable as long as there is still a plausible showing.  Thus, a plausible showing may require even less likelihood than one equal to that of any alternative explanation.  The permissibility of alternative explanations consistent with an at-least-as-compelling-as-any-opposing-inference inference, however, is inconsistent with the *Twombly* Court's suggestion that allegations could be insufficient though the inference of illegality weighed "equally" with the inference of legality.  *See Twombly*, 550 U.S. at 566–67 (parenthetically quoting Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 256 (S.D.N.Y. 1995)).  This suggests that the plausibility threshold may require that the inference of illegality be stronger than the inference of legality in some cases.  Additionally, it suggests that the plausibility threshold may vary from case to case.  Most likely, the Court's short quote from *Kramer* may have merely been an imprecise oversight meant only to show why parallel conduct does not establish conspiracy.  *See id.*  In that case, entitlement to relief is plausible under *Twombly* and *Iqbal*, even if the inference that the defendant is liable is not as compelling as the opposing inference.  Therefore, plausibility is a relatively low standard.

157.  *See supra* note 156.

158.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951 (2009) (citation omitted) (internal quotation marks omitted) (ellipsis omitted).

**Exhibit 3**

plausibly establish" that the defendants unconstitutionally discriminated on the basis of religion, race, or national origin because there was a lawful and justified "obvious alternative explanation" for the alleged conduct.[159] Similarly, in *Twombly*, the plaintiffs alleged the "absence of any meaningful competition between [the ILECs] in one another's markets, the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs, and the other facts and market circumstances . . . ."[160] These allegations did not plausibly suggest the requisite element of conspiracy because there was a natural and lawful "obvious alternative explanation" for this market behavior.[161]

In practice, therefore, plausibility appears to set a minimal threshold for complaints.[162] Assessing the plausibility of a claim will be a "context-specific task," meaning that complicated claims may require more factual allegations than straightforward claims.[163] Until the Supreme Court revisits the issue, reviewing courts are instructed "to draw on [their] judicial experience and common sense" to determine whether the allegations constitute a plausible showing.[164]

## V.  CRITICISM: SHOULD THE COURT HAVE ADOPTED THE PLAUSIBILITY STANDARD?

Given what the Court means when it says that "only a complaint that states a plausible claim for relief survives a motion to dismiss," the next question is whether the Court should apply the plausibility standard when assessing the sufficiency of complaints under Rule 8.[165]

The majority's own argument has largely been that the plausibility standard handed down in *Twombly* "was based on [its] interpretation and application of Rule 8."[166] In other words, the majority merely explicated the rule without weighing the costs and benefits of the standard. Other proponents of the plausibility standard have echoed the majority by arguing, for example, that *Ashcroft v. Iqbal* is "consistent with the vast bulk of prior

---

159. *Id.* at 1951–52 (alterations in original). The "obvious alternative explanation" was that "a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims" because "[t]he September 11 attacks were perpetrated by 19 Arab Muslim hijackers." *Id.*

160. *Twombly*, 550 U.S. 565 (internal quotation marks omitted). The term "ILEC" stands for incumbent local exchange carrier, and the term "CLEC" stands for competitive local exchange carrier. *Id.* at 549.

161. *Id.* at 565. The "obvious alternative explanation" was that "the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing" because it was independently in the "best interests" of each ILEC to "keep[] to their old turf." *Id.* at 568.

162. *See supra* notes 145–161 and accompanying text.

163. *Iqbal*, 129 S. Ct. at 1950.

164. *Id.*

165. *Id.* (citing *Twombly*, 550 U.S. at 556).

166. *Iqbal*, 129 S. Ct. at 1953 (*Twombly*, 550 U.S. at 554).

# Exhibit 3

precedent."[167]  Under this view, the plausibility standard is proper because it reflects the rule by which the Court is bound.  Critics disagree.[168]  Criticism falls generally into four categories: (A) the Court raised pleading standards, harming plaintiffs; (B) the Court had insufficient reason to introduce the standard; (C) the plausibility standard has too many inherent problems; and (D) the Court violated rulemaking procedure by adopting the plausibility standard.

*A.   Did the Plausibility Standard Raise Pleading Standards, Thus Harming Plaintiffs?*

In *Twombly*, the majority assured its readers that it "d[id] not apply a 'heightened' pleading standard."[169]  The Court did not mean that plausibility required no more than the no-set-of-facts test.[170]  It meant that "in practice" plausibility is the standard that courts have been applying all along.[171]  The *Iqbal* majority incorporated *Twombly*'s reasoning in its opinion.[172]  Thus, it would not have made sense for either Court to opine about the effect an unchanged pleading standard would have on plaintiffs.  That inquiry would

---

167.  *Hearing, supra* note 76 at 33 (prepared statement of Gregory G. Katsas, Partner, Jones Day, and former Assistant Att'y Gen., U.S. Dept. of Justice); Alison Frankel, *Mr. Iqbal Goes to Washington*, AM. L. LITIG. DAILY (Oct. 28, 2009), http://www.law.com/jsp/tal/digestTAL.jsp?id=12 02435006595&Mr_Iqbal_Goes_to_Washington [hereinafter *Mr. Iqbal*]; Carter Wood, *House Bill Will Overturn* Iqbal, *Restore Previous Pleading Standards*, POINTOFLAW.COM (Oct. 29, 2009, 3:27 PM), http://www.pointoflaw.com/archives/ 2009/10/house-bill-will.php ("Ranking Member Jim Sensenbrenner (R-WI) . . . sa[id] the Supreme Court merely reiterated longstanding pleading principles applied by lower courts since the 1950s."); *Has the Supreme Court Limited Americans' Access to Courts?: Hearing Before the S. Comm. on the Judiciary*, 111th Cong. 185 (2009) ("While unquestionably important, the Supreme Court's decisions in *Twombly* and *Iqbal* were hardly bolts from the blue.  To the contrary, they are firmly grounded in decades of prior precedent at both the Supreme Court and federal appellate court level concerning the pleading standards under Rule 8 of the Federal Rules of Civil Procedure.").  Even though the federal judiciary's Civil Rules Committee issued a report finding that "'most of the case law to date does not indicate a drastic change in pleading standards' as a result of the Supreme Court's Iqbal ruling," Democratic senators have challenged its legitimacy.  Alison Frankel, *At Senate Judiciary Committee* Iqbal *Rollback Hearing, Dems Go After Former SG Garre; Federal Rules Committee Report Says No Drastic Change in Pleading Standards*, AM. L. LITIG. DAILY (Dec. 2, 2009), http://www.law.com/jsp/tal/digestTAL.jsp? id=1202435984088&At_Senate_Judiciary_Committee_Iqbal_Rollback_Hearing_Dems_Go_After_Fo rmer_SG_Garre_Federal_Rules_Committee_Report_Says_No_Drastic_Change_in_Pleading_Standa rds.

168.  *See infra* notes 169–306 and accompanying text.

169.  *Twombly*, 550 U.S. at 569 n.14; *accord id.* at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.").

170.  *See id.* at 561–62.  It acknowledged that the no-set-of-facts approach "would dispense with any showing of a reasonably founded hope that a plaintiff would be able to make a case . . . ; Mr. Micawber's optimism would be enough." *Id.* at 562 (internal quotation marks omitted).

171.  *Id.*  The majority quotes Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1006 (7th Cir. 1984) stating that "Conley has never been interpreted literally." *Id.*

172.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (citing *Twombly*, 550 U.S. at 554 ).

## Exhibit 3

have exceeded the Court's power because it is bound to follow the federal rules, regardless of whether it agrees with the rules as a matter of policy.[173] Furthermore, the Court's construction of plausibility provides a low threshold for pleadings.[174] As such, from the Court's point of view, it would seem unlikely to harm plaintiffs with legitimate claims. Nevertheless, critics argue that the Court raised the standard and that the plausibility standard harms plaintiffs.

The plausibility standard allegedly harms plaintiffs by "closing the courthouse doors" to those entitled to a day in court.[175] Critics generally perceive two ways in which the Court closed the doors: some interpret plausibility as judicial discretion to disbelieve the factual allegations,[176] while others focus on the negative consequences of requiring the complaint to contain factual allegations.[177] The requirement to provide factual allegations is especially problematic in cases in which the evidence is in the possession of the defendant because the motion to dismiss occurs before the plaintiff has access to discovery.[178] Closing the court's doors in either

---

173. *See supra* note 69 and accompanying text.

174. *See supra* notes 133–164 and accompanying text.

175. Briggeman, *supra* note 3 (quoting Erwin Chemerinsky in his lecture titled "Closing the Courthouse Doors").

176. *See, e.g., id.* ("the court's decision was based on findings that Iqbal's allegations were not credible" (quoting Erwin Chemerinsky)); Liptak, *supra* note 2 ("Under the Iqbal decision, federal judges will now decide at the very start of a litigation whether the plaintiff's accusations ring true, and they will close the courthouse door if they do not.").

177. *See infra* note 178 and accompanying text.

178. *Hearing, supra* note 76 at 84–85 (prepared statement of Debo P. Adegbile) ("[P]laintiffs typically can obtain discovery only if they survive a motion to dismiss, many will be denied the very tools needed to support meritorious claims, and thus wrongdoers will escape accountability. . . . These obstacles are particularly onerous for civil rights plaintiffs."); Liptak, *supra* note 2 ("[I]nformation about wrongdoing is often secret. Plaintiffs claiming they were the victims of employment discrimination, a defective product, an antitrust conspiracy or a policy of harsh treatment in detention may not know exactly who harmed them and how before filing suit."); Frankel, *supra* note 7 ("Meanwhile, the plaintiffs['] lawyer representing Amanda Frey in the Novartis case had plenty to say about the Supreme Court's Iqbal pleading standard. 'What a mess they have created with that,' Alyssa Magenheim of O'Connor Acciani told us. 'I think it's going to become an insurmountable standard if we're not careful.' The problem, she said, is that the Iqbal standard demands specificity that plaintiffs can't often show until they've been permitted discovery. 'How do you have the facts unless you're an insider?' Magenheim said. 'How do you get there if you're not allowed to go there?'"); Mauro, *supra* note 25 ("Under *Iqbal*, 'the person filing the suit has to get inside the head of the employer' before being given access to any documents—a Catch-22 that will thwart valid suits, said Lisa Bornstein, senior counsel at the Leadership Conference on Civil Rights. 'It's really a padlock on the courthouse door.'").

In antitrust cases, "the proof is largely in the hands of the alleged conspirators" so "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Twombly*, 550 U.S. at 586–87 (Stevens, J., dissenting) (citing Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 746 (1976) and Knuth v. Erie-Crawford Dairy Coop. Ass'n, 395 F.2d 420, 423 (3d Cir. 1968) ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings.")).

In employment and government discrimination cases, information is often in the possession of the defendants. Mauro, *supra* note 4 ("Michael Winger of Washington-based Covington & Burling's New York office, who is co-counsel in a class action related to the *Iqbal* litigation, said the

**Exhibit 3**

manner arguably violates basic civil rights,[179] including the Seventh Amendment right to a trial by jury.[180]

According to critics, several arguments support the claim that *Ashcroft v. Iqbal* raised pleading standards: it is historically inconsistent with the reforms that gave rise to the Federal Rules of Civil Procedure;[181] the Court has changed its rhetoric;[182] it is part of a larger trend in Supreme Court opinions favoring defendants;[183] it appears inconsistent with the forms in the appendix to the Federal Rules;[184] and the sheer number of lower court citations to the opinion shows that it brought a significant change.[185] Finally, Justice Souter's dissent in *Iqbal* raises concerns that the *Iqbal* decision took plausibility further than Justice Souter intended when he authored the *Twombly* opinion.[186]

---

pleading was based on 'over a hundred depositions, giving us the kind of detail the Supreme Court has now said plaintiffs need. But few plaintiffs get access to such details. . . . I fear that this case will keep many victims of governmental discrimination and abuse from ever getting their day in court.'"). This creates an impossible obstacle for plaintiffs if they need information in order to bring a claim. Daphne Eviatar, *Has the Supreme Court Undermined Civil Rights Enforcement?*, WASH. INDEP. (Dec. 17, 2009, 8:43 AM), http://washingtonindependent.com/71294/has-the-supreme-court-undermined-civil-rights-enforcement ("The Democrats' witnesses, such as Eric Schnapper, law professor at University of Washington and a former attorney for the NAACP Legal Defense Fund, countered that the two recent Supreme Court cases 'brought about sweeping changes in the lower courts, all for the worse.' In discrimination cases, now, so long as 'discriminatory officials do a good job covering their tracks, under *Iqbal* and *Twombly* they can cut off any legal challenge before discovery is available to unearth their records or force them to answer questions under oath,' he said. The new standard 'requires proof of a smoking gun,' which could doom many meritorious cases at the outset, he testified.").

