**Exhibit 7**

**71 P.3d 992 (2003)**

**WELBY GARDENS, Petitioner,**
v.
**ADAMS COUNTY BOARD OF EQUALIZATION; Board of Assessment Appeals, State of Colorado, Respondents.**

No. 02SC415.

**Supreme Court of Colorado, En Banc.**

June 23, 2003.

993*993 William A. McLain, Denver, Colorado, Attorney for Petitioner.

James D. Robinson, Adams County Attorney, Jennifer Wascak Leslie, Assistant County Attorney, Brighton, Colorado, Attorneys for Respondent Adams County Board of Equalization.

Ken Salazar, Attorney General, John D. Baird, First Assistant Attorney General, State Services Section, Denver, Colorado, Attorneys for Respondent Board of Assessment Appeals.

Justice RICE delivered the Opinion of the Court.

Petitioner, Welby Gardens, appeals the court of appeals reversal of the Board of Assessment Appeals (BAA) classification of its greenhouse properties. *Welby Gardens Co. v. Adams County Bd. of Equalization,* 56 P.3d 1121 (Colo.App.2002). The BAA concluded that Petitioner's greenhouse met the statutory definition of a "farm" and therefore should be classified as agricultural land. The court of appeals reversed, concluding that the definition had not been satisfied and therefore Petitioner's land should not be classified as agricultural. We granted certiorari and now hold that Petitioner's greenhouse properties do not meet the statutory definition of a "farm." The court of appeals opinion is affirmed.

# I. FACTS AND PROCEDURAL HISTORY

Petitioner, Welby Gardens, disputes the 1999 property tax classification of its greenhouse properties. The issue for our review is whether the property, which has been classified as "all other agricultural" property, should have been classified as agricultural land.[1]

There are three parcels of land at issue. Two parcels and a portion of the third are covered by numerous greenhouse buildings. The greenhouses provide a fully-enclosed, climate-controlled environment for the cultivation of various vegetables, flowers, and fruiting plant starts. None of the plants are grown in the soil of the land itself, but rather are grown in containers which sit on top of the ground. Typically, the soil in the containers is purchased from outside sources; it is not derived from the property. In fact, Petitioner concedes that the growth of the plants does not in any way depend on the location of the greenhouses on that particular piece of property. All the

factors which typically affect the productivity of agricultural land, including temperature, humidity, and soil quality, are completely regulated and controlled in the greenhouse environment.

For tax year 1999, the Adams County assessor classified the three parcels of land as residential and "all other agricultural property." Petitioner, arguing that the land should have been classified as agricultural, appealed to the Adams County Board of Equalization. The Board affirmed the assessor's determination. Next, Petitioner appealed to the state Board of Assessment Appeals. The BAA disagreed with the county's position and held that the land located under the greenhouses should be classified as agricultural.[2] On appeal, the court of appeals reversed the BAA and held that the greenhouse land was properly classified as "all 994*994 other agricultural property." We granted certiorari to resolve the question of whether greenhouse property may be classified as agricultural land.

## II. ANALYSIS

In Colorado, owners of agricultural land receive favorable tax treatment. While other types of land are valued using one of three appraisal methods, the cost approach, the market approach, and the income approach, the value of agricultural land is determined "solely by consideration of the earning or productive capacity" of the land. Colo. Const. art X, § 3(1)(a). In addition, agricultural equipment, at least to the extent it is classified as personal property and not fixtures, is exempt from taxation. Colo. Const. art X, § 3(1)(c); *see also* Del Mesa Farms v. Bd. of Equalization, 956 P.2d 661 (Colo.App. 1998) (discussing the distinction between agricultural personal property and fixtures). Thus, the combination of these two provisions—the favorable valuation on the land itself and the tax exempt status of agricultural equipment—results in a far lower tax burden on owners of agricultural land.

The question before this court is whether Petitioner's land should be classified as agricultural. "Agricultural land" is defined, in relevant part, as a "parcel of land ... that was used the previous two years and presently is used as a farm or ranch ...." § 39-1-102(1.6)(a)(I), 11 C.R.S. (2002). A "farm," in turn, is defined as a "parcel of land which is used to produce agricultural products that originate from the land's productivity for the primary purpose of obtaining a monetary profit." § 39-1-102(3.5) 11 C.R.S. (2002). Hence, our task is to determine whether Petitioner's property qualifies as a "farm."

There is no dispute that Petitioner's property meets at least part of the definition of a farm. First, Petitioner's products are undoubtedly "agricultural products" as that term is defined in the statute. *See* § 39-1-102(1.1), 11 C.R.S. (2002) (agricultural products include, among other things, plant products in a "raw or unprocessed state" produced through the science of horticulture). In addition, the primary purpose of the greenhouse facility is to obtain a monetary profit. Therefore, only one phrase of the "farm" definition requires our attention: whether the plants produced in the greenhouse "originate from the land's productivity." § 39-1-102(3.5), 11 C.R.S. (2002).

Petitioner argues that the phrase, "originate from the land's productivity" should be construed broadly. Because the land provides a location for the greenhouse buildings, the products grown within the buildings "originate from the land's productivity." On the other hand, Respondent

contends that a plain language interpretation of the phrase, "originate from the land's productivity," requires some connection or nexus between the agricultural products grown at the site and the soil itself.