Referring to Ford's disclosures about the dangers of the Pinto's gas tank and tobacco industry's level of disclosure regarding the effects of smoking, John Vail argued that *Iqbal* insulates the defendants best at keeping their misdeeds private. *Hearing, supra* note 76, at 62, 67 (prepared statement of John Vail) ("*Iqbal* undermines the idea that no person is above the law. It insulates persons with power from scrutiny they justly should undergo.").

179. *See* Briggeman, *supra* note 3 (Erwin Chemerinsky argued that "rights are being taken away by denying a forum"); Mauro, *supra* note 25 ("'I have spent my whole life with the federal rules, and this is one of the biggest deals I have ever seen,' said New York University School of Law professor Arthur Miller, a longtime expert on civil procedure. 'Me, old fogy troglodyte that I am, I see serious problems with democratic values here, with access to the courts, with resolution of disputes with a jury of peers.'").

180. For an argument that the *Iqbal* majority's interpretation of Rule 8 is "sometimes" unconstitutional, see Kenneth S. Klein, Ashcroft v. Iqbal *Crashes Rule 8 Pleading Standards on to Unconstitutional Shores*, 88 NEB. L. REV. 261 (2009); *see also* Mauro, *supra* note 25 ("John Vail, vice president of the Center for Constitutional Litigation, thinks Iqbal caps a trend that verges on the unconstitutional, violating the Seventh Amendment's guarantee of a jury trial in civil cases. 'It heralds a return to the kind of legal practice Dickens condemned in Bleak House,' said Vail.").

181. *See supra* notes 36–46, 56–57, 71–83, 120–64 and accompanying text and *infra* note 192 and accompanying text.

182. *See infra* notes 194–201 and accompanying text.

183. *See infra* notes 202–207 and accompanying text.

184. *See infra* notes 208–211 and accompanying text.

185. *See infra* notes 212–216 and accompanying text.

186. *See infra* notes 217–226 and accompanying text.

# Exhibit 3

Historically, pleadings were dismissed for failure to meet highly technical requirements without reference to the merits of the underlying claim.[187]   When the Court first ruled on Rule 8 in *Conley*, it said that the purpose of the Federal Rules of Civil Procedure is to facilitate judgments on the merits.[188]   The no-set-of-facts test provided a guarantee that well-pled, meritorious claims would survive a motion to dismiss.[189]   *Twombly* replaced the no-set-of-facts test with the plausibility standard.[190]   The new standard requires plaintiffs to provide "factual" allegations that make entitlement to relief "plausible"—apparently two requirements with technical meanings in this context.[191]   So, the plausibility standard arguably marks a return to the days in which judgments may turn on a technicality.[192]   In reality, plausibility is not technical; rather it is a flexible standard meaning plainly that the factual allegations give rise to a reasonable inference of entitlement to relief.[193]

The majority's rhetoric in *Iqbal* does differ from the Supreme Court's attitude towards pleading expressed in its previous decisions.[194]   The tone

---

187. *See supra* notes 36–46 and accompanying text.

188. *See supra* notes 56–57 and accompanying text.

189. *See supra* notes 56–57 and accompanying text.

190. *See supra* notes 71–83 and accompanying text.

191. *See supra* notes 120–164 and accompanying text.

192. *See Hearing, supra* note 76, at 63–64 (citing Charles E. Clark, *The Complaint in Code Pleading*, 35 YALE L.J. 259 (1926)) (statement of John Vail). In his *Twombly* dissent, Justice Stevens made a historical argument charting English rules, Field Codes, and the adoption of the federal rules of civil procedure, which he understood as "relaxed" in order "not to keep litigants out of court but rather to keep them in." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 573–75 (2007) (Stevens, J., dissenting). In this context, he expected pleadings to include "a general statement distinguishing the case from all others, so that the manner and form of trial and remedy expected are clear . . . ." *Id.* at 575 (quoting Charles E. Clark, *The New Federal Rules of Civil Procedure*, 23 A.B.A. J. 976, 977 (1937) (internal quotation marks omitted)). A general statement distinguishing the case from all others might include as little as a date, a location, and a legal conclusion (presumably also including the names of the parties). *See Twombly*, 550 U.S. at 576 (Stevens, J., dissenting). Justice Stevens summarized that "the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts." *Id.* at 580. This is notably less than what the majority expected when it provided a requirement of factual allegations plausibly showing an entitlement to relief. *See supra* notes 137–164 and accompanying text. The majority makes the counterargument that Justice Stevens "greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether." *Twombly*, 550 U.S. at 556 n.3. For support, the majority noted that *Conley v. Gibson* required "grounds" in addition to "fair notice." *Id.* (citing Conley v. Gibson, 355 U.S. 41, 47 (1957)). It also cited Wright and Miller for the statement that Rule 8 "does not authorize a pleader's 'bare averment that he wants relief and is entitled to it.'" *Id.* (quoting 5 CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202 (3d ed. 2004)).

193. *See supra* notes 133–164 and accompanying text.

194. Justice Stevens also argued that the majority's ruling was inconsistent with the Court's precedent in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002). *Twombly*, 550 U.S. at 584–85 (Stevens, J., dissenting). However, in *Swierkiewicz*, the plaintiffs were not required "to plead facts establishing a prima facie case because the McDonnell Douglas framework does not apply in every employment discrimination case." *Swierkiewicz*, 534 U.S. at 511. It was not, however, because there was no requirement to plead facts establishing a prima facie case at all. Secondly, Justice Stevens cited 5 WRIGHT & MILLER, *supra* note 192, § 1202, for the proposition that "[n]o more is demanded of the pleadings" than "a general summary of the party's position that is sufficient to

**Exhibit 3**

conveyed in the *Iqbal* rule statement arguably reflected an apparent preference for dismissal by listing the numerous ways that a complaint could fail.[195]   It notably refrained from mentioning "notice" or any part of the liberal *Conley* rule, even though *Twombly* had.[196]   Additionally, *Iqbal* rejected the *Leatherman* Court's approach towards controlling discovery costs through judicial management.[197]   In *Iqbal*, however, the Court only rejected careful case management as a justification for relaxing pleading standards, not as a legitimate practice altogether.[198]   In another rhetorical shift, the *Iqbal* Court dismissed the plaintiff's claim because the allegations of discrimination were conclusory, despite the *Swierkiewicz* Court's statement that it had to permit "lawsuits based on conclusory allegations of discrimination to go forward."[199]   Finally, the *Swierkiewicz* Court named "judicial interpretation" as an inappropriate way to raise pleading standards, but that is arguably what *Twombly* and *Iqbal* did.[200]   Nevertheless, the Court stood by its argument that it merely applied the requirements present in Rule 8 without reinterpreting it.[201]

---

advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purpose of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury." *Twombly*, 550 U.S. at 587 n.7 (Stevens, J., dissenting).  Wright and Miller cite only one Third Circuit opinion for the claim that no more is demanded indicating that it was not a widely accepted rule. 5 WRIGHT & MILLER, *supra* note 192, § 1202 n.8. The majority also cited this section for the proposition that more is needed than "a bare averment that he wants relief and is entitled to it." *Twombly*, 550 U.S. at 556 n.3 (citing 5 WRIGHT & MILLER, *supra* note 192, § 1202). According to Wright and Miller, "the rules do contemplate a statement of circumstances, occurrences, and events in support of the claim being presented.  Of course, great generality in the statement of these circumstances will be permitted as long as the defendant is given fair notice of what is claimed." 5 WRIGHT & MILLER, *supra* note 192, § 1215 (footnote omitted). This demonstrates the weakness in the majority's argument.  It relies on Wright and Miller. While Wright and Miller agreed that some facts are required, the test was whether the defendant is given fair notice, not whether the factual allegations plausibly show entitlement to relief.  After *Twombly*, Wright and Miller amended their treatise to reflect what they perceive to be "a new 'plausibility standard' by which pleadings should be judged" indicating that they perceive the plausibility standard as a change and not mere extension of precedent. 5 WRIGHT & MILLER, *supra* note 20, § 1202.

195.  *See* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

196.  *Twombly*, 550 U.S. at 554–55.

197.  *See Iqbal*, 129 S. Ct. at 1953 (rejecting the careful-case-management approach); Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168–69 (1993) (relying upon summary judgment and control of discovery to weed out unmeritorious claims).

198.  *Iqbal*, 129 S. Ct. at 1953–54 ("We decline respondent's invitation to relax the pleading requirements on the ground that the Court of Appeals promises petitioners minimally intrusive discovery.").

199.  *Id.* at 1952; *see also Swierkiewicz*, 534 U.S. at 514–15.  *But see* Papasan v. Allain, 478 U.S. 265, 286 (1986) (noting that on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation'").

200.  *Swierkiewicz*, 534 U.S. at 514–15.

201.  *Supra* note 169 and accompanying text; *Iqbal*, 129 S. Ct. at 1954 ("Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and

**Exhibit 3**

Some critics also see the introduction of a plausibility standard as simply a part of a larger trend in Supreme Court decisions favoring defendants.[202] The composition of the Court has changed over the years, making differences of opinion possible.[203] A few years ago, defendants benefited when the Court changed the standards by which courts render summary judgments.[204] *Iqbal* arguably makes it easier for defendants to delay trial or to occasionally have the complaint dismissed entirely.[205] So, the trend appears to have some continuity. In this vein, the Court may even appear sinister for hiding its secret agenda to protect corporate defendants.[206]

---

expect his complaint to survive a motion to dismiss.").

202. For an argument that *Iqbal* "is just the latest in a long line of decisions shutting the courthouse doors," see Schwartz, *supra* note 4 ("A Supreme Court ruling in May, *Ashcroft v. Iqbal*, on how much individual civil complaints in a lawsuit must contain, might seem a narrow technical matter, of interest only to lawyers and law journals. Yet, it is on just such 'technicalities' that the legal rights of victims of public or private wrongdoing often hinge. For almost four decades the Court's right wing has been perfecting such technicalities as legal weapons to deny Americans an opportunity to enforce their rights in court.") and Briggeman, *supra* note 3 (Erwin Chemerinsky argues that "a series of decisions under the Rehnquist and, now, the Roberts Supreme Courts . . . limit access to the federal court system.").

203. *See* 5 WRIGHT & MILLER, *supra* note 20, § 1216 (suggesting that the "mood of the Court" has changed from *Leatherman* and *Swierkiewicz* to *Twombly* "perhaps reflecting the change in its composition").