We hold that the plain language of the statute requires some nexus between the agricultural product produced on the land and the land itself. The mere placement of a building on the land is not a sufficient connection to satisfy this statutory mandate. To inform our opinion, we first consider the plain language of the statute and hold that the phrase, "originate from the land's productivity," requires some connection, or nexus, between the agricultural product and the land such that the agricultural product arises from the land's productivity. The placement of a building on the land, by itself, is insufficient to furnish this connection. We further explore the substantial legislative history regarding the passage of this statute but uncover nothing which compels us to deviate from the plain language of the statute. Finally, we decline Petitioner's invitation to infer intent based on legislative inaction. The court of appeals' decision is affirmed.[3]

995*995 A. Plain Language

In any statutory interpretation, our task is to determine and give effect to the intent of the General Assembly. *James E. Freemyer, P.C. v. Indus. Claim Appeals Office,* 32 P.3d 564 (Colo.App.2000). A tax statute is no different than any other statute; it must be construed as a whole in order to give consistent, harmonious, and sensible effect to all of its parts. *Bell & Pollock, P.C. v. City of Littleton,* 910 P.2d 69 (Colo.App. 1995). In construing a statute, interpretations that render statutory provisions superfluous should be avoided. *Indus. Claim Appeals Office v. Orth,* 965 P.2d 1246, 1254 (Colo.1998).

The statutory language "originate from the land's productivity" is clear and unambiguous. In order to qualify as a farm, there must be some connection between the agricultural product and the productivity of the land which is being valued. Specifically, the connection is that the agricultural product must "originate" from the land's productivity. "Originate" has a commonly understood definition, namely, to "give rise to." *Websters Third New International Dictionary* 1592 (1986). Thus, the land's productivity must give rise to the agricultural product.

The question, therefore, is whether the placement of a building on the land, by itself, provides a sufficient connection such that the land may be said to have "given rise to" the plants grown within the building. We believe it does not. Were we to hold that the placement of a building is sufficient connection, the phrase "originate from the land's productivity" would have essentially no meaning. If these plants—which are grown in a fully enclosed, climate-controlled building and never touch the soil of the subject land satisfy this requirement, we cannot envision any plant product that would not.

We need not, however, attempt to decipher the meaning of the phrase, "originate from the land's productivity," in all possible circumstances. The facts which are necessary to satisfy this statutory requirement will inevitably fluctuate based upon the specific type of agricultural operation at issue. This case requires nothing more than to determine whether a building, by itself, provides sufficient connection to the land to satisfy the statute. We conclude it does not.

**Exhibit 7**

We leave the precise contours of the phrase open to future interpretation by the Division of Property Taxation, the courts, and perhaps, to further guidance from the legislature.

Since the General Assembly included the requirement that the products must "originate from the land's productivity," the phrase must have some meaning. We hold that the phrase, "originate from the land's productivity," requires some connection, or nexus, between the agricultural product and the land such that the agricultural product arises from the land's productivity. This nexus must be more substantial than merely providing a location for the placement of a structure in which agricultural products are produced.

## B. Legislative History

Since we have concluded that the plain language of the statute is clear, we need not consider other interpretive aids. *See City of Westminster v. Dogan Constr. Co., 930 P.2d 585 (Colo.1997)* (where a statute is unambiguous, there is no need to resort to a consideration of legislative history). Nonetheless, because of the quantity of legislative discussion surrounding the passage of this statute, we explore the legislative history and conclude that our plain language interpretation is consistent with the legislative intent.

Senate Bill 6, enacted by the General Assembly in 1983, created the definitions we interpret today. The original bill, as introduced in the Senate, defined a farm narrowly to ensure, at least in part, the exclusion of a greenhouse operation from the meaning of the term:

"Farm" means a parcel of land the soil of which is tilled and cultivated for the primary purpose of raising, harvesting, and selling crops or for the primary purpose of feeding, breeding, and selling livestock or livestock products and which parcel of land is in a natural environment and is subject to the elements of nature.

996*996 S.B. 6, 54th Gen. Assemb., 1st Reg. Sess. (Colo.1983) (original bill as introduced in the Senate).[4]

However, the Senate Finance Committee, concerned that the phrase, "subject to the elements of nature," would inappropriately exclude legitimate agricultural pursuits, amended the definition of a "farm" to broaden its coverage:

"Farm" means a parcel of land which is used for the primary purpose of growing, raising, and harvesting agricultural products for the primary purpose of obtaining a monetary profit.

S.B. 6, 54th Gen. Assemb., 1st Reg. Sess. (Colo.1983) (referred to the Senate Committee of the Whole on Mar. 3, 1983). In addition, the definition of "agricultural products" was significantly expanded to include all the sort of products grown inside greenhouses:

"Agricultural and livestock products" means plant or animal products in a raw or unprocessed state and owned by the grower or producer thereof which are derived from the science and art of farming, ranching, agriculture, horticulture, floriculture, animal husbandry, or forestry.

**Exhibit 7**

*Id.* Thus, when the bill was referred to the full Senate, it was clearly the intent of the finance committee that a greenhouse would qualify as a farm.

During debate before the Senate, the definitions were amended to exclude a typical greenhouse, in which flowers or other non-food products were grown, from being classified as agricultural land. Specifically, the definition of "agricultural products" was changed to exclude flowering and ornamental plants grown in a structure:[5]

"Agricultural and livestock products" means plant or animal products in a raw or unprocessed state and owned by the grower or producer thereof which are derived from the science and art of agriculture defined as farming, ranching, animal husbandry, and horticulture not to include flowering or ornamental plants grown in a structure.

*See* S.B. 6, 54th Gen. Assemb., 1st Reg. Sess. (Colo.1983) (passed by the Senate on Mar. 25, 1983). Thus, as the bill existed upon passage by the Senate, a greenhouse qualified as a farm only to the extent it did not produce "flowering or ornamental plants."