204. *Hearing, supra* note 76, at 65–66 (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) and Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)) (statement of John Vail) ("The 'trilogy' of summary judgment opinions in 1986 took certain factual questions away from juries and probably is responsible for a quadrupling of the rate of cases disposed of at this stage of litigation."); *see, e.g.,* Marcy J. Levine, Comment, *Summary Judgment: The Majority View Undergoes a Complete Reversal in the 1986 Supreme Court,* 37 EMORY L.J. 171, 215 (1988); Adam N. Steinman, *The Irrepressible Myth of Celotex: Reconsidering Summary Judgment Burdens Twenty Years after the Trilogy,* 63 WASH. & LEE L. REV. 81, 82, 86–88, 143–44 (2006); *see also* Poller v. CBS, Inc., 368 U.S. 464, 473 (1962) ("Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'"); Stephen B. Burbank, *Vanishing Trials and Summary Judgment in Federal Civil Cases: Drifting Toward Bethlehem or Gomorrah?,* 1 J. EMPIRICAL LEGAL STUD. 591, 592, 617–18 (2004); Robert L. Rothman, Twombly *and* Iqbal*: A License to Dismiss,* 35 NO. 3 LITIG. 1, 2 (2009) ("Iqbal has the potential to short-circuit the adversary process by shutting the doors of federal courthouses around the nation to large numbers of legitimate claims based on what amounts to a district court judge's effectively irrefutable, subjective assessment of probable success. This is so notwithstanding a complaint containing well-pled factual allegations that, if allowed to proceed to discovery and proved true at trial, would authorize a jury to return a verdict in the plaintiff's favor." (footnotes omitted)). *But see* Mark Moller, Twombly *and* Iqbal*: Reality Check,* CATO @ LIBERTY (Oct. 13, 2009, 4:07 PM), http://www.cato-at-liberty.org/twombly-and-iqbal-reality-check/ ("[D]espite anecdotal claims that Celotex prompted a significant increase in summary judgment in civil rights cases, the authors found 'no evidence that the likelihood of a summary judgment motion or termination by summary judgment has increased' in civil rights cases since 1986."). Moller argues that "a 2007 study by the Federal Judicial Center on the effect of a trio of similarly controversial 1986 Supreme Court decision (known as the '*Celotex* trilogy') raises questions about dire claims that *Twombly* or *Iqbal* will dramatically change lower court practice." *Id.*

205. The Court in *Iqbal* articulated a plausibility requirement and applied it to every civil claim. *Iqbal,* 129 S. Ct. at 1949, 1953.

206. *See, e.g.,* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 596 (2007) (Stevens, J., dissenting) ("The transparent policy concern that drives the [*Twombly*] decision is the interest in protecting antitrust defendants—who in this case are some of the wealthiest corporations in our economy— from the burdens of pretrial discovery."). The defense-bar supports the plausibility standard and they have a primary duty to win cases for their clients, not to improve law for the public. *Id.* at 595;

**Exhibit 3**

On the other hand, if the Court merely applied Rule 8, then these criticisms are impotent because the Court is not at liberty to change the rules based on its own judgment about the desirability of certain consequences.[207]

In his dissent from *Twombly*, Justice Stevens argued that the model complaint for negligence reflects the notice standard, rather than the plausibility standard.[208]   Further still, an argument could be made that the model complaint would not survive a motion to dismiss under the plausibility standard.[209]   If the model complaint would not survive, then *Iqbal* clearly modified the pleading procedure in violation of the rulemaking process.   Moreover, plausibility would be inconsistent with the Federal Rules, which the model complaint is designed to reflect.   In *Twombly*, the Court responded to this criticism by emphasizing that the model complaint provides sufficient notice to the defendant and by applying the plausibility standard such that the model complaint would be deemed in compliance.[210] This response may be unsatisfactorily circular but it does seem to vitiate the criticism by circumventing the premise that the model complaint would not survive under the plausibility standard.[211]

---

*see also* Wood, *supra* note 167 (Chairman of the House Judiciary Subcommittee, Jerrold Nadler (D-NY), said, "[t]his is another wholly invented new rule, overturning 50 years of precedent, designed to close the courthouse doors.  This combines with tightened standing rules, and cramped readings of existing remedies, to implement this conservative Court's agenda to deny access to the courts to people victimized by corporate or government misconduct.  This is judicial activism at its worst— judicial usurpation of the procedures set forth for amendment [of] the Federal Rules of Civil Procedure.").

207.  *See infra* notes 297–305 and accompanying text.

208.  *See Twombly*, 550 U.S. at 590 (Stevens, J., dissenting).   In *Twombly*, the majority distinguished between that plaintiff's complaint and the model complaint on the basis that:

> Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place.  A defendant wishing to prepare an answer in the simple fact pattern laid out in Form [11] would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

*Id.* at 565 n.10 (majority opinion).  This explanation sounds very close to the notice standard of pleading which asks whether the complaint gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *See* Conley v. Gibson, 355 U.S. 41, 47 (1957), *abrogated by Twombly*, 550 U.S. at 560–63.  But if fair notice is enough, then why does the majority also require allegations plausibly suggesting entitlement to relief?  *See Twombly*, 550 U.S. at 557.  The Supreme Court evaded the obvious question.  *See id.* at 565 n.10.

209.  If a judge deemed "negligently" to be a conclusory term and evaluated the allegation that a "defendant . . . drove his motor vehicle against the plaintiff" for plausibility, she may conclude that the alternative explanation (discussed *supra* note 154) constituted an obvious alternative explanation.  The existence of an obvious alternative explanation renders a claim insufficient.  *See supra* text accompanying note 155.  So, given these conditions, the model complaint for negligence would not survive a motion to dismiss under the plausibility standard.

210.  *See supra* note 208 (explaining the *Twombly* majority's response to this criticism).

211.  If the model complaint for negligence meets the requirements of the plausibility standard,

**Exhibit 3**

Pursuant to *Iqbal*, federal courts quickly reassessed the standard by which they must evaluate motions to dismiss.[212]  Consequently, lower court opinions have cited *Iqbal* an incredible number of times in just a few months.[213]  As of February 15, 2010, it had been cited 5,548 times by lower courts.[214]  The difficulty is that these numbers may not be informative because the large number of citations to *Iqbal* does not necessarily indicate that a complaint is more likely to be dismissed.[215]  In the meantime, legal professionals must meet the plausibility standard.  Empirical data collection currently underway will better equip the judiciary and legal professionals to understand the relevance of these numbers.[216]

Justice Souter's dissent requires explanation because he wrote the opinion in *Bell Atlantic Corp. v. Twombly*.[217]  When the Court took up the question about whether *Twombly* applied outside of antitrust,[218] Justice Souter called the *Iqbal* decision into question.[219]  Most importantly,

---

then the standard must be fairly low.  *See supra* note 154 and accompanying text.  That fact should console Justice Stevens.  It may be understandably frustrating when one does not receive a direct response to a logically valid argument.  Nonetheless, one cannot pin down the majority when it is the same members who articulate the standard and interpret it in practice.

212.  *See* Liptak, *supra* note 2.

213.  *See id.* ("[T]he lower courts have certainly understood the significance of the decision, *Ashcroft v. Iqbal*, which makes it much easier for judges to dismiss civil lawsuits right after they are filed.  They have cited it more than 500 times in just the last two months."); David Ingram, *Former Solicitor General Feels Senators' Wrath Over Supreme Court's '*Iqbal*' Ruling*, NAT'L L.J. (Dec. 03, 2009), http://www.law.com/jsp/scm/PubArticleSCM.jsp?id=1202436006825&Former_Solicitor_General_Feels_Senators_Wrath_Over_Supreme_Courts_Iqbal_Ruling ("There were more than 1,500 district court decisions related to Iqbal in the four months after it came down in May."); Mauro, *supra* note 25 ("With remarkable speed and success, '*Iqbal* motions' to dismiss because of insufficient pleadings have become commonplace in federal courts, already producing more than 1,500 district court and 100 appellate court decisions according to a Westlaw search.  Many more are pending."); Schwartz, *supra* note 4 ("In the few months since the decision in *Iqbal* came down, it has resulted in the dismissal of 1500 District Court and 100 appellate court cases, many if not most of which would probably have survived; more dismissal motions are pending.").  Even Gregory Garre, the lawyer who won the case, admits that "[t]he decision is being cited an extraordinary number of times by defense counsel.  And courts are coming out with decisions on both sides."  Frankel, *Mr. Iqbal*, *supra* note 167 (reporting that *Iqbal* has been cited in almost 3,000 lower court rulings in just five months on the books); Briggeman, *supra* note 3 ("[I]n January, there were already 6,000 federal court cases in which Ashcroft v. Iqbal was cited.").

214.  According to Westlaw's Key Cite display (Feb. 15, 2010).

215.  Mauro, *supra* note 25 ("U.S. District Judge Mark Kravitz of Connecticut, who chairs the influential Judicial Conference Advisory Committee on Civil Rules, said his committee is monitoring the impact of *Iqbal* and *Twombly* with an eye toward gathering data and discussing later this year whether rule changes are needed.  'We ought to be deliberate about it,' Kravitz said in his first comments to the press about the *Iqbal* issue.  So far, he told *The National Law Journal*, his sense is that judges are 'taking a fairly nuanced view of *Iqbal*' and that it is not yet 'a blockbuster that gets rid of any case that is filed.' . . . Indeed, not all judges are rubber-stamping *Iqbal* motions.  During a hearing Aug. 10 in an employment discrimination case, Senior Judge Milton Shadur of the U.S. District Court for the Northern District of Illinois told defense lawyers that *Iqbal* and *Twombly* 'don't operate as a kind of universal "get out of jail free" card.'").

216.  *Id.*

217.  Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

218.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009).

219.  *Id.* at 1954 (Souter, J., dissenting).

**Exhibit 3**

however, he did not dissent because he disagreed with the finding that *Twombly* applied to every civil case.[220]   He dissented in part because he disagreed with the majority's decision to rule on an issue unrelated to the plausibility standard.[221]   When he reached his point of disagreement regarding the sufficiency of Iqbal's complaint under Rule 8, Justice Souter did not disagree with the standard applied by the majority.[222]   He disagreed with its application of the first prong.[223]

Justice Souter used the same rule as the majority stating that "[u]nder *Twombly*, the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible. That is, in *Twombly*'s words, a plaintiff must 'allege facts' that, taken as true, are 'suggestive of illegal conduct.'"[224]   In *Iqbal*, he believed that the majority had incorrectly identified the allegations in Iqbal's complaint as conclusory.[225]   He agreed with the majority's second-prong analysis that, given the factual allegations identified, the complaint did not state a plausible claim.[226]   Justice Souter just would have identified some additional allegations as factual.[227]   What is really remarkable is that Justices Stevens, Ginsburg, and Breyer all joined in Souter's opinion.[228]   Justices Stevens and Ginsburg objected to the plausibility standard in *Twombly*.[229]   But now, all nine Justices have essentially adopted the plausibility standard.[230]

---

220.   *See id.*

221.   *Id.* at 1956–57 ("[D]eciding the scope of supervisory Bivens liability in this case is uncalled for.").

222.   *Id.* at 1960 ("I do not understand the majority to disagree with this understanding of 'plausibility' under *Twombly*.").

223.   *Id.*

224.   *Id.* at 1959.

225.   *Id.* at 1960.

226.   *Id.*

227.   *Id.*   Justice Souter said that the following should have been considered nonconclusory: "Ashcroft was the 'principal architect' of the discriminatory policy;" "Mueller was 'instrumental' in adopting and executing the discriminatory policy;" and "Ashcroft and Mueller 'knew of, condoned, and willfully and maliciously agreed to subject' Iqbal to harsh conditions 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'"   *Id.*   He seems to be correct about the first two statements because those are specific to the factual setting out of which the case arose. *See supra* notes 129–132 and accompanying text. The last allegation, however, appears to be nothing more than a recital of the elements of the claim. So, it should rightly be considered conclusory. *See supra* notes 129–132 and accompanying text. Even if the first two allegations were considered factual, the result would likely have been the same because the obvious alternative explanation still applies, even when it is admitted that Ashcroft was the principal architect and Mueller was instrumental in adopting and executing the policy. *See supra* notes 158–161 and accompanying text.

228.   *Iqbal*, 129 S. Ct. at 1954 (Souter, J., dissenting).

229.   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 576–78 (2007) (Stevens, J., dissenting).

230.   *See Iqbal*, 129 S. Ct. at 1949; *id.* at 1959 (Souter, J., dissenting).

**Exhibit 3**

The dissent really amounts to a disagreement about the substantive law. The *Iqbal* complaint contained the conclusory allegation:

> Defendants ASHCROFT, MUELLER, SAWYER, RARDIN, COOKSEY, HASTY, ZENK, THOMAS, SHERMAN, LOPRESTI, and SHACKS each knew of, condoned, and willfully and maliciously agreed to subject Plaintiffs to these conditions of confinement as a matter of policy, solely on account of their religion, race, and/or national origin and for no legitimate penological interest.[231]

Turning the factual allegations against Ashcroft and Mueller, one finds only allegations that they directed and authorized the arrest and detainment of many Arab Muslim men following the attacks on September 11, 2001.[232] The factual allegations of wrongful conduct by others could not be imputed to Ashcroft and Mueller, which is why the Court needed to determine whether supervisory liability was available.[233] The facts alleged against Ashcroft and Mueller, therefore, showed nothing more than that Ashcroft and Mueller's policies had a disproportionate impact on Arab-Muslim men. The Court has already established that showing a disproportionate impact is not enough to entitle a plaintiff to relief for claimed discrimination.[234] The complaint might be remedied by showing an actual "invidious discrimination purpose" or that such a purpose may "be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."[235] As it stood before the Court, however, the factual allegations were insufficient. The minority, therefore, disagreed about whether showing a disproportionate impact was enough and how the plausibility standard was applied, but not about the plausibility standard itself.