As the bill made its way through the House of Representatives, the greenhouse issue again triggered significant debate. The House Finance Committee amended the definition of a "farm" by inserting the word "tilled":

"Farm" means a parcel of land which is tilled for the primary purpose of growing, planting, and harvesting agricultural products for the primary purpose of obtaining a monetary profit.

*See Hearing on S.B. 6 Before the House Finance Comm.,* 54th Gen. Assemb., 1st Reg. Sess. (April 18, 1983). In addition, a new definition of "agricultural products" was created:

"Agricultural and livestock products" means plant or animal products in a raw or unprocessed state which are derived from the science and art of agriculture. "Agriculture", for the purposes of this subsection (1.1), means farming, ranching, animal husbandry, and horticulture.

*Id.* The Property Tax Administrator, Mary Ann Maurer, explained that the purpose of the changed definitions was to ensure that retail greenhouse operations would not qualify as agricultural land because "they do not 997*997 plant. All they do is grow and sell." *Id.* (statement of Mary Ann Maurer). The committee unanimously approved the amended definitions and the bill was sent the full House where it was passed without any relevant changes. Therefore, as the bill existed upon passage by the House, a greenhouse operation did not qualify as a farm unless the soil under the greenhouse was itself tilled and planted.

Because the two versions of the bill differed, a conference committee was created to fashion a compromise. The committee quickly focused on the primary difference between the House and Senate versions of the bill, namely, that the House version required that a "farm" be a parcel of land which is "tilled," while the Senate version only required that the land be "used." The committee members were split, with four members favoring the House version and two favoring the Senate version. A motion to adopt the broad Senate definition was rejected four to two, but the two who opposed the House definition refused to allow the bill to proceed with the word

"tilled" in the definition. *See Hearing on S.B. 6 Before the Conference Comm.,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983). Finally, after considerable discussion and debate, an amendment was proposed to remove the word "tilled" and to insert the requirement that the product "originate from the land's productivity."[6] The committee adopted the amendment by a vote of four to two and then unanimously voted to report the bill to both houses.[7] The committee's new definition of "farm" read:

"Farm" means a parcel of land which is used to produce agricultural products that originate from the land's productivity for the primary purpose of obtaining a monetary profit.

*See* S.B. 6, 54th Gen. Assemb., 1st Reg. Sess. (Colo.1983) (First Report of the Conference Committee).

Later that day, both the House and the Senate adopted the conference committee report and enacted the bill. In the House, Representative Heim, one of the three House members of the conference committee, explained that the new definition of a "farm," required "a direct nexus ... between something that is grown or raised, and the land on which it is grown and raised." *Debate on S.B. 6 Before the House of Representatives,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983) (statement of Rep. Heim). Following Representative Heim's remarks, the House adopted the conference committee report and passed the bill by a vote of 62-3.

In the Senate, the disagreement in the conference committee quickly became evident. Senator Beatty, one of the senators on the conference committee, stated that the "farm" definition crafted by the conference committee was a broad one. In his view, "every agricultural product originates in some form from the land's productivity." *Debate on S.B. 6 Before the Senate,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983) (statement of Senator Beatty). On the other hand, Senator Stewart, another senator who served on the conference committee, argued that the definition of "farm" was intended to be read narrowly. He claimed that the language in the definition of "farm" referred to "the productivity of the soil itself, or the land itself, and not of improvements thereon." *Debate on S.B. 6 Before the Senate,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983) (statement of Senator Stewart). Without further clarification, the Senate adopted the conference committee report and passed the bill.

While we cannot discern any uniform legislative intent based solely on these proceedings, we do gain two significant insights. First, we note that a broad definition of the 998*998 term "farm," which would require nothing more than the "use" of the parcel of land to produce agricultural products, was explicitly considered, and rejected, by the conference committee. Thus, the phrase "originate from the land's productivity" must mean something more than the mere surface use of the land.

Second, the focus of the inquiry is on that particular land's productivity, not the productivity of land in general. A member of the conference committee first suggested that the definition of "farm" be amended by adding the phrase, "originate from land's productivity." *Hearing on S.B. 6 Before the Conference Committee,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983). After some discussion, this phrase was amended by adding the article "the," thus clarifying that the focus should be on that particular parcel, not the productivity of land in general.

Our review of this legislative history does not provide any convincing evidence that the General Assembly intended a greenhouse to qualify as a farm. To the extent any indication of legislative intent can be derived from this examination of the legislative history, it supports a plain language interpretation that the statute requires some nexus between the agricultural product and the productivity of the subject land.

## C. Legislative Inaction

Petitioner finally contends that the court of appeals and the Division of Property Taxation have both adopted a broad interpretation of the term "farm" which would include greenhouses. Petitioner then argues that since the General Assembly has not amended the statute to explicitly adopt a narrower interpretation of the term, we should infer that, despite the plain language of the statute, the General Assembly has implicitly approved a broader interpretation of the statute by its failure to amend the statute. We disagree.[8]

Petitioner places heavy reliance on the court of appeals' decision in *Morning Fresh Farms, Inc. v. Weld County Bd. of Equalization,* 794 P.2d 1073 (Colo.App.1990) and the legislature's failure to amend the statute thereafter. In that case, Morning Fresh Farms argued that its egg production facilities were an agricultural use. The facilities, built on forty acres of a larger 800-acre farm, were entirely self-contained and provided an environment in which none of the hens ever touched the ground. Only a small amount of the feed for the hens was grown on the farm. Nonetheless, the court of appeals concluded that the parcel should be classified as a farm. *Id.* at 1074. Tracking the language of the definitions of a "farm" and "agricultural product," the court noted that eggs are an "animal product" in a "raw or unprocessed state" and that they were sold for a monetary profit. *Id.* Hence, it concluded that the land under the egg production facilities was agricultural land.