The *Iqbal* Court, in fact, did not change the standard by which the sufficiency of a complaint is assessed under Rule 8(a)(2). Ever since 1957, the Supreme Court has required complaints to state the "grounds" upon which the claim rests.[236] There was tension between the literal no-set-of-facts test and the requirement that a plaintiff provide grounds.[237] By retiring

---

231. First Amended Complaint and Jury Demand, *supra* note 102, ¶ 96.

232. *See id.* ¶¶ 77–193.

233. *See Iqbal*, 129 S. Ct. at 1948.

234. Washington v. Davis, 426 U.S. 229, 242 (1976) ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."). Justice Stevens's concurrence in *Washington v. Davis* explains why he dissented in *Iqbal*; to Stevens, showing a disproportionate impact is sufficient. *Id.* at 253-54 (Stevens, J., concurring).

235. *Id.*

236. Conley v. Gibson, 355 U.S. 41, 47 (1957), *abrogated by Twombly*, 550 U.S. at 560–63.

237. *Twombly*, 550 U.S. at 561.

**Exhibit 3**

the no-set-of-facts test, the Court resolved this tension.[238] Thereafter, *Iqbal* established a new two-pronged approach to determine whether a complaint satisfies Rule 8, but applied the same standard that has been applied since *Conley*.[239]

In *Iqbal*, the Court held that the complaint "fail[ed] to plead sufficient facts to state a claim"[240]—a familiar phrase describing one widely-accepted justification for dismissal.[241] Notably, this would not be an acceptable justification for dismissing a complaint under the literal no-set-of-facts test.[242] Consistent with years of precedent, sufficient pleading of fact is exactly what the plausibility standard requires.[243] Conclusory allegations are not enough.[244] Plaintiffs must provide a minimal statement of the factual grounds upon which their claims rest.[245]

*B. Did the Court have Sufficient Reason to Adopt the Plausibility Standard?*

The rules should not be changed without sufficient reason.[246] Although the Court claims to have derived the plausibility standard from Rule 8, it seemed to sympathize with the idea that the costs of litigation can be too

238. *See id.*

239. *Supra note* 116 and accompanying text.

240. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1954 (2009).

241. *See, e.g.*, Powell v. McCormack, 395 U.S. 486, 498 (1944); Ward v. Avaya, Inc., 299 Fed. Appx. 196, 199 (3d Cir. 2008); Learner v. Fleet Bank, N.A., 459 F.3d 273, 278 (2d Cir. 2006); Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 6 (1st Cir. 2005); Plotkin v. IP Axess Inc., 407 F.3d 690, 702 (5th Cir. 2005) (complaint did not fail, but the court recognizing by implication that a complaint may fail to plead sufficient fact); Varner v. Peterson Farms, 371 F.3d 1011, 1020 (8th Cir. 2004) (also stating that *legal conclusions are not entitled to an assumption of truth*); Grippo v. Perazzo 357 F.3d 1218, 1223–24 (11th Cir. 2004) (complaint did not fail, but the court recognizing by implication that a complaint may fail to plead sufficient fact); Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 319 (5th Cir. 2002); Endsley v. City of Chi., 230 F.3d 276, 282 (7th Cir. 2000); Davis v. Hall, 992 F.2d 151, 152 (8th Cir. 1993); United States v. 4492 S. Livonia Rd., 889 F.2d 1258, 1266 (2d Cir. 1989) (complaint did not fail, but the court recognized by implication that a complaint may fail to plead sufficient fact); United States v. Staggs, 881 F.2d 1527 (10th Cir. 1989) ("This court has frequently sustained the dismissal of civil actions for failure to plead sufficient facts, notwithstanding the absence of Fifth Amendment grand jury concerns and Sixth Amendment notice concerns, the liberal pleading practices permitted by Rule 8 of the Federal Rules of Civil Procedure, and the availability of broad discovery in civil cases."). *But see, e.g.*, United Steelworkers of Am. v. Or. Steel Mills, Inc., 322 F.3d 1222, 1228 (10th Cir. 2003) (applying the no-set-of-facts test); Fuentes v. S. Hills Cardiology, 946 F.2d 196, 201 (3d Cir. 1991) (applying the no-set-of-facts test).

242. *See supra* note 76 and accompanying text.

243. *Iqbal*, 129 S. Ct. at 1949, 1951 (citing *Twombly*, 550 U.S. at 570).

244. *See id.*

245. *Id.; see also supra* note 162 and accompanying text.

246. Baker, *supra* note 48, at 334 ("[T]he fundamental tenet of rulemaking should be that no rules be changed unless there is good reason and substantial need.").

**Exhibit 3**

burdensome for defendants.[247]   Consequently, critics argue that the Court silently reinterpreted Rule 8 to reduce the costs of litigation.[248]   First, the Court's critics argue that the cost of litigation should not be a factor in the Court's interpretation of Rule 8.[249]   Second, they argue that, even if litigation costs are a factor worthy of consideration, the benefits of a plausibility standard simply do not outweigh the costs.[250]

The plausibility standard and the liberal no-set-of-facts standard each have costs and benefits.  The primary cost associated with the plausibility standard is the risk of dismissing or deterring meritorious claims by requiring factual allegations.[251]   The height of that cost depends upon how much risk really exists.  Under the relatively low plausibility standard, that risk is fairly low, unless the plaintiff is truly unable to obtain the information necessary to make factual allegations.[252]   The primary benefit of the plausibility standard is that it conserves the resources of parties defending against lawsuits and of the courts responsible for adjudication.[253]   Discovery has become more expensive for defendants than it was when the Federal Rules were created, especially since the advent of the computer.[254]   The

---

247.  Justice Kennedy argues that "costs in terms of efficiency and expenditure of valuable time and resources" are an important concern for the Court. *Iqbal*, 129 S. Ct. at 1953. For an argument that "*Twombly* was not revolutionary, but simply part of the Court's ever-expanding application of the familiar three-factor *Mathews v. Eldridge* test, used to determine whether procedural due process requires adopting a procedural safeguard," see Andrew Blair-Stanek, Twombly *is the Logical Extension of the* Mathews v. Eldridge *Test to Discovery*, 62 FLA. L. REV. 1 (2010).

248.  *See, e.g., Twombly*, 550 U.S. at 584 (Stevens, J., dissenting).

249.  In his dissenting opinion in *Twombly*, Justice Stevens advocated against "craft[ing] a standard for pleading municipal liability that accounted for 'the enormous expenses involved today in litigation'" arguing that "[w]riting for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort" in *Leatherman*. *Id.* (citing Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993)); *accord id.* at 586 ("[F]ear of the burdens of litigation does not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.").

250.  *Hearing, supra* note 76 at 85–86 (citing Robert G. Bone, *Plausibility Pleading Revisited and Revised: A Comment on* Ashcroft v. Iqbal, 85 NOTRE DAME L. REV. 849, 878 (2010) ("Strict pleading can produce screening benefits for some cases, but it does so in a relatively crude way and at an uncertain and potentially high cost. The most serious cost involves screening meritorious suits. In cases like Iqbal, where the defendant has critical private information, the plaintiff will not get past the pleading stage if she cannot ferret out enough facts before filing to get over the merits threshold for each of the elements of her claim. As a result, strict pleading will screen some meritorious suits, even ones with a high probability of trial success but a probability that is not evident at the pleading stage before access to discovery.")) (prepared statement of Debo P. Adegbile).

251.  *See supra* notes 175–177 and accompanying text.

252.  *See supra* notes 145–161, 178 and accompanying text.

253.  District courts are facing steadily increasing caseloads. 5 WRIGHT & MILLER, *supra* note 20, § 1029. The cost of discovery may be limited to reduce costs. *See, e.g.*, Jackson v. Cnty. of Sacramento, 175 F.R.D. 653 (E.D. Cal. 1997). The plausibility standard allows a judge to dismiss the case before discovery occurs and before trial costs are incurred.

254.  *See* Smith, *supra* note 91, at 1094–97. "[T]he runaway cost of e-discovery is perhaps the single most important problem in civil litigation today" because the amount of information subject to discovery has increased as has the cost of retrieving that information. *Should the* Iqbal *Pleading Standard Be Overruled?*, Interview with Gregory Katsas, former Assistant Attorney General for the Civil Division of the Justice Department, METRO. CORP. COUNSEL (Dec. 01, 2009) [hereinafter *Katsas Interview*], http://www.metrocorpcounsel.com/current.php?artType=view&artMonth=December

# Exhibit 3

expense of discovery also increases the opportunity for discovery abuse, which occurs when plaintiffs file weak claims and implicitly threaten to run up discovery costs to increase the settlement value of the lawsuit.[255] Evidence suggests that the cost of defending lawsuits can become a boon to corporations responsible for providing jobs and improving the economy.[256] Lawsuits against government officials can divert and discourage them from performing their public function.[257]   *Iqbal* even implicates concerns about

---

&artYear=2009&EntryNo=10398 (estimating that the costs can be "millions, if not tens of millions, of dollars of out-of-pocket and non-reimbursable expense, not counting the defendant's additional and non-reimbursable opportunity costs"); *see also* Steuer, *supra* note 90, at 862 (citing David Walton, *Machine Dreams*, N.Y. TIMES, Oct. 3, 2004, § 7, at 35) ("Through the decades, discovery itself change dramatically.  When the Federal Rules of Civil Procedure were adopted in 1938, photostats were only thirty years old and xerography had not quite been invented.  The creators of the concept of liberal discovery could not possibly contemplate the nature or volume of the electronic data and documents that would proliferate seventy years later."); Liptak, *supra* note 2 ("Mark Herrmann, a corporate defense lawyer with Jones Day in Chicago, said the Iqbal decision *will allow for the dismissal of cases that would otherwise have subjected defendants to millions of dollars in discovery costs."*).

255.  Discovery abuse occurs because defendants facing discovery are "sorely tempted to settle even meritless claims for large sums of money, simply to avoid the various costs of discovery." *Katsas Interview*, *supra* note 254; *see also* William McGurn, *Terror by Trial Lawyer*, WALL ST. J., (Nov. 30, 2009, 10:53 PM), http://online.wsj.com/article/SB200014240527487039394045745681 30713843644.html ("Rightly used, discovery allows lawyers from both sides to gain access to evidence—documents, email, depositions, etc.—that support their case.  In practice it can be abused, as when lawyers use discovery to go fishing for a case they don't have.  And because compliance alone can be expensive and time-consuming, many companies find it cheaper to settle."); Liptak, *supra* note 2 ("For more than half a century . . . plaintiffs were entitled to force defendants to open their files and submit to questioning under oath.  This approach, particularly when coupled with the American requirement that each side pay its own lawyers no matter who wins, gave plaintiffs settlement leverage.  Just by filing a lawsuit, a plaintiff could subject a defendant to great cost and inconvenience in the pre-trial fact-finding process called discovery."); Mauro, *supra* note 4 ("Michael Carvin, a partner in the Washington office of Jones Day and a frequent litigator on behalf of companies, countered that *Iqbal* has been 'very beneficial' in 'slowing the major abuse of litigation against corporations.'  He said, 'You can't just throw mud against the wall.  You have to have some theory of the case.'  Under the previous rule, companies contend, plaintiffs would state frivolous claims in hopes that companies would settle rather than face expensive discovery."); Ingram, *supra* note 213 ("Sen. Jeff Sessions, R-Ala., the committee's top Republican, was the sole senator in the room defending Garre's position.  He said plaintiffs have too often abused the civil justice system.  'We really ought to tighten up this thing a bit,' he said.").