Petitioner's reliance on the *Morning Fresh Farms* case and the legislature's failure to amend the statute thereafter is misplaced. The holding in *Morning Fresh Farms* was not nearly as broad as Petitioner contends in that the court did not purport to address any circumstance other than that particular egg production facility. Contrary to Petitioner's argument, the court of appeals did not simply disregard the requirement that the agricultural product "originate from the land's productivity," but rather, it specifically concluded that under the facts of that case, the eggs "emanate from the productivity of this farm's land."[9] *Id.* at 1075. "Emanate" is a synonym 999*999 for "originate," the word used in the statute. *See Rogets II: The New Thesaurus* 316 (1980). Thus, there is nothing inconsistent between the *Morning Fresh Farms* holding and our plain language understanding of the statute. To the extent *Morning Fresh Farms* can be read as holding that the mere presence of a building, without more, provides sufficient connection to meet the requirement that the product "originate from the land's productivity," we decline to follow it. Given the limited scope of the court's decision, we would not expect the legislature to amend the statute one way or another in response.

Three subsequent court of appeals cases applied the *Morning Fresh Farms* decision to similar egg production facilities. *See Del Mesa Farms v. Bacus,* No. 99CA0527 (Colo. App. Feb. 24, 2000); *Del Mesa Farms v. Hall,* No. 98CA1611 (Colo.App. Aug. 12, 1999); *Del Mesa Farms v. Bd. of Equalization,* 956 P.2d 661 (Colo.App.1998) (collectively, "*Del Mesa Farms* cases"). In

each case, the court concluded that the egg production facilities met the statutory definition of a farm. Once again, we do not assign any significance to the fact that the legislature did not subsequently amend the statute in response to these cases.

First, we note that two of the cases on which Petitioner relies were not selected for publication and therefore have no value as precedent. *See* C.A.R. 35(f). It is not surprising that the General Assembly did not amend the statute in response to these two cases.

In the only reported case, *Del Mesa Farms v. Montrose County Board of Equalization,* 956 P.2d 661 (Colo.App.1998), the issue was limited to whether the taxpayer's egg production equipment should be classified as personal property or fixtures. The court did not analyze the meaning of a farm other than to simply cite *Morning Fresh Farms* for the proposition that egg production facilities may qualify as a farm. *Id.* at 663. Because of the limited scope of the opinion, the lack of legislative response is not extraordinary.[10]

In addition to the court of appeals decisions, Petitioner argues that the Division of Property Taxation has adopted a broad interpretation of the term "farm." Since the General Assembly has not amended the statute in response to this interpretation, Petitioner contends that it must approve of the Property Tax Administrator's view. Again, we disagree.

The Property Tax Administrator is required to prepare and publish a land valuation manual to assist county assessors in classifying and valuing land for property tax. *See* § 39-2-109(1)(e), 11 C.R.S. (2002). Throughout the 1980s and 90s, this manual specifically listed a greenhouse among several types of property which did not meet the definition of a farm or ranch. *See, e.g.,* 3 *Assessors Reference Library: Land Valuation Manual* at 5.29 (rev.1/89) ("Examples of `all other agricultural property' include apiaries (bee farms), dairies, feedlots, mushroom farms, poultry farms, and greenhouses, among others."). In fact, the county assessor who performed the appraisal of Welby Gardens in 1999 was required to adhere to the manual and classify the greenhouse as "all other agricultural property." *See Huddleston v. Grand County Bd. of Equalization,* 913 P.2d 15 (Colo.1996) (property tax administrator's manuals are binding on county assessors). In 2000, the manual was amended to clarify that certain previously excluded properties—dairies, hog farms, and poultry farms may—be classified as a farm. 3 *Assessors Reference Library: Land Valuation Manual* at 5.14 to 5.17 (rev.3/00). Notably, a greenhouse continued to be classified as "all other agricultural property." *Id.* In 2001, the manual was again amended and this time the entire list of excluded properties, including greenhouses, was deleted. *See* 3 *Assessors Reference Library: Land* 1000*1000 *Valuation Manual* at 5.15 (rev.7/01). Rather than providing a list of "all other agricultural property," the manual now urges county assessors to consider the decisions of the court of appeals—*Morning Fresh Farms* and the *Del Mesa Farms* cases—in classifying agricultural land.

Petitioner contends we should infer that the General Assembly agrees with the Property Tax Administrator's interpretation simply because the General Assembly has not chosen to amend the definition of a "farm." We are not persuaded. First, we note that the amendment to the Assessors Reference Library is very recent in that only two years have passed since the change was adopted. *See Pueblo Bancorporation v. Lindoe, Inc.,* 63 P.3d 353, 368 (Colo.2003) (noting that four years was too short a period of time to infer intent through legislative inaction). Prior to that

time, the Land Valuation Manual specifically prohibited a greenhouse from being classified as a farm.