256.  COUNCIL OF ECONOMIC ADVISERS TO THE PRESIDENT OF THE UNITED STATES, THE ECONOMIC REPORT OF THE PRESIDENT (2005) [hereinafter ECONOMIC REPORT OF THE PRESIDENT]. "Our litigation system encourages junk lawsuits and harms our economy." *Id.* at 4; *see also* McGurn, *supra* note 255 ("The U.S. Chamber of Commerce naturally opposes the bill, saying it would impose a hefty 'litigation tax' on American business and encourage frivolous lawsuits."). *But see Hearing*, *supra* note 76, at 68 (citing EMERY G. LEE, III & THOMAS WILLING, FEDERAL JUDICIAL CENTER, NATIONAL CASE-BASED CIVIL RULES SURVEY, PRELIMINARY REPORT TO THE FEDERAL JUDICIAL CONFERENCE ADVISORY COMMITTEE ON CIVIL RULES (Oct. 2009)) ("Available empirical information belies the premise [that costs of discovery are a troublesome drag on certain litigants and a drag on the economy.]") (statement of John Vail).  For arguments on both sides of the tort reform debate, *see generally* PAUL RUSCHMANN, TORT REFORM (2006).

257.  Eviatar, *supra* note 178 ("When it comes to cases against government officials, such as

**Exhibit 3**

national security.[258] Additionally, the courts have to spend time and public money to process and adjudicate frivolous lawsuits.[259] Requiring plaintiffs to make a plausible showing on the pleadings may reduce each of these costs by deterring frivolous and otherwise unsubstantiated lawsuits.[260]

The careful-case-management approach is the most prominent alternative method suggested for limiting the costs of discovery.[261] In fact, Justice Breyer wrote a separate dissent just to make this point.[262] In recent years, however, the Court has been largely averse to the case-management approach because it has been ineffective in practice.[263] Supporters of liberal pleading standards have expressed greater confidence in the ability to curb costs through case management.[264] Still, the Court stressed that case

---

*Iqbal*—which alleged that senior Bush administration officials discriminated against Muslims by improperly detaining them after the Sept. 11 terrorist attacks—'such discovery would vitiate an important component of the officials' qualified immunity' even where the claims are against individual government officials 'for actions undertaken to prosecute wars abroad or to respond to national security emergencies at home,' said [Gregory] Katsas. 'Such a result,' he added, 'would be paralyzing if not deadly.'"); Adam Liptak, *Justices Hear a Case Weighted by 9/11*, N.Y. TIMES (Dec. 10, 2008), http://www.nytimes.com/2008/12/11/washington/11scotus.html?_r=1&fta=y ("Justice John Paul Stevens suggested that he was uneasy about lightly letting claims against high officials proceed, mentioning his majority opinion in Clinton v. Jones, the 1997 decision that allowed Paula Jones's sexual harassment case against President Bill Clinton to go forward. A prediction in that decision about the burden the suit would place on the president—'it appears to us highly unlikely to occupy any substantial amount of the petitioner's time'—turned out to be incorrect.").

258. *See* Iqbal v. Hasty, 490 F.3d 143, 179 (2d Cir. 2007) (Cabranes, J., concurring). *Iqbal* implicates the "national interest in enabling Cabinet officers with responsibilities in the national security area to perform their sensitive duties with decisiveness and without potentially ruinous hesitation." *Id.* (quoting Mitchell v. Forsyth, 472 U.S. 511, 541 (1985) (Stevens, J., concurring)); *see also* McGurn, *supra* note 255 ("We know that al Qaeda operatives are trained to claim abuse when they are captured. If Mr. Specter's legislation succeeds, what is to prevent them from alleging all sorts of violations so they can go on discovery expeditions against, say, Gen. David Petraeus or Defense Secretary Robert Gates? And how would that affect the ability of these men to prosecute the war?"). For a debate between Senator Arlen Spector and Senator Jeff Sessions on this issue, see *Restoring Justice or Hurting National Security?*, WALL ST. J. (Dec. 6, 2009), http://online.wsj.com/article/SB10001424052748704007804574573771092340430.html.

259. Enright v. Auto-Owners Ins. Co., 2 F. Supp. 2d 1072, 1076 n.2 (N.D. Ind. 1998) (noting that each federal judge costs taxpayers about $900 per hour); CHRISTOPHER E. SMITH, JUDICIAL SELF-INTEREST 23 (1995).

260. *See supra* note 255 and accompanying text.

261. *See, e.g.*, Ashcroft v. Iqbal, 129 S. Ct. 1937, 1961–62 (2009) (Breyer, J., dissenting).

262. *Id.*

263. *See* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559–60 (criticizing the careful-case-management approach); *Iqbal*, 129 S. Ct. at 1953 (rejecting the careful-case-management approach). Gregory Katsas offered an example of "limited discovery" showing that "[i]t sounds good in the abstract, but in practice discovery inevitable tends to expand." *Katsas Interview, supra* note 254.

264. Edward D. Cavanagh, Twombly, *the Federal Rules of Civil Procedure and the Courts*, 82 ST. JOHN'S L. REV. 877, 879 (2008) ("[T]he Court's assertion that judges cannot effectively control litigation costs because the parties—not the courts—control claims and defenses as well as the nature and amount of discovery in any given case is contrary to fact."); *see also Twombly*, 550 U.S. at 595 n.13 (Stevens, J., dissenting) ("The Court vastly underestimates a district court's case-management arsenal."); *Iqbal*, 129 S. Ct. at 1961–62 (Breyer, J., dissenting) ("The law . . . provides trial courts with other legal weapons designed to prevent unwarranted interference. As the Second Circuit explained, where a Government defendant asserts a qualified immunity defense, a trial court, responsible for managing a case and 'mindful of the need to vindicate the purpose of the qualified

**Exhibit 3**

management is to be used to prevent excessive costs, but not as a justification for allowing implausible claims to proceed further than necessary.[265] As long as the Court resists modifying the rules by judicial interpretation, this response is most appropriate because it respects the deference due to the requirements of the rule itself.[266] Ironically, the Court and many of its critics agree on this point.[267] Even if the Court did assess the consequences of the plausibility standard, the stated purpose of the rules is to "secure the just, speedy, and inexpensive determination of every action and proceeding."[268] Rule 8 and the *Iqbal* interpretation arguably strike a reasonable balance between a plaintiff's need for a determination on the merits and a defendant's need to avoid unnecessary costs related to discovery abuse and defending against frivolous claims aiming to secure both the just and the inexpensive determination of every civil action.[269]

The critics also argue that the Court does not have sufficient reason for adopting a plausibility standard at the dismissal stage because other avenues

---

immunity defense,' can construct discovery in ways that diminish the risk of imposing unwarranted burdens upon public officials. A district court, for example, can begin discovery with lower level government defendants before determining whether a case can be made to allow discovery related to higher level government officials." (citation omitted)). *But see Twombly*, 550 U.S. at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case management,' given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." (citation omitted)); *id.* (citing Frank Easterbrook, *Discovery as Abuse*, 69 B.U. L. REV. 635, 638 (1989)) ("Judges can do little about imposition discovery when parties control the legal claims to be presented and conduct the discovery themselves."); *Iqbal*, 129 S. Ct. at 1953 ("It is no answer to these concerns [about the diversion of a Government official from his or her duties] to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.").

265. *Iqbal*, 129 S. Ct. at 1953.

266. *See id.*

267. *Compare supra* note 249 and accompanying text *with supra* note 265 and accompanying text.

268. FED. R. CIV. P. 1.

269. *See supra* notes 251–268 and accompanying text. Still, it is helpful to keep in mind the Seventh Circuit's expression of reluctance to sacrifice justice in order to promote the inexpensive determination:

> Pressure from the flux of cases makes early disposition of weak claims attractive, freeing judicial time for others that appear to have superior prospects. Matters that formerly were tried now are resolved by summary judgment. But the next time-saving step—resolving under Rule 12(b)(6) matters that formerly were handled by summary judgment—is incompatible with the Rules of Civil Procedure. Litigants are entitled to discovery before being put to their proof, and treating the allegations of the complaint as a statement of the party's proof leads to windy complaints and defeats the function of Rule 8.

Bennett v. Schmidt, 153 F.3d 516, 519 (7th Cir. 1998).

**Exhibit 3**

exist to protect defendants.

If the pleadings are too vague or ambiguous, the defendant may move for a more definite statement.[270] The defendant may simply deny the allegations and allow the plaintiff to produce its evidence.[271] Finally, the defendant may move for summary judgment under Rule 56 if the plaintiff is unable to substantiate its claims.[272] On the other hand, when pleadings are dismissed for failure to state a claim, the plaintiff may request leave to amend.[273] Courts are instructed to grant leave to amend freely and in accordance with justice.[274] So, protections exist for plaintiffs as well. This gives the courts significant flexibility to pursue justice through various procedural avenues.[275] The protections afforded to plaintiffs do not give the Court license to change the rules of procedure, but they do alleviate concern that requiring plausibility does substantial injustice.

## C. Are There Too Many Difficulties in the Application of the Plausibility Standard?

Much of the criticism has to do with the plausibility standard itself. The first prong of the plausibility standard requires reviewing courts to

---

270. FED. R. CIV. P. 12(e); Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514 (2002) ("If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding."); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 590, n.9 (2007) (Stevens, J., dissenting) ("The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement."); *see also* 61A AM. JUR. 2D *Pleading* § 478 (2009) (stating that if a complaint fails to state a claim under Rule 8, "a defendant's motion for a more definite statement should be granted.").

271. Even if the complaint does not point to a specific event, "[a] defendant could, of course, begin by either denying or admitting the charge." *Twombly*, 550 U.S. at 593 n.12 (Stevens, J., dissenting).

272. FED. R. CIV. P. 56; *Swierkiewicz*, 534 U.S. at 513–14 ("[C]laims lacking merit may be dealt with through summary judgment under Rule 56.").

273. FED. R. CIV. P. 15(a)(1)–(2).
    [I]f the requisite allegations are not in the complaint and a motion to dismiss for failure to state a claim upon which relief may be granted is made under Rule 12(b)(6), the pleader should be given the opportunity to amend the complaint, if she can, to show the existence of the missing elements."

5 WRIGHT & MILLER, *supra* note 20, § 1216.

274. FED. R. CIV. P. 15(a)(2).

275. *See e.g.*, Shah v. Inter-Cont'l Hotel Chi. Operating Co., 314 F.3d 278, 282 (7th Cir. 2002) ("True, the defendant might be quite unsure what statute, state or federal, or common law principle the conduct alleged in the complaint might violate, but he could smoke out the plaintiff's theory of the case by serving a contention interrogatory on him. Or the judge, if skeptical that there was any legal basis for such a complaint, could on his own initiative asked the plaintiff to file a supporting legal memorandum. It is commendable rather than censurable in a judge to review complaints as they are filed and weed out the frivolous ones without putting the defendant to the burden of responding, provided of course that the review is conscientious and made by the judge himself (or herself) rather than delegated to staff." (citations omitted)); United States v. 4492 S. Livonia Rd., 889 F.2d 1258, 1266 (2d Cir. 1989) ("In addition, and of more importance, in determining the sufficiency of a complaint under Rule E(2)(a), courts have examined supporting affidavits to determine whether they cure a lack of particularity in the complaint itself." (citations omitted)).

**Exhibit 3**

distinguish between facts and conclusions.[276]  This is objectionable for two reasons: it is conceptually a problematic distinction, and it unnecessarily creates potential for the improper influence of judicial bias.

In the past, courts struggled with the ability to draw a line between facts and conclusions.[277]  This difficulty produced inconsistent results.[278]  Even the current members of the Supreme Court have been unable to agree upon which allegations are factual and which are conclusory.[279]  This is the primary reason why Justice Souter, author of the *Twombly* opinion, dissented in *Iqbal*.[280]  Where allegations are borderline, they are by definition more difficult to marshal.  However, the Court's description of conclusory allegations seems only to refer to the "bare" and the "naked" allegations without any content specific to the factual setting out of which the case arose.[281]  These allegations on the extreme end of the fact-conclusion continuum ought to be easier for courts to identify.[282]  Therefore, the risk of a mistake is low.

The Court expressly informed readers that personal disbelief is not grounds for finding that allegations are conclusory.[283]  Nevertheless, concerns exist about the opportunity for judges to express their personal bias when they distinguish between facts and conclusions.[284]  This should not be

---

276.  *See supra* notes 117–118 and accompanying text.