In addition, the Property Tax Administrator did not use its special expertise to provide any new insight into the meaning of a "farm." Instead, the Land Valuation Manual simply refers assessors to the four court of appeals opinions on the subject. To the extent we disagree with the court of appeals interpretation of a "farm," that disagreement extends to the adoption of that interpretation by the Property Tax Administrator. While we may defer to an administrative agency's interpretation of a statute, we "are not bound by an agency decision that misapplies or misconstrues the law." *El Paso County Bd. of Equalization v. Craddock,* 850 P.2d 702, 704-05 (Colo.1993).

In sum, we cannot say with any certainty that the General Assembly's inaction signals its tacit approval of the premise that greenhouses should be included in the definition of a "farm." *See Patterson v. McLean Credit Union,* 491 U.S. 164, 175, n. 1, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) ("It is `impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the Court's statutory interpretation.") (quoting *Johnson v. Transp. Agency,* 480 U.S. 616, 671-672, 107 S.Ct. 1442, 94 L.Ed.2d 615, (1987) (Scalia, J., dissenting)). Without contrary evidence of legislative intent, we are compelled to follow the plain meaning of the statute. The phrase "originate from the land's productivity" requires some nexus between the agricultural product and the land on which the product was produced. In this case, that nexus is lacking.

# III. CONCLUSION

We hold that the products grown within Petitioner's greenhouse do not "originate from the land's productivity." As such, the land does not satisfy the statutory definition of a "farm" and consequently, does not qualify as agricultural land. The opinion of the court of appeals is affirmed.

Justice KOURLIS dissents, Chief Justice MULLARKEY and Justice HOBBS join in the dissent.

Justice KOURLIS, dissenting:

In my view, the statutory language concerning the definition of agricultural land in sections 39-1-102(1.6)(a)(I) and (3.5), is ambiguous. Specifically, the statutory directive that horticultural products must "originate from the land's productivity" in order to qualify the underlying land for agricultural tax status is unclear as written. The relevant legislative history provides no definitive guidance. In the face of such an intractable ambiguity, I suggest that the court must rule in favor of the taxpayer, thus giving the land under the greenhouses the agricultural land status. Accordingly, I respectfully dissent from the majority opinion.

# I. Rules of Statutory Interpretation

Our purpose here is to attempt to discern what the General Assembly intended and then give effect to that intent. *Farmers Group, Inc. v. Williams,* 805 P.2d 419, 422 (Colo.1991); *People v. Dist. Ct.,* 713 P.2d 918, 921 (Colo.1986). To fulfill that purpose, we look first to the language of the statute, and give each of the words their plain and ordinary meaning. *Dist. Ct.,* 713 P.2d at 921. We presume that the General Assembly intended each provision of the statute to be 1001*1001 effective and intended a just and reasonable result. § 2-4-201(1)(b) and (c), 1 C.R.S. (2002); *People v. Luther,* 58 P.3d 1013, 1015 (Colo.2002); *Charnes v. Boom,* 766 P.2d 665, 667 (Colo.1988) ("[W]e must read and consider the statutory scheme as a whole to give consistent, harmonious and sensible effect to all its parts.").

If a statutory provision is clear and does not conflict with other portions of the applicable statutory construct, then we need not look further than the plain language. *Luther,* 58 P.3d at 1015. If, however, the provision is reasonably susceptible to multiple interpretations, or if a particular interpretation would conflict with other portions of the statute, we then look to various other tools of statutory interpretation, such as legislative history, prior law, the consequences of a given construction, and the goal of the entire statutory scheme. § 2-4-203; *Luther,* 58 P.3d at 1015.

Importantly, when we are interpreting statutes that impose taxes, we construe ambiguities in those statutes against the government and in favor of the taxpayer. *See Transponder Corp. v. Prop. Tax Admin.,* 681 P.2d 499, 504 (Colo.1984); *Associated Dry Goods v. City of Arvada,* 197 Colo. 491, 496, 593 P.2d 1375, 1378 (1979); *City & County of Denver v. Sweet,* 138 Colo. 41, 52, 329 P.2d 441, 447 (1958).

## II. Analysis

The Colorado Constitution mandates that agricultural lands are to be valued for *ad valorem* taxation purposes "solely by consideration of the earning or productive capacity of such lands capitalized at a rate as prescribed by law." Colo. Const. art. X, § 3(1)(a); *Douglas County Bd. of Equalization v. Clarke,* 921 P.2d 717, 720 (Colo.1996); *Boulder County Bd. of Equalization v. M.D.C. Constr. Co.,* 830 P.2d 975, 978 (Colo. 1992).

The General Assembly has enacted various provisions defining agricultural land, so as to establish the parameters for the special tax status. Specifically, the General Assembly defined "agricultural land" as:

A parcel of land ... that was used the previous two years and presently is used as a farm or ranch, as defined in subsections (3.5) and (13.5) of this section.... "Agricultural land" under this subparagraph (I) includes land underlying any residential improvement located on such agricultural land and also includes the land underlying other improvements if such improvements are an integral part of the farm or ranch and if such other improvements and the land area dedicated to such other improvements are typically used as an ancillary part of the operation.

§ 39-1-102(1.6)(a)(I), 11 C.R.S. (2002). The statute defines "farm" as "a parcel of land which is used to produce agricultural products that *originate from the land's productivity* for the primary purpose of obtaining a monetary profit." § 39-1-102(3.5) (emphasis added). "Agricultural

products" are defined with "livestock products" and include "plant or animal products in a raw or unprocessed state that are derived from the science and art of agriculture...." § 39-1-102(1.1). For the purposes of that section, the legislature defined "agriculture" as "farming, ranching, animal husbandry, and horticulture." *Id.* Hence, to determine this land's status, we must discern whether the land can be classified as a "farm" under the statutory definition.