277.  *See* 5 WRIGHT & MILLER, *supra* note 20, § 1216.  "[D]istinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' were a 'source of considerable confusion' . . . ." *Id.*

278.  *Id.*  "[A]s was amply demonstrated by years of frustrating experience, it was difficult, if not impossible, to draw meaningful and consistent distinctions between or among 'evidence,' 'facts,' and 'conclusions.'  These concepts tended to merge to form a continuum and no readily apparent dividing markers developed to separate them." *Id.*

279.  The *Iqbal* majority treated the assertion that the FBI's policy discriminated against Arab Muslim men "solely on account of their race, religion, or national origin" as conclusory, *see* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951 (2009), but Justice Souter considered it a non-conclusory, relevant assertion supported by factual allegations, *see id.* at 1960–61 (Souter, J., dissenting). According to Justice Souter, there is no principled basis for the distinction between the allegations that "(1) after September 11, the FBI held certain detainees in highly restrictive conditions, and (2) Ashcroft and Mueller discussed and approved these conditions," which the majority deems factual, and:

> (1) [A]fter September 11, the FBI designated Arab Muslim detainees as being of "high interest" "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," and (2) Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed" to that discrimination.

*Id.* at 1961.

280.  *Id.* at 1960.

281.  *See supra* notes 120–132 and accompanying text.

282.  *See supra* notes 120–132 and accompanying text.

283.  *See supra* note 123 and accompanying text.

284.  Mauro, *supra* note 4 ("Brooklyn Law School professor Elizabeth Schneider, who has written extensively on federal civil procedure, said *Iqbal* is forcing trial judges to go 'line by line' through

149

## Exhibit 3

concerning because such an abuse would be grounds for reversal.[285]  Greater opportunity for the influence of judicial bias exists under the second prong, where the Court's instructions are relatively vague.[286]

The second prong requires reviewing courts to use "judicial experience" and "common sense" to determine whether a claim is plausible.[287]  This, critics argue, gives judges too much discretion and opportunity to employ their subjective beliefs and biases.[288]  But the Court also said that judges are not permitted to dismiss a complaint on the basis that they personally disbelieve that the allegations are true.[289]  Plausibility does not refer to

---

pleadings, using subjective factors to decide what parts are factual and which statements are conclusory. 'If that's not an open door to judicial bias, I don't know what is,' she said.").

285.  The standard of review on a motion to dismiss is de novo.  Harry v. Marchant, 291 F.3d 767, 769 (11th Cir. 2002) (en banc).

286.  *See infra* notes 287–288 and accompanying text.

287.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

288.  *See, e.g., Hearing, supra* note 76, at 62 (*Iqbal* "puts improperly broad and additional power into the hands of judges while adversely affecting the authority the Constitution reposes in juries." (statement of John Vail)); Frankel, *Mr. Iqbal, supra* note 167 (John Vail of the Center for Constitutional Law argues that, "[a] person is now barred even from entering the courthouse, absent being able to drum up facts that convince a federal judge—someone who breathes fairly rarified air—that her claim is subjectively 'plausible.'"); *Hearing, supra* note 76, at 90 ("[T]his new plausibility standard appears dangerously subjective. . . ." (prepared statement of Debo P. Adegbile)); Liptak, *supra* note 2 ("'[*Iqbal*] obviously licenses highly subjective judgments,' said Stephen B. Burbank, an authority on civil procedure at the University of Pennsylvania Law School. 'This is a blank check for federal judges to get rid of cases they disfavor.'"); *Restoring Access to the Courts* (Editorial), N.Y. TIMES (Dec. 22, 2009), http://www.nytimes.com/2009/12/22/opinion/22tue3.html?_r=1 (*Iqbal* "gives judges excessive latitude to bury cases based on their subjective views before the evidence emerges and can be fairly weighed.").

During oral arguments for *Ashcroft v. Iqbal*, the Court engaged in a highly subjective line of questioning about whether they were permitted as judges to disbelieve the factual allegations in the complaint. *See* Liptak, *supra* note 257 ("Justice Stephen G. Breyer asked a hypothetical question: would a plaintiff be allowed to pursue a lawsuit against the president of Coca-Cola on the bare accusation that the president had personally put mice in soda bottles?  Other justices engaged the question, considering whether such a lawsuit would be subject to sanctions on the grounds that it was frivolous and whether the company's president would have to submit to questioning under oath at a deposition. 'How are we supposed to judge whether we think it's more unlikely that the president of Coca-Cola would take certain actions,' Chief Justice John G. Roberts Jr. asked Mr. Iqbal's lawyer, Alexander A. Reinert, 'as opposed to the attorney general of the United States?' Mr. Reinert said that the answer was not to require more detailed accusations from his client but to require the defendants to provide evidence to establish whether they bore responsibility for what happened and whether they are entitled to immunity. Mr. Garre countered that no such inquiry was needed because 'common experience shows' that the attorney general and F.B.I. director 'simply aren't involved' in 'granular decisions' about whom to detain and under what conditions."). This raises concerns about subjectivity but did not ultimately influence the opinion, which held that factual allegations were entitled to an assumption of truth.  *See supra* notes 117–118 and accompanying text.

At the very least, it is apparent that different judges may reach different conclusions about a claim's plausibility.  For example, the majority in *Twombly* said that a conspiracy based on allegations of parallel conduct did not meet the plausibility standard, but Justice Stevens and Justice Ginsburg would have said that the claim was plausible.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 591 (Stevens, J., dissenting).  So, proponents of the plausibility standard should realistically expect less consistent opinions.

289.  *See Iqbal*, 129 S. Ct. at 1959 ("[A] court must take the allegations as true, no matter how skeptical the court may be." (citations omitted)).

150

**Exhibit 3**

whether the factual allegations are believable or credible.[290]   On the contrary, factual allegations are entitled to an assumption of truth.[291] Plausibility refers to whether it is believable that the plaintiff will be entitled to relief *assuming that the factual allegations are true.*[292]  So, judges are called upon to use their judicial experience in their area of expertise, the law, to determine whether the complaint meets a minimal level of plausibility, not to make subjective judgments about what happened.

Some critics even object to the requirement that the complaint contain factual allegations sufficient to establish a plausibility of entitlement because it unjustly requires plaintiffs to obtain "evidence" before bringing a claim.[293]

---

290.  The first prong does not permit judges to deem allegations conclusory on the basis that they are unbelievable.  *See supra* note 123 and accompanying text.  Neither does the second prong permit judges to dismiss a complaint based on personal disbelief.  *See supra* note 289 and accompanying text.

291.  *See supra* note 142 and accompanying text.  However, Justice Souter would not extend the presumption of truth to sufficiently fantastic factual allegations. *Iqbal*, 129 S. Ct. at 1959 (Souter, J., dissenting) ("[A] court must take the allegations as true, no matter how skeptical the court may be. . . . The sole exception to this rule lies with the allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel." (citations omitted)).  To the extent that judges disagree about the nature of reality involving the existence of ghosts, angels, extraterrestrials, etc., this could lead to fairly disparate results.  Perhaps one potentially better avenue for judges in this situation is to deny jurisdiction. *See, e.g.*, United States *ex. rel.* Mayo v. Satan and His Staff, 54 F.R.D. 282 (W.D. Pa. 1971) (refusing plaintiff's prayer in part because plaintiff cannot obtain personal jurisdiction over the defendant, Satan).

292.  *See supra* note 143 and accompanying text; *see also Iqbal*, 129 S. Ct. at 1959 (Souter, J., dissenting).

293.  Herman Schwartz, professor of law at the American University, misrepresented the Court by claiming that "[a]t issue was how much evidence the plaintiff, Javaid Iqbal, needed to support his complaint about government mistreatment."  Schwartz, *supra* note 4; *see also* Stephen C. Webster, *Scahill: Setback for Iraqis' Suit Against Blackwater Actually a Victory*, RAW STORY (Oct. 24, 2009), http://rawstory.com/2009/2009/10/judge-iraqi-lawsuits-blackwater-proceed/ (stating incorrectly that the Supreme Court "found that the two Bush administration officials could not be sued without evidence that they ordered the abusive treatment").

Plausibility does not have its ordinary meaning in this context. *See* Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008) ("Thus, 'plausible' cannot mean 'likely to be true.'  Rather, 'plausibility' in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."(footnote omitted) (citation omitted) (quoting *Twombly*, 550 U.S. at 570)).

Justice Stevens quoted Justice Rehnquist, explaining that "it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."  *Id.* at 583 (Stevens, J., dissenting) (emphasis omitted) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), *abrogated by* Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  The issue in *Scheuer* was whether plaintiffs with sufficient factual allegations could survive a motion to dismiss without providing proof that the allegations were true, not whether the factual allegations were sufficient in the first place.  *See Scheuer*, 416 U.S. at 238.  The plausibility standard is not in conflict with Justice Rehnquist's statement in *Scheuer* because he was primarily referring to whether it appeared that there would be sufficient evidence to succeed at trial, not whether entitlement to relief was plausible in light of the factual allegations. *See id.* at 236–38.

**Exhibit 3**

Evidence, however, is not required because allegations are given the assumption of truth.[294]   Some pre-trial fact-finding may be necessary because Rule 11 requires "an inquiry reasonable under the circumstances."[295]   Even then, Rule 11 specifically contemplates pleading allegations that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."[296]   So, the factual allegations need only be based on what the attorney, or *pro se* plaintiff, believes in good faith to be true.

### D.   Did the Court Violate the Rulemaking Process?

The Rules Enabling Act granted courts the power to govern court procedure.[297]   Under the current system, rules of procedure are created or modified by a process beginning with the Judicial Conference, consisting of twenty-seven judges, which has set up committees to "carry out a 'continuous study of the operation and effect of the general rules of practice and procedure.'"[298]   The Standing Committee considers and proposes revisions, which are circulated for comment, possibly modified, submitted to the Judicial Conference, and finally transmitted to the Supreme Court, which "retains the ultimate responsibility for the adoption of changes in the rules which are accomplished by an Order of the Court."[299]   The Supreme Court will retain the authority to govern procedure unless Congress decides to revoke it.[300]

Currently, the legislature and the Supreme Court both agree that the rules should neither be made by judicial interpretation nor on an ad hoc basis.[301]   The Court in *Iqbal* claimed to have merely interpreted Rule 8(a)(2), not to have changed the rule.[302]   Whether the Court violated the rulemaking

---

294.   *Iqbal*, 129 S. Ct. at 1949; Haase v. Sessions, 835 F.2d 902, 904 (D.C. Cir. 1987) (explaining that a motion to dismiss is based solely on the plaintiff's pleadings unlike a motion for summary judgment which is based on evidence).

295.   FED. R. CIV. P. 11(b).

296.   FED. R. CIV. P. 11(b)(3).

297.   *See* 28 U.S.C. § 2072(a)–(b) (2008); *see also supra* note 48 and accompanying text.

298.   Baker, *supra* note 48, at 328–29 (quoting 28 U.S.C. § 2073(b)).

299.   *Id.* at 328–31 (providing a detailed, step-by-step description of the process); *see also* Stephen C. Yeazell, *Judging Rules, Ruling Judges*, 61 LAW & CONTEMP. PROBS. 229, 232–37 (1998) (describing how the process has changed over the years).

300.   *See* Laurens Walker, *A Comprehensive Reform for Federal Civil Rulemaking*, 61 GEO. WASH. L. REV. 455, 460 (1993) (citing U.S. CONST. art. III, § 2, cl. 2). Although the power has been given to the judiciary, "Congress has the constitutional authority to make court rules and may revoke delegation of that authority to the Supreme Court and the Judicial Conference." *Id.*

301.   Cavanagh, *supra* note 263, at 879 ("[C]ertain classes of cases may well warrant particularized pleading but that decision should be made by the rulemakers through amendments to the Federal Rules of Civil Procedure and not by judges on an ad hoc basis."); Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514–15 (2002) (citing Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993)).

302.   Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554 (2007)).