The Majority agrees that the land under Welby Gardens' greenhouses is used to produce agricultural products for the primary purpose of obtaining a monetary profit, thereby satisfying part of the operative definition of "farm". Maj. op. at 994. However, the Majority concludes, with reference to the plain language of the statute, that the greenhouses fail to satisfy the balance of the test because there is an insufficient nexus between the agricultural product grown in the greenhouses and the land itself. Maj. op at 994.

I believe the phrase "originate from the land's productivity" is inherently ambiguous and could refer to the productivity of that particular land or the productivity of land more generally. Accordingly, I would look to additional interpretive aids in order to ascertain the intent of the language in sections 39-1-102(1.6)(a)(I) and (3.5). Maddeningly, even 1002*1002 after looking to those interpretive aids, I suggest that the answer is still not apparent. Hence, in the end, I would conclude that because ambiguity should be resolved in favor of the taxpayer, because the court of appeals has consistently held that similar operations constitute agricultural land, and because the Division of Property Taxation for the State of Colorado has amended the Assessors Reference Libraries, Land Valuation Manual, to reflect the decisions of the court of appeals, the land under Welby Gardens' greenhouses constitutes "agricultural land," and is eligible for taxation as agricultural property.

## A. Ambiguity

Determining that a statutory provision is ambiguous only requires that the language is reasonably susceptible to more than one reasonable interpretation. *Grant v. People,* 48 P.3d 543, 548 (Colo.2002). The phrase "originate from the land's productivity" certainly meets this requirement. First, the statute, on its face, is unclear as to whether the product must originate from *that* land's productivity or whether it would be sufficient that the product came from *some* land's productivity. Second, even if the product must originate from that particular land, it is still possible to construe the statute such that growth of the product in the greenhouse would be sufficient. Indisputably, the plants in the greenhouse "grow" while they are in the greenhouse, and could, thus, "originate from the land's productivity." The term "productivity" certainly can encompass something more than growing from the soil of that piece of property. The phrase is, quite simply, confusing, leaving us questioning to what degree, if any, the agricultural product needs to be connected to the land on which it is produced.

## B. Case Law and Administrative Interpretation

Judicial precedent affords the phrase a broad and loose meaning. First, in *Morning Fresh Farms, Inc. v. Weld County Board of Equalization,* 794 P.2d 1073, 1074 (Colo.App. 1990), the court of appeals considered whether a 40-acre parcel of an 800-acre farm, which accommodated

numerous chicken houses used to produce eggs for profit, met the statutory definition of a farm. The chickens housed in the egg production facility were primarily fed feed bought from outside sources, although a small portion of the feed came from the farm operations. *Id.* Other than that bit of feed, the chicken operation was completely self-contained and the chickens never touched the ground. *Id.* The Board of Assessment Appeals concluded that the land did not fall within the definition of a farm and the court of appeals reversed that decision. *Id.* The court found that the statute in no way excluded self-contained portions of farmland, within which livestock were sustained without feeding off the ground itself. *Id.* While not using the exact statutory phrase at issue here, the court concluded that "eggs, as agricultural products, emanate from the productivity of this farm's land." *Id.* at 1074-75; *see also Del Mesa Farms v. Bd. of Equalization,* 956 P.2d 661, 663 (Colo.App.1998) (citing *Morning Fresh Farms* to state that certain property used in egg production operation constituted agricultural equipment).

This court has given credence to an administrative interpretation of a statute when the statute is subject to differing reasonable interpretations, and when the issue comes within the agency's special expertise. *See Colo. State Pers. Bd. v. Dep't of Corr.,* 988 P.2d 1147, 1150 (Colo.1999) ("[W]e will defer to the agency's construction when the statute may be given more than one reasonable interpretation and the agency has employed its expertise to select a particular interpretation."); *Huddleston v. Grand County Bd. of Equalization,* 913 P.2d 15, 17 (Colo.1996) ("Judicial deference is appropriate when the statute before the court is subject to different reasonable interpretations and the issue comes within the administrative agency's special expertise.") Here, the Property Tax Administrator, who is charged with overseeing the state property tax valuation system, has addressed this issue in her Assessor's Reference Library manuals. She cites *Morning Fresh Farms, Del Mesa Farms* and two other unpublished court of appeals' 1003*1003 opinions[1] for the proposition that: "Based on the language in the above court cases, it is proper to classify parcels that produce agricultural products through `farming, ranching, animal husbandry and horticulture' as agricultural." 3 *Assessors Reference Library: Land Valuation Manual* at 5.16-5.17 (rev.7/01). She does not require any particular nexus to the land on which the agricultural products are being grown.

The Majority has declined to follow *Morning Fresh Farms* and its progeny. While this court is not bound by decisions of the court of appeals or by the interpretations provided by the Property Tax Administrator, we should nonetheless be wary of overruling the sole appellate construction of a statute that has been in place for over ten years and that has been incorporated into the state-wide administrative standards without a compelling reason to do so. *See Kern v. Gebhardt,* 746 P.2d 1340, 1345 (Colo.1987) (following the principles of *stare decisis* to rely on a court of appeals decision that had been the only appellate construction of the statute for the previous ten years). The principle of reliance upon precedent, or *stare decisis,* promotes uniformity, certainty, and stability in the law. *Id.; Smith v. Dist. Ct.,* 907 P.2d 611, 612 (Colo.1995). Under the *stare decisis* doctrine, courts should follow an established rule of law, "unless clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come from departing from precedent." *People v. Blehm,* 983 P.2d 779, 788 (Colo.1999).