**Exhibit 3**

process turns upon whether it misinterpreted Rule 8.[303]  Critics have made several arguments that it did.[304]  In fact, it did not.[305]  Assuming that the Court is correct in its interpretation of Rule 8, there is still disagreement about whether the plausibility standard is the best standard for achieving justice and about whether Congress should act to overturn it.[306]

## VI.  IMPACT: RULE 12(B)(6) MOTIONS UNDER THE PLAUSIBILITY STANDARD

The plausibility standard is the standard used to determine whether a complaint states a claim upon which relief can be granted under Rule 8(a)(2).[307]  When a question arises regarding whether a complaint states a claim, a defendant can file a Rule 12(b)(6) motion to dismiss the complaint.[308]  Under *Iqbal*, the Court will now apply the plausibility standard when assessing the merits of a 12(b)(6) motion to dismiss.[309]  The Court made it clear that it would no longer apply the *Conley* no-set-of-facts test because it was retired by *Twombly*.[310]  The Court also articulated a two-pronged approach to plausibility, requiring that the factual, non-conclusory allegations plausibly suggest an entitlement to relief.[311]  This new approach gives rise to the question: what impact will the plausibility standard have on those involved—plaintiffs, defendants, courts, and the legal profession?

Plaintiffs may fear that *Iqbal* gives federal judges the discretion to throw out disfavored cases, but it does not.[312]  What it does mean is that plaintiffs will have to gather facts, or at least make factual allegations in the complaint, because federal courts will continue to require a sufficient amount of facts to suggest entitlement to relief.[313]  This may be difficult and costly in those cases where some facts are not available to plaintiffs, such as antitrust, employment discrimination, and products liability.[314]  However,

---

303. If the Court properly explicated Rule 8, then it did not change the rules in violation of the rulemaking process.
304. *See supra* notes 187–201 and accompanying text.
305. *See supra* notes 236–245 and accompanying text.
306. *See infra* notes 336–339 and accompanying text.
307. *Iqbal*, 129 S. Ct. at 1949.
308. FED. R. CIV. P. 12(b)(6).
309. *Iqbal*, 129 S. Ct. at 1950–51.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).
310. *Twombly*, 550 U.S. at 563.  The *Iqbal* Court incorporated the *Twombly* reasoning. *Iqbal*, 129 S. Ct. at 1953.
311. *See supra* note 309 and accompanying text.
312. *See supra* notes 287–292 and accompanying text.
313. *See supra* note 243 and accompanying text.
314. *See supra* note 178 and accompanying text.

**Exhibit 3**

plaintiffs still only need to make a reasonable inquiry into the facts and can proceed on factual allegations that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery" if specifically identified.[315]  *Iqbal* may prevent some plaintiffs from engaging in abusive discovery by providing federal courts with a clear means to dismiss claims that lack any factual basis.[316]

The general impression from practicing attorneys seems to be that *Iqbal* has made motions to dismiss more common.[317]  Whether 12(b)(6) motions will be granted more frequently, however, is still yet to be determined.[318]  Once courts and defense attorneys have a better understanding of the plausibility standard, filing a motion to dismiss should become a more calculated decision.[319]   Still, defense attorneys may attempt to take advantage of an opportunity to file motions to delay trial.[320]  The great benefit for defendants will be the ability to better ward off frivolous claims, but the plausibility standard does nothing to decrease litigation costs where the complaint is sufficient to state a claim.[321]

Federal courts have experienced a large number of *Iqbal* motions to dismiss over the past year.[322]  When the motions can be granted, they will often be granted with leave to amend.[323]   When a complaint can be dismissed entirely, however, such dismissals should serve to reduce the docket of federal judges and the administrative costs of running the court by the federal courts' own actions in dismissing meritless claims as early as possible.[324]  The federal courts reviewing a motion to dismiss will now have to apply the plausibility standard to every civil action.[325]  Justice Kennedy's sometimes cryptic opinion does create a potential for misunderstanding.[326]  Judges and their law clerks should be careful not to dismiss a complaint based on mere personal disbelief of the factual allegations, as that would be

---

315.  FED. R. CIV. P. 11(b)(3).

316.  *See supra* notes 254–255 and accompanying text.

317.  *See supra* note 4 and accompanying text.

318.  *See supra* notes 212–216 and accompanying text.

319.  *See* Gerald L. Maatman, Jr., *Winning Defense Litigation Strategies in Employment Litigation*, 712 PRACTISING L. INST. LITIG. 817, 823 (2004) ("I rarely file motions to dismiss unless the benefits of such a motion far outweigh its costs.  If the court is likely to allow the plaintiff to simply file an amended complaint, it is my general practice to file a general denial by way of answer and affirmative defenses rather than educating the plaintiff through a motion to dismiss.").

320.  *See id.*

321.  *See supra* notes 254–255 and accompanying text.

322.  *See supra* notes 212–216 and accompanying text.

323.  *See supra* notes 273–274 and accompanying text.

324.  *See supra* notes 253, 259 and accompanying text.

325.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 ("Though *Twombly* determined the sufficiency of a complaint sounding in antitrust, the decision was based on our interpretation and application of Rule 8.  That Rule in turn governs the pleading standard 'in all civil actions and proceedings in the United States district courts.'  Our decision in *Twombly* expounded the pleading standard for 'all civil actions,' and it applies to antitrust and discrimination suits alike." (citations omitted)).

326.  *See supra* notes 133–143 and accompanying text.

**Exhibit 3**

grounds for reversal.[327]   We should have more confidence in the federal judiciary than to expect judges to act on pure skepticism about the factual allegations.[328]   When applied correctly, the plausibility standard should further all three of the purposes of the federal rules—to secure the just, speedy, and inexpensive determination of every action.[329]

The legal profession will hereafter be called upon to investigate claims before filing a complaint.[330]   For those who favor the litigious plaintiff, this may be seen as a setback.[331]   A plaintiff will first have to gather sufficient facts before bringing a claim into federal court.[332]   Still, the plausibility standard does not really raise the standard articulated by the Supreme Court in the past;[333] rather, the Court made it clear that lower courts are not to apply the no-set-of-facts test under which practically any complaint stating a fact and the elements of a cause of action in conclusory fashion would be able to survive.[334]   From now on, the motion to dismiss for an insufficient pleading of fact may play a greater role in federal practice simply because it is clear that factual allegations are required.[335]

## VII.   CONGRESS SHOULD NOT ENACT LEGISLATION TO OVERRULE *TWOMBLY* AND *IQBAL*

Congress has introduced legislation that purports to restore the no-set-of-facts test from *Conley v. Gibson*.[336]   In so doing, it has politicized two

---

327.   *See supra* notes 141–143 and accompanying text.

328.   Judges know that "a court must take the allegations as true, no matter how skeptical the court may be." *Iqbal*, 129 S. Ct. at 1959 (Souter, J., dissenting).

329.   *See supra* notes 251–269 and accompanying text.

330.   *Iqbal*, 129 S. Ct. at 1949 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'").

331.   *See* Mauro, *supra* note 4(discussing impact on plaintiffs).

332.   *Iqbal*, 129 S. Ct. at 1949.

333.   *See supra* notes 236–245 and accompanying text.

334.   *See supra* notes 236–245 and accompanying text.

335.   *See supra* notes 236–245 and accompanying text.

336.   Senator Arlen Specter, a Democrat from Pennsylvania, introduced the "Notice Pleading Restoration Act of 2009" in the Senate on July 22, 2009. S. 1504, 111th Cong. (2009). It would provide that:

Except as otherwise expressly provided by an Act of Congress or by an amendment to the Federal Rules of Civil Procedure which takes effect after the date of enactment of this Act, a Federal court shall not dismiss a complaint under rule 12(b)(6) or (e) of the Federal Rules of Civil Procedure, except under the standards set forth by the Supreme Court of the United States in Conley v. Gibson, 355 U.S. 41 (1957).

*Id.* § 2.

Representative Jerrold Nadler, a Democrat from New York's eighth district, sponsored the "Open Access to Courts Act of 2009" in the House, which was introduced by several representatives on November 19, 2009. H.R. 4115, 111th Cong. (2009). Section 2 provides:

(a) In General- Chapter 131 of title 28, United States Code, is amended by adding at the

## Exhibit 3

major issues in civil procedure.  It has brought the debate about whether the plausibility standard is a proper interpretation of Rule 8 to the floors of the legislature.[337]  Additionally, it reinvigorated the debate about where to strike the balance between judicial and congressional dominance over the rulemaking process.[338]

---

end the following:
    Sec. 2078. Limitation on dismissal of complaints
    (a) A court shall not dismiss a complaint under subdivision (b)(6), (c) or (e) of Rule 12 of the Federal Rules of Civil Procedure unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief.  A court shall not dismiss a complaint under one of those subdivisions on the basis of a determination by the judge that the factual contents of the complaint do not show the plaintiff's claim to be plausible or are insufficient to warrant a reasonable inference that the defendant is liable for the misconduct alleged.
    (b) The provisions of subsection (a) govern according to their terms except as otherwise expressly provided by an Act of Congress enacted after the date of the enactment of this section or by amendments made after such date to the Federal Rules of Civil Procedure pursuant to the procedures prescribed by the Judicial Conference under this chapter.
*Id.* § 2 (internal quotation marks omitted).

337.  Eviatar, *supra* note 178 ("As in the Senate, House lawmakers appear divided along party lines.  Democrats and their witnesses say that the Supreme Court's recent decisions in Bell Atlantic v. Twombly and Ashcroft v. Iqbal have gutted the civil rights and antitrust laws and imposed an unfair and often insurmountable burden that will doom many valid claims.  Republicans and their witnesses, meanwhile, say the court did the right thing to help reduce frivolous lawsuits that destroy small businesses and drag busy government officials into court unnecessarily.").

338.  *See, e.g.*, Walker, *supra* note 300.  Walker's reform proposal aims to curb the influence of judicial self-interest by including the following tenants in a new rulemaking procedure:
    [T]he Advisory Committee, (1) shall make rules based on adequate information; (2) shall not make rules unless the potential benefits to society outweigh the potential costs; (3) shall pursue objectives chosen to maximize the net benefits to society; (4) shall, among alternatives, choose the alternative involving the least cost to society; and (5) employ priorities with the aim of maximizing the aggregate net benefits to society.
*Id.* at 464.  The discussion need not be limited to a choice between the judicial branch and the congressional branch.  For example, Stephen Burbank has argued that practicing attorneys should have a role in the process.  Stephen B. Burbank, *Implementing Procedural Change: Who, How, Why, and When?*, ALA. L. REV. 221, 223 (1997).  Also recommending the involvement of lawyers, Stephen Yeazell proposes "a two-step rulemaking process in which the earlier stages are dominated by lawyers, with judges asked only to approve the final result" in addition to relocating final approval authority to the Standing Committee rather than the Supreme Court.  Yeazell, *supra* note 299, at 238–39; *see also* Charles G. Geyh, *Paradise Lost, Paradigm Found: Redefining the Judiciary's Imperiled Role in Congress*, 71 N.Y.U. L. REV. 1165, 1165 (1996) (proposing an "Interbranch Commission on Law Reform and the Judiciary").
    For a discussion of competing policy interests, see Johnson, *supra* note 49, at 33–34.  Johnson explains:
    There are essentially two possible routes for policymaking for federal courts: the administrative route and the political route. . . . Advocates of this administrative approach hope to insulate the work of the courts from the vicissitudes of democratic politics and promote less costly and more uniform disposition of cases. The administrative route leads to increased authority by judges, administrative personnel, and staff in the judicial branch over important policies for the courts. Obstacles on the path of administrative policymaking include the traditionally decentralized, judge-focused, politically responsive, and locally dominated character of our federal court structure.
    . . . [The] political approach appeals to those who contend that in a democratic system the power of the federal courts is only legitimate to the extent that it reflects the values of the people. . . . The obvious institution to accomplish such oversight is Congress, although the executive branch, primarily through the Department of Justice, does play a part. Such

**Exhibit 3**

Under the current law, this legislative action violates the Rules Enabling Act because pleading standards are procedural matters.[339] It is possible to reverse the plausibility standard through the established rulemaking process.[340] Nonetheless, opponents of the plausibility standard would undoubtedly prefer a relatively quick legislative response, as opposed to a slow and unpredictable response through the committee.[341] To be fair to opponents of the plausibility standard, they seek legislative action in part because they see it as necessary to correct the Supreme Court's violation of the rulemaking process.[342]

The politicization of the rulemaking process is nothing new. For the first thirty years of the Rules Enabling Act, the tendency was to allow the judicial branch near-complete dominance of procedural rulemaking while Congress governed substantive rights and law.[343] However, when the Judicial Conference took on the rules of evidence in the 1960s, the difficulty

---

an emphasis on political accountability is in tension, however, with traditions of judicial independence, the rule of law, and an emphasis on courts being a separate realm, protected from democratic politics.
*Id.*

339. *See* 28 U.S.C. § 2072(a)–(b) (2008).