The decision in *Morning Fresh Farms* has been in place since 1990. Other divisions of the court have followed that decision, and no division of the court of appeals has held to the contrary.

Furthermore, the Property Tax Administrator has relied on the holdings of the court of appeals, as have landowners. The court, in *Morning Fresh Farms,* did note that a small portion of the chicken feed was grown on the farm land; however, the court did not then tie that fact to the conclusion that the chicken operation "emanate[s] from the productivity of this farm's land." *Morning Fresh Farms,* 794 P.2d at 1074-75. Furthermore, the cases following the reasoning of *Morning Fresh Farms* have not relied on a small bit of feed to hold that the agricultural products "originate from the land's productivity." I am not persuaded that the greenhouses at issue here are distinguishable from the chicken operations in the *Morning Fresh Farms* line of cases, as in either situation the taxpayer is growing an agricultural product on the land. Further, I am not of the view that the courts of appeals' decisions are clearly erroneous, or that any conditions have changed that would warrant departure from that precedent.

## C. Legislative History

The legislative history surrounding the enactment of section 39-1-102, Senate Bill 6, merely confirms my conclusion that the provision is ambiguous—it does not dispositively resolve that ambiguity. As the Majority points out, the Senate and the House clearly had differing points of view on the issue. Upon passage in the Senate, the definition of "farm" included land "which is *used* for the primary purpose of growing, raising, and harvesting agricultural products for the primary purpose of obtaining a monetary profit." S.B. 6, 54th Gen. Assemb., 1st Reg. Sess. (Colo.1983) (passed the Senate Mar. 28, 1983) (emphasis added). The Majority agrees that under this definition, the land underlying greenhouses, except those growing flowering or ornamental plants, would clearly qualify for the favorable tax treatment allotted to agricultural lands. Maj. op. at 996. The House, however, inserted the word "tilled" into the definition of a farm 1004*1004 with the express intent of excluding retail greenhouse operations. Under the House definition, a farm meant "a parcel of land which is *tilled* for the primary purpose of growing, planting, and harvesting agricultural products for the primary purpose of obtaining a monetary profit." *Id.* (emphasis added) (passed the House May 4, 1983).

The Conference Committee charged with arriving at a Bill acceptable to both Houses debated this precise point at some length. Members of the Senate delegation made a motion to revert back to the broader "used" language, but that motion failed. Senator Beatty and Senator Powers, however, would not allow the provision to go forward with the "tilled" definition and they urged a more expansive definition. Receiving guidance from other states' definitions, the Conference Committee arrived at the language "originate from the land's productivity." Representative Reeves explained that this language would require a tie to the parcel of land. *Hearing on S.B. 6 Before Conference Committee,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983) (statement of Rep. Reeves). While voting against the amendment, both Senator Beatty and Senator Powers voted to report the bill to both Houses, with the reservation that they viewed the language as encompassing something more than actually growing from the soil. For instance, Senator Powers expressed his view that "livestock and livestock products are produced from the land's productivity." *Id.* (statement of Sen. Powers). Under this logic, agricultural products need not come directly from the soil. Senator Beatty expressed concern that the legislative history would indeed reflect two legislative intents—presumably, one that included such uses as greenhouses, and one that did not. *Id.* (statement of Sen. Beatty).

Subject to the tenuous compromise reached at Conference, the Bill proceeded to the House and Senate floors. The continued disagreement about what would be included in the new definition of farm became apparent. As the Majority points out, Representative Heim explained to the House that the new definition reflected the intention "that there is a direct nexus required between something that is grown and raised, and the land on which it is grown and raised." *Debate on S.B. 6 before the House of Representatives,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983) (statement of Rep. Heim). In the Senate, Senator Beatty explained that the new definition was broader than that originally adopted by the House and that "every agricultural product originates in some form from the land's productivity." *Debate on S.B. 6 before the Senate,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983) (statement of Sen. Beatty). This interpretation met opposition from Senator Stewart, who insisted that the new language still required that "whatever that agricultural product is, it must have come from the productivity of the soil, of the land which is agricultural land; not from the productivity of the building or improvement that might be put on it." *Id.* (statement of Sen. Stewart).

The lack of a uniform legislative intent is painfully clear from these proceedings. We do not know whether the legislature as a whole intended that the phrase "originate from the land's productivity" include only products that are grown from the soil, or whether it intended it to include agricultural products in general—irrespective of their direct connection to that land.

## D. Ambiguity resolved in favor of the taxpayer

Due to the ambiguity in the statute and the lack of guidance by the legislature, I suggest that we must rule in favor of the taxpayer. *See Transponder Corp. v. Prop. Tax Admin.,* 681 P.2d 499, 504 (Colo.1984); *Associated Dry Goods v. City of Arvada,* 197 Colo. 491, 496, 593 P.2d 1375, 1378 (1979); *City & County of Denver v. Sweet,* 138 Colo. 41, 52, 329 P.2d 441, 447 (1958).

This view is buttressed by the fact that the Division of Property Taxation Assessors' Reference Library guidelines would support such a conclusion, as would the court of appeals' precedent on point. The General Assembly, which is charged with knowledge of applicable case law, chose not to amend the statute to achieve a different result. *See Vaughan v. McMinn,* 945 P.2d 404, 409 (Colo.1997) (noting that the legislature is presumed 1005*1005 to know of judicial precedent in an area of law when it legislates in that area).