340. *See* Mauro, *supra* note 25 ("U.S. District Judge Mark Kravitz of Connecticut, who chairs the influential Judicial Conference Advisory Committee on Civil Rules, said his committee is monitoring the impact of *Iqbal* and *Twombly* with an eye toward gathering data and discussing later this year whether rule changes are needed. 'We ought to be deliberate about it,' Kravitz said in his first comments to the press about the Iqbal issue. So far, he told *The National Law Journal*, his sense is that judges are 'taking a fairly nuanced view of *Iqbal*' and that it is not yet 'a blockbuster that gets rid of any case that is filed.'"); Uplend, *supra* note 167 ("Garre concluded that 'the *Twombly* and *Iqbal* decisions are unquestionably important and in line with decades' worth of precedent at both the Supreme Court and appellate level. It is too soon to say what impact they will have on civil litigation in the federal courts,' he conceded, 'but they have yet to lead to the wholesale dismissal of claims and are more likely to have an effect on a case-by-case basis. Any legislative effort to override these decisions at this time would be precipitous and unwise,' Garre warned. 'The sounder course is to permit the Judicial Conference of the United States to continue to monitor the situation and respond if need be through the time-honored judicial rulemaking process established by Congress.'").

341. *See, e.g., Hearing, supra* note 76, at 75 (statement of John Vail) ("Congressional action could be subject to criticism for usurping the rulemaking role of the Judicial Conference of the United States under the Rules Enabling Act. I do not believe such criticism would be just. That process is too slow to grant necessary relief, and Congressional action would not usurp the role of the Conference."); Mauro, *supra* note 25 ("But altering the federal rules is a lengthy process, noted University of Pennsylvania Law School professor Stephen Burbank, a strong critic of *Iqbal*. He also cautioned, 'The process is under the control of the Supreme Court, which is responsible for these atrocities.' Chief Justice John Roberts Jr., who was in the 5–4 majority in *Iqbal*, appoints members of Judicial Conference committees.").

342. *See supra* notes 298–302 and accompanying text.

343. Johnson, *supra* note 49, at 34 ("review[ing] the historical trend toward politicization of procedural rulemaking and the resulting changes in the political dynamics between Congress and the judicial branch"); Baker, *supra* note 48, at 333. "Although previously passive, during the last two decades Congress has taken a more active role to change proposed rules and to preempt altogether the judicial rulemaking procedure." *Id.*

**Exhibit 3**

distinguishing between substance and procedure became more apparent.[344] Congress perceived that the Conference was crossing the boundary too far into the substantive domain.[345] Consequently, Congress felt justified to take greater part in rulemaking.[346] Since that time, Congress has become increasingly involved in the rulemaking process.[347]

Importantly, there are significant problems with the legislation as it is written. First, it would replace the plausibility standard with the problematic no-set-of-facts standard.[348] The no-set-of-facts test is too permissive and cannot be taken literally.[349] Furthermore, it is inconsistent with dismissing a complaint for an insufficient pleading of facts.[350] As a result, it would also increase administrative costs and potential for abusive litigation.[351] Second, the legislation would eliminate the heightened pleading standard in fraud and mistake cases under Rule 9 because it applies to every 12(b)(6) motion.[352] Finally, it could create an unfair playing field. Under the literal language of the bill, a plaintiff's complaints are judged by the no-set-of-facts test, while elements of a defendant's answer may still be judged by the plausibility standard.[353]

Basically, Congress is not as well-equipped as the Judicial Conference either to assess the impact of *Iqbal* or to draft a proper interpretation of Rule 8.[354] Moreover, repealing *Iqbal* is likely to harm the economy.[355] Finally,

---

344. *See* Johnson, *supra* note 49, at 34; Paul D. Carrington, *"Substance" and "Procedure" in the Rules Enabling Act*, 1989 DUKE L.J. 281, 283 (1989).

345. *See* Johnson, *supra* note 49, at 34.

346. *Id.*

347. *Id.* For a comprehensive overview of this development see Geyh, *supra* note 338, at 1167–91.

348. Michael C. Dorf, *Should Congress Change the Standard for Dismissing a Federal Lawsuit?*, FINDLAW.COM (July 29, 2009), http://writ.news.findlaw.com/dorf/20090729.html ("Rather than specifying a standard for dismissing lawsuits, the Specter bill simply incorporates the *Conley* standard by reference. That would be fine if the *Conley* standard were well-understood, but it is not."). Moreover, the Court may claim that the plausibility standard is consistent with *Conley*. *Id.* However, this latter problem is eliminated in the house bill. *See supra* note 336.

349. *See supra* notes 75–76 and accompanying text.

350. Under the no-set-of-facts test, a complaint is not dismissed unless there is no set of facts that the plaintiff could prove in order to be entitled to relief. *Conley v. Gibson*, 355 U.S. 41, 44 (1957). The concept of insufficient pleading of facts assumes that some facts must be plead. However, the no-set-of-facts test does not.

351. *See supra* notes 251–260 and accompanying text.

352. The Specter bill could eliminate the heightened specificity requirement for allegations of fraud or mistake under Rule 9(b). *See supra* notes 251–260 and accompanying text.

353. *See supra* notes 251–260 and accompanying text. Some lower courts have begun applying the plausibility standard to defendants' complaints, and the Specter proposal runs the risk of relieving plaintiffs' complaints of the plausibility standard while defendants' complaints are judged by the more rigorous standard. *See supra* notes 251–260 and accompanying text. "In responding to a pleading, a party must: (A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party." FED. R. CIV. P. 8(b)(1).

354. *See supra* notes 215–216, 297–300 and accompanying text.

355. *See generally* Lisa A. Rickard, *Repealing* Iqbal *and* Twombly: *Understanding the Physics of Politics*, TOWNHALL.COM (July 15, 2010), http://townhall.com/columnists/LisaARickard/2010/07/

**Exhibit 3**

Congress ought to be spending its time on issues of greater national urgency.[356]

## VIII.  CONCLUSION

Even though critics of the plausibility standard have exhibited alarm,[357] the standard has not led to the wholesale dismissal of civil complaints.[358] The plausibility standard will be applied in "all civil actions and proceedings in the United States district courts,"[359] but the level of factual allegations required will be "context-specific."[360] On the first prong of the two-pronged approach, the Court distinguishes between the factual allegations and conclusory allegations.[361] Factual allegations are those specific to the factual setting out of which the case arose.[362] Only the factual allegations are entitled to the assumption of truth.[363] On the second prong, the Court assumes that the factual allegations are true and assesses whether those allegations "plausibly suggest an entitlement to relief."[364] In assessing the plausibility of a claim, the Court does not ask whether the factual allegations are believable or credible.[365] Rather, *the Court asks whether, assuming the factual allegations are true, it is plausible that the plaintiff will be entitled to*

---

15/repealing_iqbal_and_twombly_understanding_the_physics_of_politics ("Reversing Iqbal and Twombly would increase the already-excessive litigation burdens on businesses in this country—small and large alike—diverting resources that would otherwise be used to create jobs and strengthen our nation's economy."); Darpana M. Sheth, *Overturning* Iqbal *and* Twombly *Would Encourage Frivolous Litigation and Harm National Security,* THE HERITAGE FOUNDATION (June 4, 2010), http://www.heritage.org/Research/Reports/2010/06/Overturning-Iqbal-and-Twombly-Would-Encourage-Frivolous-Litigation-and-Harm-National-Security ("There is no question that [the proposed legislation to overturn *Iqbal* and *Twombly*] would lead to an exponential increase in frivolous and abusive litigation at great cost to the parties, the federal courts, and the American taxpayer, and interfere with the ability of government officials to protect the national security of the United States.").

356.  *See, e.g.,* Peter S. Goodman & Javier C. Hernandez, *Jobless Rate Holds Steady, Raising Hopes of Recovery,* N.Y. TIMES, Mar. 6, 2010, at A1, (reporting 9.7 percent national jobless rate, 16.8 percent underemployment rate); *Credit Crisis—The Essentials,* N.Y. TIMES (July 12, 2010), http://topics.nytimes.com/top/reference/timestopics/subjects/c/credit_crisis/index.html (referring to "Wall Street's biggest crisis since the Great Depression," the mortgage crisis, and global economic crisis); *U.S. Federal Deficit As Percent of GDP,* USGOVERNMENTSPENDING.COM http://www.us governmentspending.com/federal_deficit_chart.html (last visited Oct. 13, 2010) (reporting that the federal deficit is 10.64 percent of GDP—highest ever at $14,623.9 billion).

357.  *See supra* notes 2–17 and accompanying text.

358.  *See supra* note 215.

359.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009).

360.  *Id.* at 1950; *see also supra* text accompanying note 163.

361.  *Iqbal,* 129 S. Ct. at 1950; *see also supra* notes 117–118 and accompanying text.

362.  *See supra* notes 129–132 and accompanying text.

363.  *Iqbal,* 129 S. Ct. at 1950.

364.  *Id.* at 1950; *see also supra* note 119 and accompanying text.

365.  *See supra* notes 141–143 and accompanying text.

**Exhibit 3**

relief.[366]   Plausibility is a minimal requirement that does not require the plaintiff to eliminate all possible alternative explanations to the plaintiff's theory.[367]   Failure to meet the plausibility standard justifies a dismissal for an insufficient pleading of fact.[368]

Contrary to much criticism, the plausibility standard did not raise pleading standards above the level required by Rule 8.[369]   It only raised pleading standards above that required by the overly-permissive no-set-of-facts test.[370]   The plausibility standard adopted by the Supreme Court is consistent with the purpose of the Federal Rules of Civil Procedure—to "secure the just, speedy, and inexpensive determination of every action and proceeding."[371]   The plausibility standard does not subject plaintiffs to the subjective discretion of each federal judge.[372]   Rather, it sets a minimal threshold, which requires what has long been understood as a sufficient pleading of fact.[373]   Finally, all nine Justices of the Supreme Court have adopted the plausibility standard.[374]   So, practicing civil lawyers should be prepared to deal with what has become "the most significant Supreme Court decision in a decade for day-to-day litigation in the federal courts."[375]

Daniel W. Robertson*

---

366.   *See supra* notes 141–143 and accompanying text.
367.   *See supra* notes 145–161 and accompanying text.
368.   *Iqbal,* 129 S. Ct. at 1954.
369.   *See supra* notes 236–245 and accompanying text.
370.   *See supra* notes 236–245 and accompanying text.
371.   *See supra* notes 246–269 and accompanying text.
372.   *See supra* notes 123–143 and accompanying text.
373.   *See supra* notes 162, 240–245 and accompanying text.
374.   Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); *id.* at 1959 (Souter, J., dissenting); *see also supra* note 230.
375.   *See supra* note 2 and accompanying text.

   *   Daniel W. Robertson is a third-year J.D. candidate at Pepperdine University School of Law and a Masters candidate at the Straus Institute for Dispute Resolution. He received his Bachelors of Arts degree in Philosophy from the University of California, Santa Barbara. He dedicates this article to the late Anthony "Skippy" McDermott, his Civil Procedure professor. Skippy's sense of humor and enthusiasm always brightened his students' days.

Daniel would like to thank his professors, especially Steven Shultz, his Legal Research and Writing professor, for teaching him how to write, and Roger Alford, for taking him under his wing as a research assistant. Daniel also thanks the Pepperdine Law Review for putting in all the hard work to get this article ready for publication. Lastly, he would like to thank his friends and family. Most importantly, he thanks his loving and supportive wife, Erica, without whom he never would have applied to law school, let alone have been given the opportunity to publish in this excellent law review.

This note received the 2010 Sorenson award for Pepperdine Law Review's best student article.