## III. Conclusion

Notably, while the Majority concludes that the statute is not ambiguous, it does not define the term or provide guidance as to what "originate from the land's productivity" means. It does hold that there must be some connection between the agricultural product produced and the land itself and that building a greenhouse on the land is insufficient. Maj. op. at 995. I question what connection is needed and how close that connection must be. For instance, would it be enough if several, or even one, of the containers in the greenhouse contained soil from the ground beneath it? Does it matter whether the plants in the greenhouse remain there and grow there for a period of time or are just briefly warehoused for sale?

**Exhibit 7**

I do note that the definition of agricultural under section 39-1-102(1.1), provides that "agricultural" includes "farming, ranching, animal husbandry, and horticulture." Under the Majority's position, the production of animal products through animal husbandry may not be susceptible to the agricultural land classification unless the animals are in some way fed from products grown on that land. I find no statutory support for that conclusion.

Until the General Assembly resolves this confusion, it is my view that we should afford the taxpayer the benefit of the "tie", continue to follow the reasoning of the court of appeals and the Property Tax Administrator, and rule in favor of the taxpayer, Welby Gardens. For these reasons, I respectfully dissent from the Majority opinion.

I am authorized to state that Chief Justice MULLARKEY and Justice HOBBS join in this dissent.

[1] The classification of "all other agricultural property" is used to describe all agriculture-related property which does not meet the statutory definition of agricultural land. *See* § 39-1-102(1.6)(b), 11 C.R.S. (2002).

[2] A retail center which occupies less than an acre of land was classified by the assessor as commercial property. The BAA affirmed this classification and the parties did not raise this issue on appeal.

[3] There is some confusion regarding the scope of the court of appeals' opinion. The court of appeals reversed the BAA's order only with regard to the specific issue that was appealed, namely, whether Petitioner's greenhouse land qualified as agricultural land. The court's opinion did not disturb the other findings and conclusions of the BAA. Specifically, the BAA classified a fifteen-acre parcel which is actively farmed by a third party lessee of Petitioner, and a three-acre test field which is operated by Petitioner, as agricultural land. The BAA also adopted the cost approach to value the improvements on the land. These conclusions, Adams County concedes, were not disturbed by the court of appeals' opinion.

[4] Frank Miles, a representative of the citizen's committee which assisted in drafting the legislation, testified before the Senate Finance Committee that the phrase "subject to the elements of nature" was intended to exclude a greenhouse or similar operation from being classified as a farm. *Hearing on S.B. 6 Before the Senate Finance Comm.,* 54th Gen. Assemb., 1st Reg. Sess. (Feb. 10, 1983).

[5] This amendment was the second one proposed to address the greenhouse issue. Earlier, Senator Stewart proposed an amendment which would have re-inserted the original definition of a "farm" to include only those properties which are "subject to the elements of the natural climate." *Debate on S.B. 6 before the Senate,* 54th Gen. Assemb., 1st Reg. Sess. (Mar. 25, 1983) (statement of Sen. Stewart). He stated that one of the purposes of the amendment was to exclude greenhouses from being classified as a farm. *Id.* The amendment was defeated on a voice vote.

[6] Notably, the members first suggested that the phrase read "originate from land's productivity." *Hearing on S.B. 6 Before the Conference Comm.,* 54th Gen. Assemb., 1st Reg. Sess. (May 17, 1983). To make clear that the product must be tied specifically to the parcel of land being valued, the members changed the requirement to "originate from *the* land's productivity." *Id.* (emphasis added).

[7] Senator Beatty and Senator Powers, the two members of the committee who favored a broad definition of a farm, voted against the addition of the phrase "originate from the land's productivity." Once the phrase was added, however, the two men voted to report the bill to both houses.

[8] Initially, we note that of the many sources we may consult to discern legislative intent, reliance on legislative inaction is particularly risky. The reasons for enacting, or not enacting, legislation are too numerous to tally. This

case is unlike previous situations in which we have held that the absence of legislative amendment may be evidence of intent. Where this court has provided an interpretation of a statute and the General Assembly subsequently amends the statute without changing the previously construed portion, we presume that the legislature agrees with the interpretation provided by this court. See *People v. Swain,* 959 P.2d 426, 430-431 (Colo.1998) ("[T]he legislature is presumed, by virtue of its action in amending a previously construed statute without changing the portion that was construed, to have accepted and ratified the prior judicial construction."). Here, this court has never interpreted the meaning of a "farm" in this context and the legislature has not amended the definition since its enactment in 1983.

[9] While the court did not discuss the specific factors which led to this conclusion, we note that the Morning Fresh egg production facility was a small part of a larger agricultural operation and a portion of the feed for the hens was grown on the farm.

[10] Like *Morning Fresh Farms,* to the extent any of the *Del Mesa Farms* cases can be read to stand for the proposition that a building, without more, provides sufficient connection to meet the requirement that the product "originate from the land's productivity," we decline to follow them.

[1] *Del Mesa Farms v. Hall,* 98CA1611, slip op. at 4 (Colo.App. Aug. 12, 1999) (finding that eggs and replacement laying hens originate from the productive use of the land "in the sense that there were no replacement laying hens until Del Mesa Farms, through animal husbandry, raised them on the land, and no eggs until Del Mesa Farms, again through animal husbandry, created the environment on the land for them to be laid"); *Del Mesa Farms v. Bacus,* 99CA0527, slip op. at 5 (Colo.App. Feb. 24, 2000) (holding that animal husbandry operations were included in the definition of farm, even if the animals do not touch the ground, graze on the land, or feed from crops grown on the land, and holding that land used to support buildings used in the production of agricultural products is a productive use of the land).